

Scott A. Kamber (SK-5794)
KAMBER & ASSOCIATES, LLC
19 Fulton Street, Suite 400
New York, N.Y. 10038
Tel: (212) 571-2000

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

James Michaelson and Ori Edelstein,

         Plaintiffs,

v.

Sony BMG Music, Inc.
and First 4 Internet,
         Defendants.

**JUDGE BUCHWALD**

**05 CV 9575**

CIVIL COMPLAINT

PLAINTIFF DEMANDS A TRIAL BY JURY

    Plaintiffs James Michaleson and Ori Edelstein ("plaintiffs"), by their undersigned attorneys, bring this complaint (the "Complaint") against the defendants named herein and alleges as follows:

### SUMMARY OF ACTION

1.    This is a complaint for damages and injunctive relief.

2.    In March 2003, First 4 Internet, Ltd. ("F4i") introduced its XCP software. According to F4I, XCP stands for "extended copy protection" and was an end-to-end solution to protect the rights of record labels and artists against the unauthorized copying of CD content."

3.    Sometime thereafter F4i and Sony BMG Music, Inc. ("Sony") entered into an agreement under which F4i would produce a customized version of its XCP

software for Sony's use on its compact discs ("CDs") worldwide. Sony was the first major record label to agree to use the XCP software. Sony is one of the world's largest purveyors of music, video and games.

4. In March 2005, Sony began encoding numerous music titles that it sold worldwide with the XCP software. While Sony publicly touted this development as a "speed bump" for consumers seeking to illegally share its music, in reality it was something far more sinister. For reasons not yet disclosed, Sony and F4i crafted an anti-burning scheme that would make permanent and irreversible alterations to the core windows operating system which could be later utilized by Hackers or Sony to take control of the users' computer without the users' knowledge. According to Computer Associates, this software is "spyware" that is a "trojan that opens securities vulnerabilities through rootkit functionality".

5. In encoding the disks XCP, Sony and F4i have decided that their intellectual property is more deserving of protection than the intellectual property and personal information on millions of personal computers worldwide.

6. Unfortunately, the risk is not just theoretical or a subject merely of relevance to technology bloggers. To date, over 3 million copies of XCP encoded disks have been sold. It is probable that millions of consumers have played these discs on their PC's and thus compromised their systems without knowing it. Today, several viruses have been reported that exploit the weakness that defendants created. Millions of users are at risk from these viruses that destroy software and steal personal information.

7. Sony and F4i have taken concerted action to cover up their actions under the guise of trying to fix the problem. Sony has even refused to disclose which titles it sold that were encoded with the XCP technology.

8. The plans Sony and F4i may have for future usage of this sinister technology in the game or video sector is currently unknown. 4Fi Managing Director was upbeat about the market potential of XCP and was quoted as saying, "Right now we're focusing on the music sector, where there's a real burning desire for this technology, excuse the pun! But there are other types of data that need to be protected, and our technology can be applied to video, for example, and to games. We've got lots of plans for the future. So it's all exciting times really."

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

10. Personal jurisdiction over the defendants exists and venue is proper pursuant to 28 U.S.C. § 1391 (b)(3). Defendant Sony has a regular and established place of business in this judicial district.

11. In addition, Plaintiff invokes the supplemental jurisdiction of this Court, 28 U.S.C. § 1367, over claims based upon state or common law.

## PARTIES

12. Plaintiff Michaelson is a resident of Illinois. Plaintiff Michaelson purchased a Neil Diamond CD encoded with XCP and the root kit in question.

13.  Plaintiff Edelstein is a resident of New Jersey. Plaintiff Edelstein purchased a disk by Switchfoot encoded with XCP and the root kit in question.

14.  Defendant Sony BMG music, Inc. ("Sony") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 550 Madison Avenue, New York, New York. Sony is a subsidiary of the Sony Corporation. During the relevant time period, Sony has distributed CDs in this jurisdiction under various labels including, but not limited to, Columbia, Epic, Epic Associated, Sparrow, Delicious Vinyl, Sony Classical, Sony Broadway, Masterworks Dinner Classics and Masterworks.

