# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re:

SONY BMG CD
TECHNOLOGIES LITIGATION

Case No. 1:05-cv-09575-NRB

## MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

**GIRARD GIBBS**
**& De BARTOLOMEO LLP**
Daniel C. Girard (Pro Hac Vice)
Jonathan K. Levine (JL-8390)
Elizabeth C. Pritzker (Pro Hac Vice)
Aaron M. Sheanin (Pro Hac Vice)
601 California Street, Suite 1400
San Francisco, California 94108
Telephone:  (415) 981-4800

**KAMBER & ASSOCIATES LLC**
Scott A. Kamber (SK-5794)
19 Fulton Street, Suite 400
New York, NY  10038
Telephone:  (212) 571-2000

*Plaintiffs' Co-Lead Counsel*

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND OF THE LITIGATION............................................................... 3

   A.   The Nature Of SONY BMG's Content Protection Software ............................... 3

   B.   XCP CDs And Software Expose Computers To Security Vulnerabilities ......................... 4

   C.   MediaMax CD Software Installs Without Consent And Exposes
       Computers To Security Vulnerabilities ...................................................... 6

   D.   The Class Action Litigation ............................................................... 6

III.    THE PROPOSED SETTLEMENT........................................................................ 8

   A.   The Settlement Class........................................................................ 8

   B.   The Settlement Consideration ........................................................... 9

       1.   XCP CD Exchange Program........................................................ 10

       2.   MediaMax Compensation ........................................................... 11

       3.   XCP And MediaMax Software Updates And Uninstallers.......................................... 11

       4.   SONY BMG Will Not Collect Personal Data................................................. 13

       5.   Defendants Will Waive Rights Under XCP And MediaMax EULAs ......................... 13

       6.   The Settlement Contains "Most Favored Nations" Protection ..................................... 14

       7.   Injunctive Relief Required By The Settlement Will Effectuate Changes
          In  Defendants' Use Of Content Protection Software................................................. 14

   C.   Release Of Claims........................................................................... 15

   D.   Defendants' Limited Right To Withdraw From Settlement ............................. 17

IV.    PRELIMINARY SETTLEMENT APPROVAL ................................................ 18

   A.   The Role Of The Court ..................................................................... 18

   B.   The Proposed Settlement Class May Be Certified Under *Amchem* ................................... 19

1.    Plaintiffs Have Met All Of The Prerequisites Under Rule 23(a)................................. 20

2.    The Court Should Certify The Settlement Class Under Rule 23(b)(3)........................ 21

3.    The Court Should Appoint Plaintiffs' Co-Lead Counsel As Class Counsel ............... 22

C.   Criteria To Be Considered In Deciding Preliminary Approval ....................................... 23

1.    There Are No Grounds To Doubt The Fairness Of The Settlement,
      Which Is The Product Of Extensive, Arm's-Length Negotiations .............................. 26

2.    The Settlement Contains No Obvious Deficiencies....................................................... 27

3.    The Settlement Falls Within The Range Of Possible Approval ................................... 29

V.    THE PROPOSED PLAN OF CLASS NOTICE............................................................... 31

VII.   CONCLUSION................................................................................................................... 35

## TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

Amchem Prods. Inc. v. Windsor
521 U.S. 591 (1997).................................................................................. 19

Armstrong v. Board of School Directors of the City of Milwaukee
616 F.2d 305 (7th Cir. 1980) .................................................................. 23

Blackie v. Barrack
524 F.2d 891 (9th Cir. 1975) .................................................................. 21

Denney v. Jenkens & Gilchrist
230 F.R.D. 317 (S.D.N.Y. 2005) ........................................................... 19

Detroit v. Grinnell Corp.
495 F.2d 448 (2d Cir. 1974)................................................................... 24

Eisen v. Carlisle & Jacquelin
417 U.S. 156 (1974)................................................................................ 31

In re Airline Ticket Comm'n Antitrust Litig.
953 F. Supp. 280 (D. Minn. 1997)......................................................... 33

In re Automotive Refinishing Paint Antitrust Litig.
2003 U.S. Dist. LEXIS 4681 (E.D. Pa. Mar. 17, 2003)......................... 26

In re Compact Disc Minimum Advertised Price Antitrust Litig.
216 F.R.D. 197 (D. Me. 2003)................................................................ 32

In re Initial Pub. Offering Sec. Litig.
226 F.R.D. 186 (S.D.N.Y. 2005) ............................................... 18, 23, 24

In re Inter-Op Hip Prosthesis Liab. Litig.
204 F.R.D. 359 (N.D. Ohio 2001) ......................................................... 27

In re Medical X-Ray Film Antitrust Litig.
1997 U.S. Dist. LEXIS 21936 (E.D.N.Y. Dec. 10, 1997) ...................... 26

In re Michael Milken & Assoc. Sec. Litig.
150 F.R.D.  46 (S.D.N.Y. 1993) ............................................................ 18

In re NASDAQ Market-Makers Antitrust Litig.
176 F.R.D. 99 (S.D.N.Y. 1997) ................................................................. 18, 23

In re Prudential Sec. Inc. Ltd. P'ships Litig.
163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................... 23, 24, 26

In re Serzone Prods. Liab. Litig.
2005 U.S. Dist. LEXIS 30468 (S.D.W.Va. Sep. 2, 2005) ........................... 33

In re Shell Oil Refinery
155 F.R.D. 552 (E.D. La. 1993) ............................................................... 27

In re Visa Check/Mastermoney Antitrust Litig.
280 F.3d 124 (2d Cir. 2001) .................................................................... 19, 21

In re Warner Comms. Sec. Litig.
798 F.2d 35 (2d Cir. 1986) ...................................................................... 18

Lyons v. Marrud, Inc.
[1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 93 (S.D.N.Y. 1972) ........... 25

Maywalt v. Parker & Parsley Petroleum Co.
67 F.3d 1072 (2d Cir. 1995) .................................................................... 25

McNamara v. Bre-X Minerals Ltd.
214 F.R.D. 424 (E.D. Tex. 2002) .............................................................. 26

Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp.
323 F. Supp. 364 (E.D. Pa. 1970) ............................................................ 24

Reed v. General Motors Corp.
703 F.2d 170 (5th Cir. 1983) .................................................................. 25, 26

Saylor v. Lindsley
456 F.2d 896 (2d Cir. 1972) .................................................................... 24

Soberal-Perez v. Heckler
717 F.2d 36 (2d Cir. 1983) ...................................................................... 31

Spann v. AOL Time Warner, Inc.
2005 U.S. Dist. LEXIS 10848 (S.D.N.Y. June 7, 2005) ............................... 28

Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.
396 F.3d 96 (2d Cir. 2005) .............................................................. 24, 31, 33

Weinberger v. Kendrick
698 F.2d 61 (2d Cir. 1982) ...................................................................... 31

## STATUTES

18 U.S.C. § 1030, *et seq.*..........................................................................................8

Fed. R. Civ. P. 23(a) .........................................................................................19, 20

Fed. R. Civ. P. 23(a)(1) ..........................................................................................20

Fed. R. Civ. P. 23(a)(2) ..........................................................................................20

Fed. R. Civ. P. 23(a)(3) ..........................................................................................21

Fed. R. Civ. P. 23(a)(4) ..........................................................................................21

Fed. R. Civ. P. 23(b) ..............................................................................................19

Fed. R. Civ. P. 23(b)(2)............................................................................................2

Fed. R. Civ. P. 23(b)(3).......................................................................2, 17, 19, 21, 22, 31

Fed. R. Civ. P. 23(b)(3)(D) ....................................................................................19

Fed. R. Civ. P. 23(c)(2)(B) ...............................................................................31, 33

Fed. R. Civ. P. 23(c)(3)...........................................................................................33

Fed. R. Civ. P. 23(e) ....................................................................................1, 18, 31

Fed. R. Civ. P. 23(e)(B) ..........................................................................................31

Fed. R. Civ. P. 23(g) ...............................................................................................23

Fed. R. Civ. P. 23(g)(1)(A), (B) .............................................................................22

Fed. R. Civ. P. 23(g)(1)(C) .....................................................................................22

Fed. R. Civ. P. 23(g)(2)...........................................................................................22

New York GBL § 349 *et seq.*...........................................................................8, 20

New York GBL § 350 *et seq.*...................................................................................8

## OTHER AUTHORITIES

<u>Manual for Complex Litigation, Fourth</u>
§§ 21.632-21.635 (2004) ...............................................................................18, 19, 23

<u>Manual for Complex Litigation, Third</u>
§ 30.41.................................................................................................................. 26

<u>Manual for Complex Litigation, Third</u>
§ 40.42.................................................................................................................. 23

<u>Moore's Federal Practice</u>
3 B J. Moore, ¶ 23.80 (2d ed. 1993) ................................................................. 24

<u>Newberg on Class Actions</u>
4 Alba Conte & Herbert Newberg, § 11:41 (4th ed. 2002)............................... 24

<u>Newberg on Class Actions</u>
4 Alba Conte & Herbert Newberg, § 11:53 (4th ed. 2002)............................... 31

<u>The Settlement and Dismissal of Stockholders' Actions -- Part II: The Settlement</u>
Haudek, 23 Sw.L.J. 765 (1969) .......................................................................... 24

**TO THE HONORABLE DISTRICT COURT:**

Under Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs Edwin Bonner, Ori Edelstein, Joseph Halpin, Robert Hull, Andrew Klewan, John Maletta, James Michaelson, Jeffrey Potter, Tom Ricciuti, Yvonne Ricciuti, Dora Rivas, Mary Schumacher and James Springer ("Plaintiffs") apply to this Court for preliminary approval of a proposed settlement in this consumer class action, as set forth below.

