UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re SONY BMG CD TECHNOLOGIES LITIGATION | : : : : : : : : : : : | Civil Action No. 1:05-cv-09575-NRB<br><br>CLASS ACTION<br><br>JOINT DECLARATION OF COUNSEL IN SUPPORT OF RICCIUTI CLASS REPRESENTATIVES' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES |
| This Document Relates To:<br><br>ALL ACTIONS. |  |  |

We, CINDY A. COHN, JEFFREY D. FRIEDMAN and ROBERT S. GREEN, declare as follows:

1. We are attorneys for Tom and Yvonne Ricciuti, Mary Schumacher, Robert Hull, Joseph Halpin, and Edwin Bonner six of the thirteen class representatives in this action and for Erin Melcon a class representative in one of the California actions. We submit this declaration on behalf of attorneys from the following firms: the Electronic Frontier Foundation ("EFF"), Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Green Welling LLP, Lawrence E. Feldman & Associates, The Rothken Law Firm LLP, and the Law Offices of Mallison & Martinez. Hereinafter we collectively refer to these firms as the EFF Group.

2. This declaration describes the history of the litigation and the work performed, and the result achieved against defendants in the above-captioned matter, which were defended by highly able counsel from a corporate law firm(s). It is based on our collective knowledge as a result of our coordinated participation in these proceedings. If we were called upon as witnesses we could and would competently testify as to the matters contained herein.

3. EFF is a non-profit organization that is a leading international authority on legal issues involving digital rights, such as those presented here. EFF's website is one of the most linked to websites in the world and EFF's blog, called Deep Links, averages 800,000 views per month. By mobilizing more than 50,000 concerned citizens through its Action Center, EFF has become internationally recognized as the leading advocate for consumer rights in electronic privacy issues.

4. EFF's paid membership includes approximately 10,400 people and almost 48,000 people subscribe to EFF's weekly newsletter. EFF litigated against Sony the most important copyright case involving music and digital rights decided by the U.S. Supreme Court in the last 15

years.  *See MGM Studios, Inc. v. Grokster, Ltd.*, __ U.S. __, 125 S. Ct. 2764 (2005).  EFF was counsel of record for the respondents appearing before the Supreme Court.

5. Lerach Coughlin Stoia Geller Rudman & Robbins LLP is one of the largest class action firms in the county, with attorneys specializing in securities, consumer, insurance, healthcare, human rights, employment discrimination and antitrust class actions.

6. Green Welling LLP is also one of the leading firms in the nation for consumer class actions.

7. Lawrence E. Feldman & Associates has extensive experience practicing in the area of protecting the rights of artists and consumers in the music industry.

8. Beginning on October 31, 2005, when issues of the Sony BMG Music Entertainment ("Sony BMG") rootkit problems first surfaced, through the present, the EFF Group conducted and supervised extensive legal and factual research into all possible legal claims against defendants, including the federal Computer Fraud and Abuse Act, the Digital Millennium Copyright Act, the California Consumer Legal Remedies Act, the California Unfair Competition Law, the California Consumer Protection Against Spyware Act, breach of contract, applicable laws in New York, Illinois and Texas and various other claims.

9. Beginning on November 3, 2005, only four days after Sony BMG's use of a rootkit first became public, EFF notified its membership of more than ten thousand people and the public that the Sony BMG rootkit was an issue with grave security and privacy concerns.  In an article published on the popular blog portion of its website on November 3, 2005, EFF discussed these concerns with the XCP CDs and the even more problematic issues with the XCP "update."

10. After communicating with industry experts and conducting factual research, on November 9, 2005, the EFF Group identified and published a list of 20 CDs that contained the XCP

software on EFF's website. Included in the November 9, 2005 article was a list of three CDs that included the MediaMax software. This was the first time it was publicly suggested that the MediaMax CDs from Sony BMG had similar security and privacy issues as the XCP CDs.

11. On November 9, 2005, EFF also published an article directing attention to Sony BMG's End User License Agreement ("EULA"), and the many unconscionable provisions inserted into its EULA that violated end-users' rights. During these first two weeks of November, the EFF Group conducted extensive research into the factual and legal bases of potential claims against Sony BMG, that included communicating with many of EFF members knowledgeable in this area, reading and researching statutes and case law, communicating with many of the experts in the field, such as Ed Felten, Professor of Computer Science and Public Affairs at Princeton University, and one of his graduate students, Alex Halderman, communicating with other attorneys about these claims, reviewing Sony BMG CDs and EULAs, testing their software, and conducting extensive factual and internet research into these issues. This extensive research continued on a daily basis with the EFF Group, almost the entire time that this case has been pending, and continuing through the present.