15.  Defendant First 4 Internet, Ltd., is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in Wales, United Kingdom. First 4 Internet is a developer of digital rights management software including the XCP1 Burn Protect. First 4 Internet. A customized version of this software was produced by First 4 Internet for Sony for worldwide use on Sony's Compact Discs, including discs sold in the United States.

## CLASS ALLEGATIONS

16.  Pursuant to Section of the Federal Rules of Civil Procedure, plaintiffs bring this action individually on their own behalf and as a national class action, on behalf of all individuals who either: (i) purchased compact discs from Sony BMG encoded with digital rights management software ("Encoded CDs") any time since January 2005; or (ii) played any Encoded CDs on their personal computer resulting in the installation of software on a computer that has a modem or other internet

connection. (Collectively, the "Class"). Specifically excluded from the Class are the defendant and any person, firm, trust, corporation, or other entity related to or affiliated with it.

17. This action is properly maintainable as a class action pursuant to Rule 23 of the federal Rules of Civil Procedure.

18. Plaintiffs believe that there are hundreds of thousand of members of the Class, though the exact number and the identities of the Class members are currently unknown to plaintiffs. The members of the Class are so numerous that joinder of all Class members is impracticable.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are whether:

(a) Whether Sony adequately disclosed the nature and purpose of its rootkit program on its CDs;

(b) Whether Sony made representations that the Sony music CDs had characteristics, uses, benefits or qualities which it did not have;

(c) Whether Defendants made false and/or misleading statements of fact to the Class and the public concerning the content of the music CDs;

(d) Whether Defendants knew, or was reckless in not knowing, that its rootkit program would detrimentally affect the computers of users who installed its CDs on their computers;

(e) Whether Defendants engaged in deceptive and unfair trade practices;

(f) Whether Sony engaged in false advertising;

(g) Whether Defendants engaged in an unlawful conspiracy to hide the true nature of the software encoded on Sony music CDs from the general public;

(h) Whether the members of the Class have sustained damages, and if so what is the proper measure of damages;

(i) Whether Sony is liable for punitive damages, and if so, in what amount; and

(j) whether the Class is entitled to injunctive relief.

20. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have sustained monetary damages arising out of defendant's violations of common and statutory law as alleged herein.

21. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation. Plaintiffs intend to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

22. The class action is superior to other available means for the fair and efficient adjudication of the claims of plaintiff and the Class. The damages suffered by each individual Class member are of such magnitude that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by defendant's conduct. Furthermore, it would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential

for inconsistent or contradictory judgments, and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by defendant's conduct. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## SUBSTANTIVE ALLEGATIONS

### F4i and Sony Create a Customized Version of the XCP Software

23. In March 2003, F4i introduced its XCP software.

24. According to F4I, XCP stands for "extended copy protection" and was an end-to-end solution to protect the rights of record labels and artists against the unauthorized copying of CD content."

25. Sometime thereafter F4i and Sony entered into an agreement under which F4i would produce a customized version of its XCP software for Sony's use on its compact discs ("CDs") worldwide. Sony was the first major record label to agree to use the XCP software.

### Sony Began Encoding Titles In Early 2005 With Spyware

26. In March 2005, Sony began encoding numerous music titles that it sold worldwide with the XCP software. CDs containing XCP software are referred to herein as "Encoded CDs".

27. While Sony publicly touted this development as a "speed bump" for consumers seeking to illegally share its music, in reality it was something far more

sinister. For reasons not yet disclosed, Sony and F4i crafted an anti-burning scheme that would make permanent and irreversible alterations to the core windows operating system which could be later utilized by hackers or Sony to take control of the users' computer without the users' knowledge.

28. According to Computer Associates, the Encoded CDs are "spyware" meaning that the software is a "trojan that opens securities vulnerabilities through rootkit functionality".