## I.   <u>INTRODUCTION</u>

Plaintiffs submit this application for preliminary approval of a proposed settlement in this consumer class action brought on behalf of people who purchased, received, possessed or used a compact disc ("CD") containing SONY BMG Music Entertainment's content protection software known as Extended Copy Protection ("XCP") or MediaMax.  Plaintiffs assert claims against Defendants SONY BMG Music Entertainment ("SONY BMG"), First 4 Internet, Ltd. ("F4I"), SunnComm International Inc. ("SunnComm").  The settlement will resolve all claims before this Court and all claims in related actions nationwide.

Under the terms of the settlement, Defendants agree to:

- stop manufacturing SONY BMG CDs with XCP software ("XCP CDs") and SONY BMG CDs with MediaMax software ("MediaMax CDs");

- immediately recall all XCP CDs;

- provide software to update and uninstall XCP and MediaMax content protection software from consumers' computers;

- ensure that ongoing fixes to all SONY BMG content protection software are readily available to consumers;

- implement consumer-oriented changes in operating practices with respect to all CDs with content protection software that SONY BMG manufactures in the next two years;

1

- waive specified provisions currently contained in XCP and MediaMax software End-User Licensing Agreements ("EULAs");

- refrain from collecting personal information about users of XCP CDs or MediaMax CDs without their affirmative consent; and

- provide additional settlement benefits to Settlement Class Members including cash payments, "clean" replacement CDs without content protection software, and free music downloads.

The proposed compromise is set forth in a Settlement Agreement, dated December 28, 2005 ("Settlement Agreement"), which accompanies this submission.

Plaintiffs ask this Court to enter the Hearing Order, submitted herewith:  (1) granting preliminary approval of the proposed settlement; (2) certifying the proposed plaintiff class pursuant to Rules 23(b)(2) and (b)(3) for purposes of the settlement; (3) directing that the class be given notice of the pendency of this action and the settlement in the form and manner proposed by the parties; and (4) scheduling a hearing at which the Court will consider the parties' motion for final approval of the settlement and entry of their proposed final judgment, and Plaintiffs' counsel's application for an award of attorneys' fees and reimbursement of costs.

As identified in the proposed Order, Plaintiffs recommend that the Court order that the following actions occur on the dates specified in the proposed Order:  (1) notice be provided to Settlement Class Members by electronic mail ("e-mail"), Internet postings, Internet "banner" advertising, popular and commonly-employed Internet search engines, by print publication in several identified newspapers of general circulation, and by issuance of a joint press release by SONY BMG and Plaintiffs' Class Counsel;  (2) requests for exclusion from the settlement be postmarked on or before the date specified in the proposed Order; (3) objections to the settlement or the award of attorneys' fees and reimbursement of expenses in favor of Plaintiffs' counsel be

served on counsel and the Court on or before February 1, 2006; (4) a Fairness Hearing be held at

the Court's convenience, and on a date specified in the proposed Order; and (5) and properly

executed Proofs of Claim be submitted to the claims administrator, via e-mail or U.S. mail

postmarked on or before the specified date agreed upon by the Parties and identified in the

proposed Order and notice.

## II.     BACKGROUND OF THE LITIGATION

### A.     The Nature Of SONY BMG's Content Protection Software

In August 2003, SONY BMG, the second largest owner and distributor of record labels,

began including MediaMax, a content protection software program from SunnComm, on some of

its CDs.  In January 2005, SONY BMG introduced XCP, a second copy protection software

program designed by F4I.

XCP and MediaMax limit the number of copies of a CD a user can make.  XCP and

MediaMax also make audio files and digital content on the CDs compatible only with Sony or

Microsoft products and software.  The CDs can only be played and copied on a computer using

XCP or MediaMax.  The software does not allow audio file compression in the dominant non-

proprietary MP3 format or other file formats like Apple Computer, Inc.'s "*iTunes*."

SONY BMG impedes removal of XCP and MediaMax from a user's computer by (1)

preventing the software from being listed in the commonly accessed "Add/Remove Programs"

utility in the Microsoft Windows operating system, and (2) failing to provide an uninstall

program for the software.  The only way to uninstall XCP or MediaMax is for the user to visit

one of Defendants' websites, fill out a form that requires a user to disclose his or her e-mail

address, then wait for an e-mail, download additional software, and install a program that

removes the files.  Any attempt to uninstall the software manually will damage the user's

computer.

XCP and MediaMax also raise potential privacy concerns, because the software can and does exchange information between the users' computer and SONY BMG's computer servers. The information sent to SONY BMG includes the user's Internet Protocol ("IP") Address.  The software does not inform the user that his or her computer is providing information to SONY BMG's servers.

XCP and MediaMax are subject to highly restrictive and misleading EULAs.  When a user inserts a XCP CD or a MediaMax CD into a computer, a EULA appears on the computer screen and requires that the user to accept its terms to access the audio files or digital content on the CD.  If a user accepts the EULA for one CD, the EULA is not displayed when subsequent discs containing the same software are loaded onto the computer.  According to Plaintiffs, the EULAs are contrary to federal and state law in that the fail to or inadequately disclose certain material facts about XCP and MediaMax software, including the following:  (1) the programs cannot be readily removed by the computer user; (2) the programs collect information about the computer user and his or her computer; (3) the programs exchange information between the user's computer and SONY BMG's computer servers; (4) the programs are only compatible with Sony's and Microsoft's digital music file formats (5) the programs are not compatible with *iTunes* or MP3 audio file formats; and (6) the programs manage all XCP CDs or MediaMax CDs subsequently inserted in the computer.  SONY BMG also inadequately discloses material facts about the nature and function of XCP and MediaMax software on the jewel cases of SONY BMG CDs containing such software.

**B.    XCP CDs And Software Expose Computers To Security Vulnerabilities**

In October 2005, Mark Russinovich, a computer security research specialist, discovered that he had a hidden software program running on his system.  Upon further investigation, Mr. Russinovich traced the installation of the hidden software program to an XCP CD he had

purchased and used on his computer.  Mr. Russinovich discovered that XCP employs a variety of software techniques typically used by "spyware" and other virus software programs to conceal its existence from the user.  Most notably, XCP installs a "rootkit" on the user's computer.  The XCP rootkit hides its existence by integrating itself deep in the architecture of a computer's operating system, thereby forcing the computer's operating system to conceal any file, directory or process that begins with the computer code, "$sys$."  XCP Software has no mechanism to ensure that other software programs cannot employ the "$sys$" cloaking mechanism, however. In other words, any application can make itself virtually invisible to the user by renaming its files so that they begin with "$sys$."

Consequently, the XCP rootkit makes the user's computer more susceptible to unwanted intrusion from third parties, as it effectively disables any firewall, anti-spyware and anti-malware protection programs previous installed on the computer.  Indeed, in November 2005, Symantec Corporation, a leading maker of anti-virus software, public announced the discovery of the first virus to use SONY BMG's XCP CD software cloaking mechanism.

In response to the criticism sparked by Mr. Russinovich's findings, SONY BMG released a software utility to remove XCP software from a user's computer, and a program intended to allow XCP software to be visible on the user's computer.  Almost immediately, Mr. Russinovich found that these SONY BMG software programs, themselves, created additional security vulnerabilities.  As part of settlement, SONY BMG has agreed to and has stopped distributing these programs in the United States.

On November 18, 2005, after class action litigation was commenced in this Court, SONY BMG issued a statement acknowledging that its XCP software created security vulnerabilities for computer users.  Thereafter, SONY BMG announced that it would institute a program to remove all SONY BMG XCP CDs from retailers' shelves and inventory, and begin an XCP CD "recall"

effort, to allow consumers to exchange their SONY BMG XCP CDs for "clean" CDs containing the same music, but which were free of XCP software.