12. The EFF Group also retained and communicated with Ben Edelman, a graduate of Harvard Law School with extensive experience as an expert witness in computer spyware cases. *See, e.g.*, http://www.benedelman.org/bio/. Mr. Edelman provided substantial assistance in assessing the claims, addressing Sony BMG positions and settlement issues.

13. Based on this research and factual investigation, on November 14, 2005, the EFF Group sent a demand letter to Sony BMG and its counsel, pursuant to Cal. Civ. Codes §§1750, *et seq.* The demand letter informed Sony BMG that the EFF Group intended to file suit unless it took at least ten enumerated specific steps to remedy the situation caused by its illegal software products. To notify EFF's members and the general public about Sony BMG's conduct, and after investigating

the facts in further detail, the EFF Group published a version of this demand letter as an "open letter" to the public.

14. The EFF Group's demand letter addressed security and privacy concerns of both the XCP and MediaMax software and listed ten specific, detailed remedies that were requested from Sony BMG. Among other things, we demanded that Sony BMG: (a) recall all XCP and MediaMax CDs and offer replacements to customers; (b) widely publicize the security risks associated with the infected CDs, including among other things, using the banners that Sony BMG's software projects onto users' computers, to notify consumers about the available relief; (c) cooperate with antivirus companies to facilitate removal of the XCP and MediaMax software from users' computers, including an opportunity to download corrective software; (d) employ rigorous testing procedures on any future digital rights management technology Sony BMG may use in the future; and (e) certify that future CDs containing content protection software would not electronically communicate to Sony BMG nor initiate the download of any software without prior informed consent of the user.

15. On November 14, 2006, the EFF Group determined, after consultation with experts, that the uninstaller for XCP software then being offered by Sony BMG created new security problems for users.

16. Also on November 14, 2006, Jeff Cunard, counsel for Sony BMG, contacted the EFF Group and initiated a telephone call about the case. During that call, Mr. Cunard stated that he wished to extend an olive branch and a line of communication with the EFF Group, and asked us not to file suit without first informing him. We agreed to do so. The EFF Group informed Mr. Cunard that we believed that Sony BMG needed to respond to concerns with both the XCP software and the MediaMax software.

17. After the EFF Group's telephone call with Sony BMG, but also on November 14, 2005, Sony BMG announced it would agree to an exchange program for its XCP CDs. Over the next few days, the EFF Group extensively negotiated with Sony BMG's counsel, the terms of Sony BMG's XCP CD recall campaign pursuant to the terms set forth in our November 14, 2005 demand letter. Our negotiations also included the problems the EFF Group discovered with MediaMax CDs. This included informing Sony BMG on November 17, 2005, of another problem with their uninstaller for the XCP software.

18. On November 18, 2005, Sony BMG formally responded to the EFF Group's demand letter and private negotiations. In its response, Sony BMG committed to us that Sony BMG would take 12 specific steps addressed in our demand letter, including: (a) stop manufacturing CDs with XCP software; (b) withdraw existing CDs with XCP software from the distribution chain; (c) provide a notice program through retailers and electronic means; (d) provide an update for XCP to "uncloak" XCP; (e) provide an uninstaller; (f) test the uninstaller and update through a third party; and (g) notify antivirus companies that security issues have been raised. Sony BMG did not agree, at that time, to take any remedial action for MediaMax CD owners, despite pressure from the EFF Group to do so.

19. Due in significant part to Sony BMG's refusal to address the MediaMax software issues, on November 21, 2005, the EFF Group filed a class action in California state court.

20. On November 28, 2005, upon learning that many retail establishments were still offering XCP CDs for resale and that Sony BMG was providing inadequate notice to the public of its recall, the EFF Group published a public demand for Sony BMG to provide extensive notice of the XCP recall to consumers, including placing notices on the websites of artists. Also, the EFF Group's investigation further revealed that the MediaMax problems ran as deep as XCP.

21. On November 30, 2005, EFF provided evidence to Sony BMG of an undisclosed MediaMax security problem. In the letter to Sony BMG, on behalf of the Ricciuti class representatives, the EFF Group identified the existence and details of the security threat and stated we would give Sony BMG time to create a security patch before releasing details of how the software could be exploited. However, we also stated that we would seek a temporary restraining order should Sony BMG refuse to immediately address the problem.

22. After receiving this letter, Sony BMG requested that the EFF Group wait 24 hours before publicly releasing the information regarding MediaMax security vulnerabilities.