29. The moment someone attempts to play a CD on their Windows-based machine, the malicious software installs itself without the users' knowledge. This occurs even if the CD was simply copied to the computer for the users own personal use or for use on an MP3 player. Since most users have "autorun" feature enabled on their PC, once a CD is inserted and the disc tray is closed the disc plays and the software installs without requiring any further action by the user.

30. No disclosure of the root kit or the risk the user is exposed to is included in the end user license agreement ("EULA") included with the Sony CD's. In addition, once the software is installed Sony is able to compile a record of the music listening habits of the user and have that information uploaded to a location of Sony's choosing. All this is done without the users consent or knowledge.

31. To date, over 3 million copies of Encoded CDs have been sold.

32. It is probable that millions of consumers have played these discs on their PC's and installed the XCP software without any knowledge of the installation or its effect.

33. By November 2005, several viruses have been reported that exploit the weakness created by the playing of Encoded CDs. Millions of users are at risk from these viruses that destroy software and steal personal information.

34. In selling and distributing Encoded CDs, Sony and F4i have decided that their intellectual property is more deserving of protection than the intellectual property and personal information on millions of personal computers worldwide.

Plaintiffs Purchased Their Titles Unaware Of The XCP Encoding

35. Unaware that the CD was installing an administrative level program on each system on which the CD was installed, thousands of computer users have unknowingly infected their computers, and the computers of others, with the surreptitious rootkit contained on the Encoded CDs. This rootkit has been responsible for conflicts within computer systems, crashes of systems, infection of viruses and other damage.

36. Plaintiff Michaelson purchased the Neil Diamond CD, *12 Songs*, encoded with XCP and the root kit in question. Plaintiff Michaleson played the CD on his computer which resulted in the installation of a root kit on his system. Plaintiff Michaleson had not consented to the installation of the root kit, or for that matter any software that may have been bundled on the purchased CD. Plaintiff Michelson's computer is connected to the internet and is used in interstate communication.

37. Plaintiff Edelstein is a resident of New Jersey. Plaintiff Edelstein purchased a disk by Switchfoot encoded with XCP and the root kit in question.

After Mr. Edelstein purchased the disk but before he played it on his computer he learned that certain Sony CDs, including the Switchfoot disk *Nothing is Sound* by Sparrow records, could compromise a computer by playing. Thus, Plaintiff Edelstein has not played the CD on his computer even though that was the purpose for which Mr. Edelstein bought the CD. Since Mr. Edelstein has opened the CD, the store from which he purchased the CD will not give him a refund.

38. Class members have been damaged through the unauthorized installation of software that has slowed computer function, compromised personal information and/or made allowed their computers to be infected with damaging viruses. Some class members are completely unable to use their computers others have diminished use. In other cases, class members purchased CDs to install on their computers but once they learned of the nature of the Encoded CDs determined that such a use would be reckless. Many of these users have been unable to return the purchased CDs and are stuck with a CD that, for all practical purposes, can not be used on a PC.

### Defendants' Have Covered Up The Problem And Exposed Their Customers To Serious Risks

39. Sony and F4i have taken concerted action to cover up their actions under the guise of trying to fix the problem. Sony and F4i have repeatedly made changes to their EULA and FAQ sections of their websites, seeming to disclose whatever information had thus far become public, but no more. They have worked together to make posts on certain websites that downplay the risks and thus increase the vulnerability of consumers.

40. Sony refuses to disclose which titles it sold that were encoded with the XCP technology.

41. Under mounting pressure, Sony and F4i have made a corrective patch available that is not corrective at all. The only way for a consumer to get the patch is via internet and requires everyone who wishes to receive the uninstaller to do so through Sony BMG's official process, which involves releasing personally identifiable information for marketing use by Sony BMG and undisclosed third parties. The patch that they have made available does not uninstall the software but simply uncloaks the software and updates Sony's protections. It does nothing to disable the part of the software that compiles a record of user listening habits for Sony.