> C.     **MediaMax CD Software Installs Without Consent And Exposes Computers To Security Vulnerabilities**

SONY BMG's MediaMax CDs and software also contain characteristics not fully disclosed to consumers at the time of purchase.

Among other things, MediaMax software contained on SONY BMG CDs installs on the user's computer, even if the user does not consent to installation.

Additionally, when a MediaMax CD is inserted into a computer, a EULA is displayed, which the user may accept or decline.  Before the EULA even appears, however, MediaMax automatically installs approximately one dozen files on the computer's hard disk.  These files remain installed and active on the user's computer, even if the user declines the MediaMax EULA.  This installation-without-consent feature is present in MediaMax 3.0 and MediaMax 5.0, the two versions of the software contained in SONY BMG CDs.

Furthermore, the most recent version of the SONY BMG contention protection software, MediaMax 5.0, renders a user's computer more vulnerable to security breaches by third parties, by causing a file folder to be installed on a user's computer, which allows third parties to gain enhanced permissions over the user's computer running the Windows operating system.  While SONY BMG recently issued a software "patch" and uninstall program in an effort to remedy  the discovered security vulnerabilities, the day after SONY BMG issued the program, a computer specialist found that the MediaMax 5.0 patch and uninstall program, itself, posed an additional security vulnerability for computer users.

> D.     **The Class Action Litigation**

Beginning November 14, 2005, Plaintiffs filed several class action cases against Defendants in this Court and other state and federal courts around the country.  On December 1,

2005, the Court entered Stipulation And Case Management Order Number 1 ("CMO No. 1"),

consolidating the actions pending in this Court and appointing Plaintiffs' Co-Lead Counsel and

Plaintiffs' Executive Committee.[1]

    In addition, several state and federal government authorities are presently engaged in

inquiries and investigations into Defendants' conduct involving XCP and MediaMax.[2]

    On December 28, 2005, Plaintiffs filed a Consolidated Amended Class Action Complaint

(the "Complaint") on behalf of all natural persons or entities in the United States who purchased,

received, came into possession of, or otherwise used one or more MediaMax CDs and/or XCP

CDs.  The Complaint alleges that Defendants engaged in unlawful, unfair and deceptive conduct

---

[1]    The following actions are presently subject to this Court's consolidation order:  *Maletta v. Sony BMG Music Entm't*, No. 05 CV 10637 (UA) (S.D.N.Y. Dec. 19, 2005); *Ricciuti v. Sony BMG Music Entm't*, No. 05 CV 10190 (BSJ) (S.D.N.Y. Dec. 5, 2005); *Klewan v. Arista Holdings Inc. d/b/a Sony BMG Music Entm't*, No. 05 CV 9609, consolidated as No. 05 CV 9575 (NRB) (S.D.N.Y. Nov. 14, 2005); *Michaelson v. Sony BMG Music, Inc.*, No. 05 CV 9575 (NRB) (S.D.N.Y. Nov. 14, 2005); *Potter v. Sony BMG Music Entm't*, No. 05 CV 9607 (NRB) (S.D.N.Y. Nov. 14, 2005); and *Rivas v. Sony BMG Music Entm't*, No. 05 CV 9598 (NRB) (S.D.N.Y. Nov. 14, 2005).

    Additionally, other complaints raising substantially identical claims have been filed in jurisdictions other than the Southern District of New York (collectively, the "Non-S.D.N.Y. Actions"): *Black v. Sony BMG Music Entm't*, No. CIV-05-1315 WDS/RLP (D. N.M. Dec. 19, 2005); *Klemm v. Sony BMG Music Entm't*, No. C 05 5111 BZ (N.D. Cal. Dec. 9, 2005); *Melcon v. Sony BMG Music Entm't*, No. C 05 5084 MHP (N.D. Cal. Dec. 8, 2005); *Ponting v. SONYBMG Music Entm't, LLC*, No. CV-05-08472-JFW(AJWx) (C.D. Cal. Dec. 2, 2005); *Jacoby v. Sony BMG Music Entm't*, No. 05/116679 (N.Y. Sup. Ct. Nov. 30, 2005); *Bahnmaier v. Sony BMG Music Entm't*, No. CJ 2005 06968 (Okla. Dist. Ct. Nov. 28, 2005); *Xanthakos v. Sony BMG Music Entm't, LLC*, No. 05-0009203 (D.C. Super. Ct. Nov. 28, 2005); *Maletta v. Sony BMG Music Entm't Corp.*, No. BC343615 (Cal. Super. Ct. Nov. 28, 2005); *Burke v. Sony BMG Music Entm't*, No. 857213 (Cal. Super. Ct. Nov. 22, 2005); *Hull v. Sony BMG Music Entm't*, No. BC343385 (Cal. Super. Ct. Nov. 21, 2005); *Cooke v. Sony BMG Music Entm't*, No. 05-0009093 (D.C. Super. Ct. Nov. 18, 2005); *DeMarco v. Sony BMG Music*, No. 2:05-cv-05485-WHW-SDW (D.N.J. Nov. 17, 2005); *Stynchula v. Sony Corp. of Am.*, No. BC343100 (Cal. Super. Ct. Nov. 15, 2005); *Gruber v. Sony Corp. of Am.*, No. BC342805 (Cal. Super. Ct. Nov. 9, 2005); *Guevara v. Sony BMG Music Entm't*, No. BC342359 (Cal. Super. Ct. Nov. 1, 2005).

[2]    At present, the Attorney General of the State of Texas is the only government authority to have brought suit against Defendants.  *See Texas v. SONY BMG Music Entertainment*, Dist. Ct., Travis Co, Tex.

in designing, manufacturing and selling CDs with XCP and MediaMax software and without

adequately disclosing the limitations the software imposes on the use of the CDs and the audio

files contained on such CDs, and the security vulnerabilities the XCP and MediaMax software

creates for computer users.  Plaintiffs bring claims against Defendants for violating the Computer

Fraud And Abuse Act, 18 U.S.C. § 1030, *et seq.*; Section 349 *et seq.* of the New York General

Business Law; and Section 350 *et seq.* of the New York General Business Law.  Plaintiffs also

assert common law claims for breach of the implied covenant of good faith and fair dealing,

trespass to chattels, and fraud.

In December 2005, following entry of the Court's CMO No. 1, Defendants approached

Plaintiffs' Co-Lead Counsel to discuss the possibility of resolution of the litigation by settlement.

The parties engaged in virtual round-the-clock settlement negotiations for approximately one

month.  The primary and overriding concern of the parties over the course of these lengthy,

arms'-length negotiations was an effort to provide prompt relief to consumers affected by XCP

and MediaMax software, in order to limit the risk that these consumers' computers would be

vulnerable to malicious software programs such as viruses, "Trojan horses" and "spyware."  In

contemplation of these concerns, the merits of the parties' respective positions, and the risks,

costs and delays associated with litigation, the parties reached the proposed settlement presently

before this Court.

## III.    THE PROPOSED SETTLEMENT

### A.    The Settlement Class

The proposed settlement has been reached on behalf of the "Settlement Class," defined in

the Settlement Agreement as follows:

> the named Plaintiffs in the Action and all natural persons or entities in the United
> States who purchased, received, came into possession of or otherwise used one or
> more MediaMax CDs and/or XCP CDs from August 1, 2003 through the
> Effective Date.  Excluded from the Settlement Class are Released Parties; SONY

BMG-authorized resellers or distributors of the XCP CDs and MediaMax CDs; current or former employees of Released Parties; and any persons or entities that have previously executed releases discharging any or all of the Defendants from liability concerning or encompassing any or all claims that are the subject of the Complaint and the complaints in the Non-S.D.N.Y. Actions.

(Settlement Agreement, ¶ II.M.[3])

**B.      The Settlement Consideration**

As consideration for the settlement, Defendants have agreed to provide a broad package of benefits to Settlement Class Members.  The settlement benefits include:

- Compensation for buyers of XCP CDs and MediaMax CDs;

- Software utilities to update and uninstall XCP and MediaMax software from consumers' computers;

- An agreement by SONY BMG to immediately recall of XCP CDs, and not manufacture MediaMax CDs for a period of at least two years;

- A series of injunctive measures governing any SONY BMG CDs manufactured with content protection software over the next two years;

- Defendants' agreement not to collect personal information on Settlement Class Members through XCP, MediaMax and future content protection software, without their express and affirmative consent;

- Defendants' agreement to waive certain rights currently contained in the EULAs for XCP and MediaMax CDs and software; and

- A "most favored nations" provision that would enhance the benefits available to all Settlement Class Members if Defendants provide additional benefits to a subset of Settlement Class Members through an agreement with any government authority.