23. The EFF Group agreed to Sony BMG's request to delay publicly releasing this information in order to allow patches to be developed to repair the security problem before the public was given detailed information about the security weakness we had identified. The EFF Group did, however, release the information privately to the major antivirus companies. The EFF Group shared its expert's report on the MediaMax security vulnerabilities with Sony BMG and agreed to allow Sony BMG time to work towards a patch. The EFF Group did not release these security vulnerabilities publicly to prevent exploitation by computer hackers.

24. Throughout the weekend, the EFF Group provided Sony BMG access to its security experts, iSec partners, and worked with Sony BMG to create and test a security patch for the MediaMax security flaw. During the weekend, Sony BMG executive Thomas Hesse stated on a telephone call that he recognized the security problem that the EFF Group had identified to Sony BMG and that he would personally see to it that the problem was fixed for purchasers of MediaMax CDs.

25. Because Sony BMG continued to refuse to meet certain of the EFF Group's demands for further relief on behalf of the proposed classes, the Ricciuti class representatives continued to

actively pursue litigating the case against defendants. While the EFF Group worked with Sony BMG to resolve the MediaMax security vulnerabilities, the EFF Group also continued its factual investigation and prepared a motion for a preliminary injunction against the sale of MediaMax CDs.

26.     In the event Sony BMG continued to refuse to agree to sufficiently address the MediaMax security issues, including the security flaw, the EFF Group was prepared to file its motion for preliminary injunction.

27.     Thereafter, EFF Group agreed with Sony BMG not to file the motion for preliminary injunction because Sony BMG agreed to undertake a large amount of remedial measures, including: (a) joint efforts between the EFF Group and Sony BMG to solve and implement a "patch" to fix the MediaMax security flaw; (b) Sony BMG's agreement to provide robust notice of the patch, including by purchasing adwords on Google, placing notices on the websites of artists whose CDs were affected and providing notice pursuant to the banner ad functionality of the CDs; and (c) updating Sony BMG's website in accordance with the EFF Group's suggestions to make it easier for consumers to navigate.

28.     Based on these efforts, on December 6, 2005, Sony BMG and the EFF Group jointly announced to the public both the security vulnerability in the MediaMax software and the availability of a patch.

29.     The EFF Group focused on getting Sony BMG to limit the harm and potential harm it had created and getting immediate notice to class members about the need to patch their computers or uninstall the software. Throughout this period of fast-moving investigation and discovery of security vulnerabilities and privacy violations, the EFF Group also communicated with and assisted government agencies interested in and investigating these technology issues and the real-world ramifications.

30. For example, on November 22, 2005, the Texas Attorney General contacted the EFF Group. After discussing the security flaws in the MediaMax software, the EFF Group provided the Texas Attorney General with extensive information regarding MediaMax and its producer, SunnComm. This information contributed to the Texas Attorney General amending his complaint to add MediaMax claims on December 21, 2005.

31. Similarly, on December 15, 2005, the Federal Trade Commission ("FTC") contacted the EFF Group, indicating they were considering a formal investigation into defendants' conduct. The EFF Group freely shared with the FTC relevant information concerning the problems with the MediaMax software.

32. On January 4, 2006, the EFF Group spoke with the Florida Attorney General regarding the troubled MediaMax software, including the "phone home" features, the lack of pre-sale notice to consumers regarding the flawed MediaMax software, and Sony BMG's failure to provide customers with assistance in using the MediaMax and XCP updates and uninstallers.

33. The EFF Group also continued its communications with the Texas Attorney General.

34. On December 5, 2005, Sony BMG called the EFF Group and indicated that it would like to enter into a comprehensive settlement agreement, beyond the XCP recall, discussed above, and the agreements that had already been reached during the MediaMax security patch negotiations.

35. A short two days later, on December 7, 2005, Sony BMG informed the EFF Group for the first time that it was in parallel settlement negotiations with the Girard/Kamber group. Sony BMG had not previously disclosed their involvement in other negotiations or the fact that it had stipulated to the case management order filing prior to this time.

36. The EFF Group immediately made contact with Scott Kamber and Elizabeth Pritzker, who informed us that they had been appointed interim class counsel, that a settlement with Sony

BMG was already negotiated and that signature on the settlement was only "hours" away. Mr. Kamber and Ms. Pritizker stated that this settlement would include all of the claims raised by the Ricciuti plaintiffs, including claims related to the MediaMax software.

37. Despite repeated requests from the EFF Group and our co-counsel, the Girard/Kamber attorneys resisted sharing a draft of their settlement proposal until December 12, 2005, despite explicit permission from Sony BMG to do so.