42. The plans Sony and F4i may have for future usage of this sinister technology in the game or video sector is currently unknown. The 4Fi Managing Director was upbeat about the market potential of XCP and was quoted as saying, "Right now we're focusing on the music sector, where there's a real burning desire for this technology, excuse the pun! But there are other types of data that need to be protected, and our technology can be applied to video, for example, and to games. We've got lots of plans for the future. So it's all exciting times really."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Federal Computer Fraud Law

43. Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 42 as if fully set forth herein.

44. By selling and otherwise delivering the Encoded CDs to members of the Class, Defendant Sony knowingly caused the transmission of a program, code or command.

45. The Encoded CDs were intended by Sony to install software that would cause damage and such software also directed communication back to Sony certain information from the customers' computer. Such communication is an interstate communication as that term is defined under 18 U.S.C. § 1030.

46. The computers of the members of the class are "protected computers" as that term is defined 18 U.S.C. § 1030.

47. The damage to the members of the class is, in the aggregate, greater than $5,000. In addition, Sony's act of producing its master encoded tape from which all Encoded CDs were made was a single act that proximately resulted in damages greater than $5,000.

48. Defendant F4i did conspire with and act in concert with Defendant Sony to transmit the program, code or commands that comprise the XCP software and is liable as a result thereof..

## SECOND CAUSE OF ACTION
### Common Law Trespass

49. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through _42 as though fully set forth herein.

50. Defendant Sony sold discs to customers embedded with XCP.

51. Such discs installed a root kit and certain other software on the customers' computers that impacted the functionality of the computer operating system automatically upon playing on the computer.

52. The XCP programs increased the risk that the computer would be infected with a virus. It also decreased the speed and stability of the computer. In addition, the software permitting the tracking of user listening habits by Sony.

53. The acts by Defendant Sony were intentional and done without authorization.

54. The actions of Defendant Sony interfered with plaintiffs' possessory interest in the computer systems.

55. The actions of Defendant Sony proximately resulted in damage to plaintiffs and the class.

56. Defendant F4i did conspire with and act in concert with Defendant Sony to interfere with plaintiffs' possessory interest in the computer systems and is liable as a result thereof.

## THIRD CAUSE OF ACTION
### Common Law Fraud

57. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 42 as though fully set forth herein.

58. Defendants made false statements and omissions to the members of the Class regarding the XCP software and intended the Class to rely on such statements.

59. Defendants knew such statements were false.

60. Plaintiffs and the members of the Class relied on Defendants statements and, as a result were damaged.

## PRAYER FOR RELIEF

WHEREFORE, all Plaintiffs, on behalf of themselves and members of the Class, pray for judgment and relief as follows:

1. With respect to the class claims, declaring the action to be a proper class action and designating Plaintiffs and their counsel as representatives thereof;

2. Awarding injunctive and equitable relief, including restitution, in an amount to be determined at trial including, inter alia: (a) prohibiting defendant from engaging in the acts of unfair competition; (b) requiring defendant to disgorge all of its ill-gotten gains to Plaintiff and members of the Class or to whomever the Court deems appropriate; (c) awarding Plaintiff and members of the Class full restitution of all monies wrongfully acquired by defendant by means of the wrongful conduct alleged herein; and (d) ordering such funds or assets to be impounded, or a

trust imposed, to avoid dissipation, fraudulent transfers, and/or concealment of such monies or assets by defendant;

      3.      Awarding damages in an amount to be determined at trial;

      4.      Awarding Plaintiffs reasonable attorney's fees and costs;

      5.      Awarding pre- and post-judgment interest; and

      6.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: November 14, 2005
       New York, New York

Respectfully submitted,

By _____
    Scott A. Kamber (SK-5794)
KAMBER & ASSOCIATES, LLC
19 Fulton Street, Suite 400
New York, NY 10038
Tel: (212) 571-2000
Fax: (212) 202-6364