---

[3]     The parties' Settlement Agreement, together with all attachments thereto, is submitted herewith as Ex. C to the Affidavit of Elizabeth C. Pritzker In Support Of Plaintiffs' Application For Preliminary Approval of Class Action Settlement.  All cited provisions of the Settlement Agreement shall hereinafter be referenced as "¶__.__."

### 1.     <u>XCP CD Exchange Program</u>

SONY BMG will implement a program to allow Settlement Class Members to exchange each XCP CD for an identical "clean" CD title that does not contain content protection software ("XCP Exchange Program").  SONY BMG has already offered such exchanges and will extend and incorporate that offer into this settlement.  (¶ III.B.)  Through the XCP Exchange Program, Settlement Class Members will be able to ship their XCP CDs to SONY BMG, free of charge, and receive an identical "clean" CD, via mail or other direct shipping mail, from SONY BMG. (¶ III.B.5.)  SONY BMG also will encourage authorized resellers to accept returns of the XCP CDs for exchange.  (¶ III.B.3.)

To ensure that XCP CDs are promptly removed from the market, the settlement requires that SONY BMG  provide a range of Incentives to Settlement Class Members who participate in the XCP Exchange Program.  (¶ III.C.)  Settlement Class Members who exchange their SONY BMG XCP CDs will be entitled to receive a "clean," non-contented protected CD identical in music content to each XCP CD exchanged, and may download non-content protected MP3 versions of the music contained on each XCP CD purchased.  (¶¶ III.B.1.)  In addition, these Settlement Class Members may claim one of two additional incentive packages.  Under Incentive #1, Settlement Class Members will be entitled to claim a cash payment of $7.50, payable by check or debit card, and a promotion code allowing the holder to download one additional album from a list of more than 200 titles.  (¶ III.C.1.)  Under Incentive #2, Settlement Class Members are entitled to claim a promotion code allowing the holder to download three additional albums from that list.  (¶ III.C.2.)  All promotion codes provided by the settlement are fully transferable and are valid for six months.  (¶ III.C.3.)  Settlement Class Members may download albums from any one of three major download services.  SONY BMG will use commercially reasonable

efforts to offer Apple Computer, Inc.'s popular *iTunes* as one of the download services available to Settlement Class Members. (¶ III.C.3.)

Class Counsel will have the right to monitor the XCP CD Exchange Program and will be apprised of the number of claims submitted.  (¶ III.I.)  To participate in the XCP CD Exchange Program, a Settlement Class Member must:  (1) return his or her XCP CDs to SONY BMG or provide SONY BMG with a receipt showing the return or exchange of such CDs at a retailer after November 14, 2005; and (2) fill out a claim form; and (3) affirm that he or she has run the XCP Uninstaller or XCP Update (described below).  (¶ III.C.)

## 2.     MediaMax Compensation

SONY BMG will provide additional compensation to Settlement Class Members who bought or obtained MediaMax CDs during the Class Period.

Specifically, Settlement Class Members will be entitled to download non-content protected MP3 versions of the music on each of his or her MediaMax 5.0 CDs and/or MediaMax 3.0 CDs.  (¶¶ III.E., F.)  Additionally, Settlement Class Members who bought or obtained MediaMax 5.0 CDs during the Class Period will receive a promotion code allowing the holder to download one additional album from a list of more than 200 titles.  (¶ III.F.)  The promotion code will be fully transferable and will be valid for six months, and the download will be available from any one of three major download services.  (¶¶ III.E., F.)

## 3.     XCP And MediaMax Software Updates And Uninstallers

Under the terms of the settlement, Defendants further agree to provide software updates and uninstallers for SONY BMG XCP and MediaMax software.

The XCP Update will be in the form of a software utility program that removes XCP's cloaking mechanism, so that the software will be visible to users through an ordinary directory search.  The XCP Update is designed to eliminate the security vulnerability created by XCP's

use of hidden or cloaked filenames.  (¶ III.J.)  Additionally, Settlement Class Members will be able to remove XCP software from their computers completely through either the XCP Update or a separate software utility, the XCP Uninstaller.  (¶¶ III.J., K.)

The MediaMax Update available under the settlement will be in the form of a software utility program that will eliminate the all currently-known security vulnerabilities associated with MediaMax software.  (¶ III.L.)  Additionally, Settlement Class Members will be able to remove MediaMax software from their computers, completely, through either the MediaMax Update or a separate software utility, the MediaMax Uninstaller.  (¶¶ III.L.M.)

Under the Settlement Agreement, Settlement Class Members will be able to download each of these software utilities through SONY BMG's Internet website until December 31, 2007. (¶ III.N.)  The MediaMax Update and MediaMax Uninstaller will also be available on SunnComm's Internet website.  (¶¶ III.N., O.)   Settlement Class Members will not need to provide Defendants with any personal information to obtain any of the software utilities.  (¶¶ III.J., K., L., M.)  Class Counsel will have an opportunity to review and comment on all instructions provided to Settlement Class Members on how to use the software utilities.  (¶¶ III.J., K., L., M.)  In addition, Defendants will verify that they have obtained the opinion on an independent expert that the software utilities provided under the settlement are effective and would not create any known securities vulnerabilities.  (¶¶ III.J., K., L., M.)  The expert verification will be subject to confirmatory discovery by Class Counsel.  (¶¶ III.J., K., L., M.) Settlement Class Members are entitled to keep the software utilities provided under the settlement, even if the settlement is terminated after preliminary approval.  (¶ III.P.)  The parties will also discuss and attempt to agree upon other methods for publicizing and disseminating the software utilities offered by the settlement to consumers.  (¶ III.Q.)

### 4.  SONY BMG Will Not Collect Personal Data

Defendants assert that they have not used the MediaMax or XCP software, or any other content protection software placed upon SONY BMG CDs, to collect, aggregate or retain certain personal information about the users of MediaMax CDs, XCP CDs, or any such other content-protected CDs manufactured and sold by SONY BMG, without the user's express consent.  (¶ III.S.)  Defendants assert that they only collect information necessary to provide the CDs with enhanced functionality, including the album title, artist, user's IP address, and certain non-personally identifiable information.  (¶ III.S.)  As part of the settlement, SONY BMG agrees to undertake commercially reasonable steps to destroy the information that it collects within ten days of collection, except as otherwise required by law or court order.  (¶ III.S.)

SONY BMG also agrees to hire an independent third party to verify these practices and provide his or her conclusions to Class Counsel and the Court before the Fairness Hearing.  (¶ III.T.)  SONY BMG will hire an independent third party to repeat this review during each of calendar years 2006 and 2007.  (¶ III.T.)  SONY BMG will post the results of each of these reviews on its website.  (¶ III.T.)

### 5.  Defendants Will Waive Rights Under XCP And MediaMax EULAs

Defendants have agreed to waive their rights under certain provisions of the current XCP and MediaMax EULAs to the extent that they:  (1) limit the use of the audio files to Approved Media Players and Approved Portable Devices; (2) can be construed as preventing the removal of the software; (3) require the user to update the software to continue to use the audio files; (4) require possession of the CD to hold a license for the digital content on the CDs; (5) require the user to indemnify Defendants from harm arising from the use of the XCP CDs or MediaMax CDs; (6) prevent copying of music files and other digital content on the CDs; (7) prevent the consumer from reselling the CDs; and (8) terminate the software license if a consumer files for

bankruptcy protection or is declared insolvent.  (¶ III.U.)  Defendants also agree to waive the limitation of liability provisions and New York forum selection clauses of the XCP and MediaMax EULAs in cases where a Settlement Class Member alleges any claims not released by this settlement on his or her behalf only.  (¶ III.U.)  The latter provisions are not waived, if a Settlement Class Member brings such claims as part of a class action, mass action or private attorney general proceeding.  (¶ III.U.)

<strong>6.       The Settlement Contains "Most Favored Nations" Protection</strong>

SONY BMG has entered into discussions with state and federal government authorities about the claims asserted in the Action.  As part of this settlement, SONY BMG agrees that, if it enters into any other agreements with government authorities that provide additional benefits to a subset of Settlement Class Members, it will offer the same benefits to all Settlement Class Members.  In this way, the Settlement operates as a floor, not a ceiling, on the benefits available to Settlement Class Members.  (¶¶ III.V., IV.A., B.)

<strong>7.       Injunctive Relief Required By The Settlement Will Effectuate<br>Changes In  Defendants' Use Of Content Protection Software</strong>

SONY BMG has agreed to implement the following changes in operating practices and procedures with respect to XCP, MediaMax, and any and all future content protection software technologies that SONY BMG may use on CDs that it manufactures or issues, from the present to 2008.  (¶¶ II.D., IV.B.)  These changes will be enforceable either through an agreement with state and/or federal government authorities or by an injunction from this Court.  (¶¶ IV.A., B.)