38. After extensive negotiations between the EFF Group and the Girard/Kamber group, on December 12, 2005, the EFF Group received the Girard/Kamber draft settlement agreement. The EFF Group spent substantial time assessing that draft and the changes that we believed were necessary to reach a viable settlement.

39. On December 13, 2005, the EFF Group was invited to participate in the settlement negotiations on the eve of Girard/Kamber and Sony BMG executing the settlement.

40. On December 18, 2005, the EFF Group flew to New York to meet with Sony BMG's counsel to discuss settlement positions. Based on several material representations made at that time by both Girard/Kamber and Sony BMG, the Ricciuti class representatives agreed to delay objecting to the CMO appointing Girard/Kamber "class counsel," pending further settlement negotiations and additional terms to be included in the Settlement Agreement.

41. The EFF Group conducted extensive negotiations with Sony BMG's counsel (even at times, having to overcome hurdles placed between us and Sony BMG by Mr. Kamber's prior positions). Our face to face negotiations began shortly after 9:00 a.m. on Sunday, December 18, 2005 and continued until around 10:00 p.m. that night, when the EFF Group initialed a revised draft of the proposed settlement agreement, which added extensive relief for the purchasers of MediaMax

CDs, and added improved current and future benefits to most substantive terms related to purchasers of XCP CDs.

42. It was apparent from positions taken at the meeting in New York, that the Girard/Kamber group was willing to release MediaMax class members' claims without material benefit to those class members. Moreover, with respect to class members who purchased CDs with XCP software, we found little had been achieved beyond what Sony BMG committed to the EFF Group on November 18, 2005.

43. The EFF Group fought to narrow the releases. For example, Girard/Kamber seemed willing to release all EULA and MediaMax claims, despite an apparent lack of investigation into those particular issues or even a named representative plaintiff in any of their complaints who alleged such claims. Not one of the Girard/Kamber complaints had at that time any MediaMax or EULA allegations. Those claims were made only in the complaints filed by the EFF Group. No plaintiff in the Girard/Kamber complaints even alleged a purchase of MediaMax CDs.

44. As a direct result of the EFF Group's litigation efforts and negotiations, the terms of the settlement agreement provide compensation for MediaMax class members, including providing new copies of their music without content protection software. The settlement agreement also guarantees Sony BMG will stop manufacturing MediaMax CDs for a term of two years.

45. The EFF Group negotiated Sony BMG's agreement to forego enforcement of several terms of its EULA. Moreover, the EFF Group negotiated a minimum corporate standard in the process for evaluating any future digital rights management software and Sony BMG's required response to any future "Security Vulnerabilities" discovered during the settlement period the additional or enhanced terms include that the settlement website provide prominent links to anti-spyware tools and vendors, and that Sony BMG attempt to provide notice to purchasers of XCP CDs

via banner ads, artists' websites, artists' emails lists and Google and other search engine adwords, as the EFF Group had already negotiated for MediaMax purchasers.

46.     After negotiating several other material settlement terms, the EFF Group agreed to the settlement based on two conditions. First, that the Ricciuti class representatives would be included as class representatives in the settlement papers. Thus, class counsel would be required to get authorization to modify the agreement. Second, EFF would monitor the implementation of the settlement agreement terms because of their expertise and experience in this area. The Girard/Kamber group, in the presence of Sony BMG, agreed to these conditions. In fact, class counsel privately represented to EFF that their word on this was as good as "gold."

47.     Despite Girard/Kamber's verbal and written representations to the EFF Group, Girard/Kamber stalled for months from executing a formal agreement with EFF, designating EFF to monitor the implementation of particular terms of the agreement. During this time, Sony BMG delayed substantively responding to the EFF Group and the EFF Group's request that Sony BMG timely provide important settlement information to the EFF Group.

48.     Several events after the signing of the settlement agreement demonstrate that a monitoring role by counsel with the EFF Group's knowledge and experience is important to protect the interests of the class. For example, after the settlement agreement was signed, based on repeated requests for information to Sony BMG, the EFF Group discovered that certain notice provisions within the agreement for purchasers of CDs containing the MediaMax software are illusory. Sony BMG represented during negotiations that banner notice to class members would be possible for both XCP and MediaMax CDs. Banner notice is generated when a user inserts a Sony BMG CD into a computer which then queries Sony BMG's website (or SunnComm's website) for content, after which a link to the full settlement notice appears on the consumer's screen.