SONY BMG will not manufacture or distribute XCP CDs.  (¶ IV.B.1.)  SONY BMG also will not manufacture MediaMax 3.0 CDs or MediaMax 5.0 CDs.  (¶ IV.B.2.)

In addition, before manufacturing and issuing any CDs with content protection software at any time until 2008, SONY BMG will:  (1) ensure that the content protection software that is contained on any such CDs will not be installed on a user's computer, unless and until the user

14

affirmatively accepts the EULA; (2) ensure that an uninstaller for the content protection software is made readily available to consumers; (3) ensure that the functionality of any updates and/or material changes in the functionality of the copy protection software that is used on any such CDs is adequately disclosed; (4) ensure that the EULA associated with the content protection software used on any such CDs accurately describes the nature and function of the software in plain English; (5) obtain comments about the EULA associated with the content protection software contained on any such CDs from an independent third-party designated jointly by the parties; (6) obtain an opinion from at least one qualified, independent third-party that the content protection software used on any such CDs is effective and would not create any known securities vulnerabilities; (7) ensure that SONY BMG will only be able to collect limited information from the CD user necessary to provide enhanced functionality to any such CDs, namely album title, artist, the computer user's IP address, and certain non-personally identifiable information, without the user's express consent ; (8) include on the jewel case a written disclosure in plain English that the CD contains content protection software and a brief description of the software; and (9) fix security vulnerabilities discovered in the content protection software contained on any such CDs through software updates verified as secure by a computer security expert. (¶¶ IV.B. 3(a)-(h).)

   **C.**  <u>**Release Of Claims**</u>

   In return for the above consideration, Settlement Class Members will release all "Released Claims" (as defined in Section II.O. of the Settlement Agreement) against each and all of the Defendants and each and all of Defendants' direct and indirect parent companies including, in the case of SONY BMG and without limitation, Sony Corporation and Bertelsmann AG, and each and all of each of Sony Corporation's, Bertelsmann AG's and Defendants' respective divisions and direct and indirect subsidiaries, affiliates, partners, joint ventures,

predecessors and successor corporations and business entities, and each and all of their past and present officers, directors, servants, licensees, joint ventures, sureties, attorneys, agents, consultants, advisors, contractors, employees, controlling or principal shareholders, general or limited partners or partnerships, divisions, insurers, designated management companies, and each and all of their successors or predecessors in interest, assigns, or legal representatives, and any persons or entities that have designed, developed, programmed, manufactured, supplied, advertised, marketed, distributed or sold MediaMax CDs and/or XCP CDs or software thereon. (¶¶ II.O., VIII.A., B.)

Released Claims include all claims arising out of any purchase or use by them of an XCP CD or a MediaMax CD, the XCP Update, the XCP Uninstaller, the MediaMax Update, or the MediaMax Uninstaller or any installation or de-installation of XCP Software or MediaMax Software at any time, to the extent that such claims: (a) arise out of the Action or the Non-S.D.N.Y. Actions; (b) relate to any allegations that either were or could have been asserted in the Action or the Non-S.D.N.Y. Actions; or (c) which might in the future be asserted by any Plaintiff or Settlement Class Member, against any of the Released Parties that would arise out of, or relate to in any manner, directly or indirectly, any acts, facts, transactions, occurrences, conduct, representations or omissions alleged in the Action and the Non-S.D.N.Y. Actions, including, without limitation, claims respecting any disclosure, advertising or other descriptions of, or claims relating to (*i*) the nature, quality, value, and/or functionality of the MediaMax CDs, the XCP CDs, the MediaMax Software, MediaMax Update, MediaMax Uninstaller, XCP Software, XCP Update or XCP Uninstaller; and/or (*ii*) the EULAs, and/or (*iii*) the alleged collection by Defendants of Personal Data or IP addresses.  (¶ II.O.)  Defendants agree to release claims for abuse of process, malicious prosecution or any other claim arising out of, relating to, or in connection with the defense or resolution of the Action.  (¶ II.O.)

The Settlement's release of claims does not include claims for consequential damage to a computer or a network that may or are alleged to result from interactions between XCP or MediaMax software and other software or hardware installed on those computers or networks. (¶¶ II.O., VIII.B.)  The release excludes these claims out of concern that such claims for consequential damage to a computer or network may raise questions concerning the predominance and manageability requirements under Rule 23(b)(3) of the Federal Rules of Civil Procedure.  (¶¶ II. O., VIII.B.)  If the Settlement is approved, Settlement Class Members who wish to asset such claims may do so in small claims court or other venues.  The settlement also does not release any copyright, trademark or other claims concerning the ownership of intellectual property rights in the MediaMax Software or the XCP Software, or any uninstallers or updates thereto, as no such claims were alleged by Plaintiffs in the underlying actions.  (¶¶ II. O., VIII.B.)

### D. **Defendants' Limited Right To Withdraw From Settlement**

Defendants have the right to withdraw from the settlement, if the number of timely and valid requests for exclusion from the Settlement Class exceeds 1,000.  (¶ XI.H.)

In addition, SunnComm and F4I have the right to withdraw from the settlement at any time before January 15, 2006 or the date notice is first disseminated, whichever is earlier.  (¶ XI.L.)  This provision allows SunnComm and F4I, and these defendants alone, to review the terms of the settlement with their respective insurance carriers, which they were unable to do during the December holidays, while enabling the parties to move forward with the preliminary approval process.  If either SunnComm or F4I withdraws from the settlement prior to the date notice is first disseminated, the withdrawn party will no longer be considered a "Released Party" under the Settlement Agreement.  (¶ XI.L.)

IV.   **PRELIMINARY SETTLEMENT APPROVAL**

    A.   **The Role Of The Court**

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for any compromise of claims brought on a class basis.  Approval of a proposed settlement is a matter within the broad discretion of the district court.  See In re Warner Comms. Sec. Litig., 798 F.2d 35, 37 (2d Cir. 1986); In re Michael Milken & Assoc. Sec. Litig., 150 F.R.D.  46, 53 (S.D.N.Y. 1993).  "Preliminary approval of a proposed settlement is the first in a two-step process required before a class action may be settled."  In re NASDAQ Market-Makers Antitrust Litig., 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("In Re NASDAQ").  "First, the court reviews the proposed terms of settlement and makes a preliminary determination of the fairness, reasonableness and adequacy of the settlement terms."  In re Initial Pub. Offering Sec. Litig., 226 F.R.D. 186, 191 (S.D.N.Y. 2005) ("In re Initial Pub. Offering") (citing Manual for Complex Litigation, Fourth § 21.632 (2004)).  "Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted."  In re NASDAQ, 176 F.R.D. at 102.

    "If the court preliminarily approves the settlement, it must direct the preparation of notice of the certification of the settlement class, the proposed settlement and the date of the final fairness hearing."  In re Initial Pub. Offering, 226 F.R.D. at 192.  Class members may then present arguments and evidence for and against the terms of the settlement before the Court decides whether the settlement is fair, reasonable and adequate.  Id. (citing Manual for Complex Litigation, Fourth §§ 21.632-21.635 (2004)).

**B.**      **The Proposed Settlement Class May Be Certified Under *Amchem***

Prior to granting preliminary approval of a settlement, the Court should determine that the proposed Settlement Class is a proper class for settlement purposes.  See Manual for Complex Litigation, Fourth § 21.632; Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 620 (1997).  See also Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 347 (S.D.N.Y. 2005) ("Courts have frequently certified settlement classes on a preliminary basis, at the same time as the preliminary approval of the fairness of the settlement, and solely for the purposes of settlement, deferring final certification of the class until after the fairness hearing.").  The Court can certify a class where plaintiffs demonstrate that the proposed class and proposed class representatives meet the four prerequisites in Rule 23(a) – numerosity, commonality, typicality and adequacy of representation – and one of the three requirements of Rule 23(b).  Fed. R. Civ. P. 23; In re Visa Check/Mastermoney Antitrust Litig., 280 F.3d 124, 132-33 (2d Cir. 2001).

Certification of a class action for damages requires a showing that "questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  The predominance requirement, "is readily met in certain cases alleging consumer or securities fraud."  Amchem, 521 U.S. at 625.

In certifying a settlement class, the Court is not required to determine whether the action, if tried, would present intractable management problems.  Id. at 620; see Fed. R. Civ. P. 23(b)(3)(D).  Rather, the Court has great discretion in determining whether to certify a class.  Amchem, 581 U.S. at 624.