49. Notwithstanding our negotiation for banner notice to purchasers of the MediaMax CDs, and the fact that the settlement agreement clearly provides for notice by this manner for both XCP and MediaMax CDs, and our efforts to obtain detailed information related thereto, it was not until February 10, 2006, that Sony BMG disclosed to us that it could not generate banner notice for the 37 titles of MediaMax 3.0 CDs at all and only for six out of 27 MediaMax 5.0 CD titles.

50. This disclosure regarding MediaMax banners occurred over a month after our January 6, 2006 meeting with counsel for Sony BMG, and after significant negotiations about the look and feel of the banners for CDs that contain either MediaMax versions 3.0 or 5.0. During this time, Sony BMG provided sample banners to counsel for MediaMax 3.0 CDs, apparently while aware that no such banners could ever be displayed. When the EFF Group learned the truth, we then attempted to negotiate further notice to the purchasers of CDs containing MediaMax software as provided by the settlement agreement.

51. However, Sony BMG refused to provide further notice and Girard/Kamber made no apparent real effort to assist in securing any additional notice.

52. Girard/Kamber and defense counsel also agreed to amend the settlement agreement without consulting any of the Ricciuti class representatives (six out of thirteen total named plaintiffs) or their counsel. The amendment, by stipulation and submitted for this Court's approval, potentially allowed the consideration for the class to be changed at the discretion of Girard/Kamber and Sony BMG – all without proper notice to the class. This was a direct violation of the agreement's terms, and seemed contrary to class counsel's duties and obligations to the class and co-counsel.

53. On February 3, 2006, the EFF Group notified this Court of the Ricciuti plaintiffs' objection to this settlement modification. The Court requested that Girard/Kamber, defendants and the EFF Group work out an agreement or attend a case management conference. The EFF Group

then participated in further negotiations with all the parties to the Settlement Agreement, resulting in a revised modification providing more protections for the class, which was then presented to and approved by this Court.

54.     EFF spearheaded a "get out the vote" campaign with banner notices to its 10,000 members. On three occasions, EFF sent notice to the 48,000 people through its newsletter.

55.     EFF's campaign directly resulted in at least 12 offline or online press stories about the settlement, 47 blog postings about the settlement, including many websites using EFF banners, and seven republications of EFF's press releases.

56.     Additionally, since March 1, 2006, EFF's webpage devoted to the Sony BMG settlement has received over 30,000 page views. Since March 14, 2006, when we started keeping record, the link to "submit a claim" on EFF's website, which links directly to the sonybmgtechsettlement.com website, has been clicked 2,143 times, the link to the list of affected CDs has been clicked 5,648 times, and the links to learn more about the benefits of submitting a claim have been clicked 2,757 times.

57.     Additionally, Lawrence E. Feldman & Associates, of the EFF Group, has directly notified over 400,000 potential class members through various e-mails and newsletters.

58.     In the Declaration of Reed R. Kathrein, Esq. in Support of the Ricciuti Class Representatives' Memorandum of Law In Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, submitted concurrently herewith, are 44 exhibits evidencing, in part, the work detailed in this joint declaration. These exhibits are hereby incorporated by reference.

We declare under penalty of perjury under that the foregoing is true and correct. Executed this 6th day of April, 2006, at San Francisco, California.

_____
CINDY A. COHN

_____
JEFFREY D. FRIEDMAN

_____
ROBERT S. GREEN

C:\Documents and Settings\User\Local Settings\Temp\DEC00029736.doc

58. In the Declaration of Reed R. Kathrein, Esq. in Support of the Ricciuti Class Representatives' Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, submitted concurrently herewith, are 44 exhibits evidencing, in part, the work detailed in this joint declaration. These exhibits are hereby incorporated by reference.

We declare under penalty of perjury under that the foregoing is true and correct. Executed this 6th day of April, 2006, at San Francisco, California.

_____
CINDY A. COHN

_____
JEFFREY D. FRIEDMAN

_____
ROBERT S. GREEN

T:\CasesSF\Sony NY\DEC00029736.doc

58.     In the Declaration of Reed R. Kathrein, Esq. in Support of the Ricciuti Class Representatives' Memorandum of Law In Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, submitted concurrently herewith, are 44 exhibits evidencing, in part, the work detailed in this joint declaration. These exhibits are hereby incorporated by reference.

We declare under penalty of perjury under that the foregoing is true and correct. Executed this 6th day of April, 2006, at San Francisco, California.

_____
CINDY A. COHN


_____
JEFFREY D. FRIEDMAN

*/s/ Robert S. Green*
_____
ROBERT S. GREEN

T:\CasesSF\Sony NY\DEC00029736.doc