1. **Plaintiffs Have Met All Of The Prerequisites Under Rule 23(a)**

Plaintiffs have satisfied the numerosity, commonality, typicality and adequacy of representation requirements under Rule 23(a).

a. **The Requirement of Numerosity is Satisfied**

Defendants have sold to consumers over 15 million CDs containing XCP, MediaMax 3.0 and MediaMax 5.0.  Clearly, the Settlement Class is so numerous that joinder of all Settlement Class members is impracticable.  See Fed. R. Civ. P. 23(a)(1).

b. **The Requirement of Commonality is Satisfied**

There are several questions of law and fact common to the Settlement Class.  Among these questions are whether:  (1) Defendants fail to disclose, inadequately disclose and conceal at the point of sale and through the software installation process that SONY BMG CDs contain content protection software; (2) Defendants fail to disclose, inadequately disclose and conceal at the point of sale and through the software installation process that SONY BMG's content protection software restricts the use of the audio files contained on the SONY BMG CDs; (3) Defendants fail to disclose, inadequately disclose and conceal at the point of sale and through the software installation process that SONY BMG's content protection software does not have an uninstall feature and that if manual removal will damage the computer on which the software is installed; (4) Defendants violated the Computer Fraud and Abuse Act; (5) Defendants engaged in deceptive acts and practices in violation of Section 349 of the New York General Business Law; (6) Defendants engaged in deceptive acts and practices in violation of Section 350 of the New York General Business Law; (7) Defendants breached the implied covenant of good faith and fair dealing associated with the XCP and MediaMax EULAs; (8) Defendants violated the common law for trespass to chattels; and (9) Defendants committed the common law tort of fraud.  See Fed. R. Civ. P. 23(a)(2).

### c.     <u>The Requirement of Typicality is Satisfied</u>

Plaintiffs' claims are typical of those of the Settlement Class because, like all Settlement Class Members, they bought XCP CDs and/or MediaMax CDs.  <u>See</u> Fed. R. Civ. P. 23(a)(3).

### d.     <u>The Requirement of Adequate Representation is Satisfied</u>

Plaintiffs and Class Counsel have fairly and adequately represented and protected the interests of all Settlement Class Members.  Moreover, Plaintiffs have no interests antagonistic to Settlement Class Members.  Class Counsel conducted a thorough pre-filing and continuing investigation, vigorously prosecuted the Actions, and negotiated a settlement that provides prompt and valuable relief to Settlement Class Members facing vulnerabilities to the security of their computers from SONY BMG's content protection software.  <u>See</u> Fed. R. Civ. P. 23(a)(4).

### 2.     <u>The Court Should Certify The Settlement Class Under Rule 23(b)(3)</u>

Certification of a damages class is appropriate because, as set forth above, Plaintiffs have satisfied the predominance and superiority requirements under Rule 23(b)(3).

Specifically, the questions of law and fact common to all Settlement Class Members are described above.  These common questions predominate over any individual issues such as the nature and extent of damages.  <u>See</u> <u>In re Visa Check/Mastermoney Antitrust Litig.</u>, 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); <u>Blackie v. Barrack</u>, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment.").

Additionally, a class action is clearly superior to other available methods for the fair and efficient adjudication of the controversy because joinder of all Settlement Class Members is impossible.

Moreover, as the damages suffered by individual members of the Settlement Class may be relatively small, the expense and burden of individual litigation would make it impossible for all Settlement Class Members to individually redress the harm done to them.

Finally, centralizing the litigation of claims in this Court is desirable, as the EULAs contained in the SONY BMG XCP and MediaMax CDs and software that are at issue designate exclusive jurisdiction over Plaintiffs' claims to the New York state and federal courts.  See Fed. R. Civ. P. 23(b)(3).

In sum, the Settlement Class is suitable for certification, and the Court should certify the Settlement Class pursuant to Rule 23(b)(3), for purposes of granting preliminary approval to the settlement.

### 3.  The Court Should Appoint Plaintiffs' Co-Lead Counsel As Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(A), (B).  In making this determination, the Court must consider counsel's:  (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources committed to representing the class.  Fed. R. Civ. P. 23(g)(1)(C).  The Court previously appointed the law firms of Girard Gibbs & De Bartolomeo LLP and Kamber & Associates, LLC to serve as Interim Class Counsel and Plaintiffs' Co-Lead Counsel pursuant to Rule 23(g)(2).

As identified in the firm resumes presented to the Court, Plaintiffs' Co-Lead Counsel have significant experience in litigating class actions and consumer fraud cases.  See Affidavit of Elizabeth C. Pritzker In Support of Plaintiffs' Application For Preliminary Approval of Class Action Settlement, Ex. A (firm resume of Girard Gibbs & De Bartolomeo LLP) and Ex. B (firm

resume of Kamber & Associates, LLC).  Co-Lead Counsel have diligently investigated, prosecuted, and settled this Action, dedicated substantial resources to the investigation and prosecution of the claims at issue in the Action, and demonstrated their knowledge of the consumer protection and tort laws at issue.

Therefore, the Court should appoint Plaintiffs' Co-Lead Counsel to serve as Class Counsel for the Settlement Class pursuant to Rule 23(g).

### C.    Criteria To Be Considered In Deciding Preliminary Approval

After certifying the Settlement Class, the Court should turn its attention to preliminarily approving the settlement.  The Court must "make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms."  Manual for Complex Litigation, Fourth, § 21.633.  The primary question raised by a request for preliminary approval is whether the proposed settlement is "within the range reasonableness."  Id. § 40.42.

"In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice."  In re NASDAQ, 176 F.R.D. at 102.  The purpose of the preliminary approval inquiry is "to determine whether the proposed settlement is within the range of possible approval."  Armstrong v. Board of School Directors of the City of Milwaukee, 616 F.2d 305, 314 (7th Cir. 1980) (internal quotation omitted) (quoted in In re Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("In Re Prudential")).  "Such a determination, though, need not focus solely on the monetary benefits of a proposed settlement. It should additionally weigh the value of any nonmonetary or intangible benefits associated with the agreement."  In re Initial Public Offering, 226 F.R.D. 197.

Preliminary approval does not require the district court to answer the ultimate question of whether a proposed settlement is fair, reasonable, and adequate.  Rather, that decision is made only at the final approval stage, after notice of the settlement has been given to the class

members and they have had an opportunity to voice their views of the settlement or to exclude

themselves from the settlement.  See 3 B J. Moore, Moore's Federal Practice ¶ 23.80[2.-1], at 23-

479 (2d ed. 1993); In re Prudential, 163 F.R.D. at 210 (noting that the court can fully evaluate

the fairness of the settlement "at the fairness hearing, where it can consider the submissions by

proponents and potential opponents of the settlement and the reaction of the Class Members").

Preliminary approval is merely the prerequisite to giving notice so that "the proposed

settlement . . . may be submitted to members of the prospective class for their acceptance or

rejection."  Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp., 323 F.

Supp. 364, 372 (E.D. Pa. 1970).  See also In re Initial Public Offering, 226 F.R.D. at 191

(fairness hearing affords class members "an opportunity to present their views of the proposed

settlement").

   "It is well established that there is an overriding public interest in settling and quieting

litigation, and this is particularly true in class actions."  In re Prudential, 163 F.R.D. at 209.  See

also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 117 (2d Cir. 2005) (quoting 4 Alba

Conte & Herbert Newberg, Newberg on Class Actions § 11:41, at 87 (4th ed. 2002)).  In

considering a potential settlement, the trial court need not reach any ultimate conclusions on the

substantive factual or legal issues of plaintiffs' claims.  See Detroit v. Grinnell Corp., 495 F.2d

448, 456 (2d Cir. 1974).  "We recognize that since 'the very purpose of a compromise is to avoid

the trial of sharply disputed issues and to dispense with wasteful litigation', the court must not

turn the settlement hearing 'into a trial or a rehearsal of the trial'; and that the court 'is concerned

with the likelihood of success or failure and ought, therefore, to avoid any actual determination

of the merits.'"  Saylor v. Lindsley, 456 F.2d 896, 904 (2d Cir. 1972) (quoting Haudek, The

Settlement and Dismissal of Stockholders' Actions -- Part II: The Settlement, 23 Sw.L.J. 765,

795 (1969) (footnotes omitted)).  "In determining whether a proposed settlement is fair,

reasonable, and adequate, the primary concern is with the substantive terms of the settlement:

Basic to this . . . is the need to compare the terms of the compromise with the likely rewards of

litigation." Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072 , 1079 (2d Cir. 1995)

(internal quotations omitted).

Moreover, the opinion of experienced counsel supporting the settlement is entitled to

considerable weight.  See Reed v. General Motors Corp., 703 F.2d 170, 175 (5th Cir. 1983)

("[T]he value of the assessment of able counsel negotiating at arm's length cannot be gainsaid.

Lawyers know their strengths and they know where the bones are buried.").  As the court

explained in Lyons v. Marrud, Inc., [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH)

¶ 93,525 (S.D.N.Y. 1972), "[e]xperienced and competent counsel have assessed these problems

and the probability of success on the merits.  They have concluded that compromise is well-

advised and necessary.  The parties' decision regarding the respective merits of their positions

has an important bearing on this case." Id. at 92,520.

Here, experienced counsel for Plaintiffs and Defendants, after a virtual round-the-clock

course of adversarial negotiations, have concluded that the proposed settlement – which includes,

among other things, the XCP Exchange Program, MediaMax compensation, the provision of new

software utilities to uninstall and update XCP and MediaMax, limitations on Defendants'

collection personal information about consumers through the content protection software,

Defendants' waiver of certain rights under the EULAs, a "most favored nations" provision that

may enhance the benefits available to all Settlement Class Members, and a broad series of

injunctive measures that will recall XCP CDs, stop future production of MediaMax CDs, and

ensure that future content protection software will be fully and accurately disclosed,

independently tested, and readily uninstalled – is in the best interests of their respective clients

and the Settlement Class as a whole.  The settlement merits preliminary approval and submission

to the Settlement Class for its consideration.

        1.        **There Are No Grounds To Doubt The Fairness Of The Settlement, Which Is The Product Of Extensive, Arm's-Length Negotiations**

The criteria for evaluating a request for preliminary approval have been summarized thus:

> "If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval, the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement."

In re Prudential, 163 F.R.D. at 209 (quoting Manual for Complex Litigation, Third § 30.41).

Under these criteria, the Court should grant preliminary approval of the proposed settlement and

order the dissemination of notice.

The first consideration in the preliminary-approval analysis is whether "the settlement is

the result of serious, informed and non-collusive negotiations."  In re Medical X-Ray Film

Antitrust Litig., Master File No CV 93-5904 (CPS), 1997 U.S. Dist. LEXIS 21936, at *19

(E.D.N.Y. Dec. 10, 1997).  In applying this factor, courts give substantial weight to the

experience of the attorneys who prosecuted the case and negotiated the settlement.  See Reed,

703 F.2d at 175; In re Automotive Refinishing Paint Antitrust Litig., MDL No. 1426, 2003 U.S.

Dist. LEXIS 4681, at *3 (E.D. Pa. Mar. 17, 2003) (granting preliminary settlement approval)

("[I]t is appropriate to give deference to the recommendations of experienced attorneys who have

engaged in arms-length settlement negotiations."); McNamara v. Bre-X Minerals Ltd., 214

F.R.D. 424, 430-31 (E.D. Tex. 2002) ("Counsel on all sides have proved to the Court their

knowledge of the facts and law relevant to this case.  Settlement was reached by knowledgeable

counsel, and it was arrived at after much negotiation. . . .").  Indeed, when a settlement is

negotiated at arm's length by experienced counsel, there is a presumption that it is fair and reasonable.  See In re Inter-Op Hip Prosthesis Liab. Litig., 204 F.R.D. 359, 380 (N.D. Ohio 2001) (granting preliminary settlement approval) ("[W]hen a settlement is the result of extensive negotiations by experienced counsel, the Court should presume it is fair."); In re Shell Oil Refinery, 155 F.R.D. 552, 556 (E.D. La. 1993) (citing evidence of counsel demonstrating "their conviction that the settlement amount was well within the range of possible approval and was the result of arms length, non-collusive bargaining").

The proposed settlement here is the product of extensive, arm's-length negotiations conducted through virtual round-the-clock in-person and telephonic sessions.  Timing was of the essence in completing these negotiations and reaching the settlement.  The parties agreed that promptly removing XCP CDs from the market and stopping the production and distribution of MediaMax CDs was critical to protect computers from viruses, spyware and other security vulnerabilities.  The negotiations were informed by the knowledge and experience of Plaintiffs' expert, Mark Russinovich, who first discovered and published an article on the rootkit installed on his computer by Defendants' XCP software.  Based on their familiarity with the factual and legal issues, the parties were able to negotiate a fair settlement, taking into account the costs and risks of continued litigation.  The negotiations were at all times hard-fought and at arm's length, and have produced a result that the settling parties believe to be in their respective best interests.

## 2. The Settlement Contains No Obvious Deficiencies

The proposed settlement has no obvious deficiencies.  It provides for, among other things:  (1) broad injunctive relief; (2) an XCP CD Exchange and Incentive Program; (3) MediaMax compensation; (4) the widespread distribution of new software utilities to address known and potential security vulnerabilities that are present in XCP and MediaMax software; (5) limitations on Defendants' collection of personal information on Settlement Class Members; (6)

Defendants' waiver of certain rights under the XCP and MediaMax EULAs; and (7) a "most favored nations" provision that may enhance the benefits available to all Settlement Class Members.  In addition, Defendants have agreed to allow Plaintiffs' Co-Lead Counsel to conduct confirmatory discovery in support of the settlement terms which will take place in advance of the fairness hearing.

The settlement provides incentive awards for each of the named Plaintiffs in this Action and the Non-S.D.N.Y. Actions in an amount not to exceed $1,000 per Plaintiff.  These awards are reasonable in light of the overall benefit conferred on the Settlement Class.  See, e.g., Spann v. AOL Time Warner, Inc., 02 Civ. 8238, 2005 U.S. Dist. LEXIS 10848, at *27 (S.D.N.Y. June 7, 2005) (granting incentive award of $10,000 per plaintiff on class action settlement with total cash value of $2.9 million).

Finally, the settlement does not mandate excessive compensation for Plaintiffs' counsel. In fact, to ensure that Settlement Class Members obtain the benefits of this settlement as soon as possible, Plaintiffs have elected to move for preliminary settlement approval before the parties discussed compensation, in the form of attorneys' fees and reimbursable expenses, for Plaintiffs' counsel's litigation efforts.  (¶ IX.A.)  The parties understand, however, the Plaintiffs' counsel will apply for an award of attorneys' fees and reimbursement of expenses, that Defendants will pay any fees and expenses awarded, and that the payment of such fees and expenses will not affect the benefits provided to the Settlement Class Members in any way.  (¶ IX.A., B.)  If the parties reach an agreement on the amount of attorneys' fees and expenses for which Plaintiffs' counsel will apply before disseminating notice of the proposed settlement, the Full Settlement Notice will reflect that agreement.  (¶ IX.B.)

### 3.     The Settlement Falls Within The Range Of Possible Approval

As explained above, the proposed Settlement was reached only after protracted arm's-length negotiations between the parties and Plaintiffs' Co-Lead Counsel's thorough consideration of the advantages and disadvantages of continued litigation.  Plaintiffs' Co-Lead Counsel believe this settlement achieves all of the objectives of the litigation, namely removing harmful XCP software from the market, stopping the continued release of MediaMax CDs, compensating people who unknowingly installed the software on their computers, fixing security vulnerabilities in XCP, MediaMax and SONY BMG's future copy protection software, and ensuring that SONY BMG will provide complete and accurate disclosures in its EULAs for future content protection software.  Plaintiffs' Co-Lead Counsel, law firms with a great deal of experience in the prosecution and resolution of class actions and complex consumer litigation, have carefully evaluated the merits of this case and the proposed settlement.  Even if the matter were to proceed to trial, Plaintiffs' Co-Lead Counsel acknowledge, based on past, real-world experience, that the apparent strength of a plaintiff's case is no guarantee against a defense verdict.  Furthermore, even if a judgment were obtained against Defendants at trial, the relief might be no greater, and indeed might be less, than that provided by the proposed Settlement.

Under the Settlement, SONY BMG will be enjoined from using XCP and MediaMax software on audio CDs they manufacture.  SONY BMG will implement several changes to its policies and procedures concerning content protection software and the EULAs associated with that software.  These changes will ensure that the content protection software will not be installed without the user's express consent, will be removable from the user's computer, and will not render the user's computers vulnerable to known security risks.  In addition, the EULA's will be written in plain English and will accurately describe the nature and function of the content protection software.

The XCP Exchange Program is designed to ensure that the XCP CDs are removed from the market as soon as possible and to provide consumers with replacement CDs as well as downloadable music files. The MediaMax compensation will also provide benefits to consumers who unknowingly installed such software on their computers and exposed their systems to security vulnerabilities. In addition, Defendants will continue to make available software utilities that will update and remove the XCP and MediaMax software from a user's computer.

Defendants have committed that the do not and will not collect, aggregate or retain certain personal information on the computer users who listen to SONY BMG CDs without the express consent of those users. Under the settlement, Defendants will be required to engage an independent expert to verify their practices with respect to collection of personal information.

Defendants have agreed to waive certain of their rights under the XCP and MediaMax EULAs. These waivers will allow consumers to remove the XCP and/or MediaMax software from their computers, listen to the audio files across all file formats and in all portable music players, and choose not to download future updates of the XCP or MediaMax software. Once these provisions are waived, consumers will not have to be in possession of the SONY BMG CD to hold a license for the audio files, will not be precluded from copying music files and other digital content on the CDs, will be allowed to resell the CDs, and will not lose their licenses for the software if they file for bankruptcy protection or are declared insolvent. Also, Defendants waive their rights to be indemnified by users of the XCP or MediaMax software for harm arising from their use of the software.

Finally, the settlement operates as a floor, not a ceiling, on benefits available to Settlement Class Members. Accordingly, if SONY BMG enters into other agreements with state and/or federal government authorities that provide additional benefits to certain consumers,

SONY BMG will offer those same benefits to all Settlement Class Members.  All of these

measures are of particular value to Settlement Class Members.

 In light of the above considerations, the proposed settlement as a whole falls within the

range of possible final approval.  The Court should therefore grant preliminary approval of the

settlement and direct that notice of it be given to the Settlement Class.

## V. THE PROPOSED PLAN OF CLASS NOTICE

 Rule 23(c)(2)(B) says, "For any class certified under Rule 23(b)(3), the court must direct

to class members the best notice practicable under the circumstances, including individual notice

to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); see

also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175-76 (1974).  Rule 23(e)(B) similarly says,

"The court must direct notice in a reasonable manner to all class members who would be bound

by a proposed settlement, voluntary dismissal, or compromise."  Fed. R. Civ. P. 23(e)(B).  The

standard for the adequacy of a settlement notice in a class action under either the Due Process

Clause or the Federal Rules is measured by reasonableness.  Wal-Mart Stores, 396 F.3d at 113

(citing Soberal-Perez v. Heckler, 717 F.2d 36, 43 (2d Cir. 1983); Fed. R. Civ. P. 23(e)).  "There

are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or

Rule 23(e) requirements; the settlement notice must 'fairly apprise the prospective members of

the class of the terms of the proposed settlement and of the options that are open to them in

connection with the proceedings.'"  Id. at 114 (quoting Weinberger v. Kendrick, 698 F.2d 61, 70

(2d Cir. 1982)).  Notice is "adequate if it may be understood by the average class member." 4

Alba Conte & Herbert Newberg, Newberg on Class Actions § 11:53, at 167 (4th ed. 2002).

 Here, the parties propose an extensive notice campaign, designed to reach as many

Settlement Class Members as possible.  The Full Settlement Notice will be disseminated in four

ways:  SONY BMG will (1) send the Settlement Notice by e-mail to all Settlement Class

Members whose e-mail addresses SONY BMG possesses; (2) post the Settlement Notice on its website; (3) cause a "Banner" advertisement with a link to the Full Settlement Notice to appear on a user's computer screen when that user inserts an XCP CD or a MediaMax CD into a computer with an active connection to the Internet; and (4) work with Google and other popular Internet search engines to ensure that a link to the Full Settlement Notice is displayed prominently following a search for terms such as "XCP," "MediaMax" and "SONY BMG Settlement." (¶¶ VI.B.1.-6.)  The Full Settlement Notice is attached to the Settlement Agreement as Exhibit F.

In addition, SONY BMG will cause the Summary Settlement Notice to be published in the following national and local publications:  USA Today, People, Rolling Stone, Spin, the Los Angeles Times, the New York Daily News, the New York Post, the Chicago Tribune and the Atlanta Journal-Constitution.  (¶ VI.B.5.)  Moreover, Plaintiffs' Class Counsel will post the Summary Settlement Notice and the Full Settlement Notice on their websites.  (¶ VI.B.6.) Plaintiffs' Class Counsel and SONY BMG will cause a joint press release containing the information included in the Summary Settlement Notice to be issued over a national news wire service such as PR Newswire.  (¶ VI.B.6.)  The Summary Settlement Notice is attached to the Settlement Agreement as Exhibit E.

Under the Settlement Agreement, SONY BMG will pay all costs for the publication and dissemination of notice to Settlement Class Members.  (¶ X.A.)  Plaintiffs recommend that all forms of notice be disseminated no later than February 1, 2006.

The proposed methods of notice comport with Rule 23 and the requirements of due process.  See, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litig., 216 F.R.D. 197, 203 (D. Me. 2003) (approving notice program which included print advertisements, electronic publication, short- and long-form notices directing class members to Internet and

mailing addresses for further information because individual notice was not possible, given that

the class consisted of millions of unidentified CD purchasers); In re Serzone Prods. Liab. Litig.,

MDL No. 1477, 2005 U.S. Dist. LEXIS 30468, at *34 (S.D.W.Va. Sep. 2, 2005) (noting

approval of notice plan which included nationwide publication notice, establishment of a notice

and claims information website, a toll free number to take questions, and individual notice to

reasonably identifiable class members); In re Airline Ticket Comm'n Antitrust Litig., 953 F.

Supp. 280, 281-282 n.2 (D. Minn. 1997) (noting that class notice was provided electronically).

     As for the content of the notice, Rule 23(c)(2)(B) says:

The notice [to a Rule 23(b)(3) class] must concisely and clearly state in plain,
easily understood language:

- the nature of the action,

- the definition of the class certified,

- the class claims, issues, or defenses,

- that a class member may enter an appearance through counsel if the
member so desires,

- that the court will exclude from the class any member who requests
exclusion, stating when and how members may elect to be excluded, and

- the binding effect of a class judgment on class members under
Rule 23(c)(3).

Where notice is being sent in connection with a proposed settlement, "the settlement notice must

'fairly apprise the prospective members of the class of the terms of the proposed settlement and

of the options that are open to them in connection with the proceedings.'"  Wal-Mart, 396 F.3d at

114 (quoting Weinberger, 698 F.2d at 70).

     The proposed Full Settlement Notice comports with the above-cited legal authorities in

all respects.  To that end, the proposed Full Settlement Notice:  (1)  describes the nature, history,

and status of the litigation; (2) sets forth a clear definition of the proposed Settlement Class; (3)

states the class claims and issues; (4) clearly provides that Settlement Class Members may enter

an appearance through their own counsel; (5) discloses the right of people who fall within the

definition of the Settlement Class to exclude themselves from the Settlement, and specifies the

deadline and procedure for doing so; and (6) warns of the binding effect of the settlement

approval proceedings on those persons who remain in the Settlement Class.  In addition, the Full

Settlement Notice clearly describes the terms of settlement, and the compensatory and injunctive

relief available to Settlement Class Members.

      The Full Settlement Notice also provides clear notice that the parties have yet to discuss

compensation for Plaintiffs' counsel, in the form of attorneys' fees or reimbursable litigation

expenses, but advises Settlement Class Members of the Parties' agreement that any award of

attorneys' fees and reimbursable expenses to Plaintiffs' counsel will not in any way affect the

benefits available to Settlement Class Members.

      Finally, the Full Settlement Notice also provides contact information for Class Counsel;

summarizes the reasons the parties are proposing the settlement; discloses the date, time and

place of the formal Fairness Hearing; and describes the procedures for commenting on the

settlement and appearing at the Fairness Hearing.

      The Full Settlement Notice contents therefore satisfy all applicable requirements.

      Therefore, in granting preliminary settlement approval, the Court should also approve the

parties' proposed form and method of giving notice to the Settlement Class.

//

//

//

//

//

## VII.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully ask that the Court grant preliminary approval of the proposed settlement and enter the proposed Preliminary Order in Connection with Settlement Proceedings, submitted herewith.

DATED:  December 28, 2005              Respectfully submitted,


                              **GIRARD GIBBS & De BARTOLOMEO LLP**


                              By:_____/s/  *Jonathan K. Levine*_____
                              Jonathan K. Levine (JK-8390)
                              Daniel C. Girard (Pro Hac Vice)
                              Elizabeth C. Pritzker (Pro Hac Vice)
                              Aaron M. Sheanin (Pro Hac Vice)
                              601 California Street, Suite 1400
                              San Francisco, California 94108
                              Telephone:  (415) 981-4800


                              **KAMBER & ASSOCIATES LLC**
                              Scott A. Kamber (SK-5794)
                              19 Fulton Street, Suite 400
                              New York, NY  10038
                              Telephone:  (212) 571-2000


                              *Plaintiffs' Co-Lead Counsel*
                              *Interim Class Counsel*