# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re:

SONY BMG CD
TECHNOLOGIES LITIGATION

Case No. 1:05-cv-09575-NRB

**JOINT AFFIDAVIT OF DANIEL C. GIRARD AND SCOTT A. KAMBER IN SUPPORT OF:**
**(1) MOTION OF CLASS COUNSEL FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AND**
**(2) MOTION OF CLASS COUNSEL FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND INCENTIVE AWARDS TO NAMED PLAINTIFFS**

**GIRARD GIBBS
  & De BARTOLOMEO LLP**
Daniel C. Girard (Pro Hac Vice)
Jonathan K. Levine (JL-8390)
Elizabeth C. Pritzker (Pro Hac Vice)
Aaron M. Sheanin (Pro Hac Vice)
601 California Street, Suite 1400
San Francisco, California 94108
Telephone:  (415) 981-4800

**KAMBER & ASSOCIATES, LLC**
Scott A. Kamber (SK-5794)
19 Fulton Street, Suite 400
New York, NY  10038
Telephone:  (877) 773-5469

*Class Counsel*

Daniel C. Girard and Scott A. Kamber jointly declare as follows:

1.     Girard Gibbs & De Bartolomeo LLP ("Girard Gibbs") and Kamber & Associates, LLC (the "Kamber Firm") were appointed to serve as Plaintiffs' Co-Lead Counsel pursuant to Case Management Order No. 1, entered December 1, 2006, and to serve as Class Counsel for the Settlement Class pursuant to this Court's January 6, 2006 Hearing Order following Plaintiffs' motion for preliminary approval of the proposed settlement ("Hearing Order").  Girard Gibbs and the Kamber Firm (collectively "Class Counsel") jointly submit this affidavit in support of Plaintiffs' motions, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of the settlement, for an award of attorneys' fees and reimbursement of expenses and for leave to pay incentive awards to the class representatives.  The following statements are based on personal knowledge and Class Counsel's investigation and review of the files in *In re SONY BMG CD Technologies Litigation*, Case No. 1:05-cv-09575-NRB (S.D.N.Y.), unless otherwise noted.  Information pertaining to the time and expenses incurred by our respective firms is attested to individually and not jointly.

2.     We discuss, in the following order, (a) the history of proceedings in the case, which sheds light on the services required of plaintiff's counsel in this matter; (b) the reaction of the Class to the settlement; (c) the complexities and risks associated with the litigation; and (d) the terms of Class Counsel's agreement with SONY BMG Music Entertainment, Inc. ("Sony BMG") for payment of attorneys' fees, and the time, rate, and expense figures underlying the application of Class Counsel and other Plaintiffs' counsel for attorneys' fees and reimbursement of expenses.

## I.      HISTORY OF THE CASE

### A.      Sony BMG's Digital Rights Management Software Creates A Risk Of Harm To Computer Users

3.      The recitation of facts in this section is based on Class Counsel's pre-filing investigation of the claims asserted in this litigation against Sony BMG.  This investigation took place from November 1 through November 14, 2005, during which time our firms independently reviewed and analyzed various media reports, conducted interviews with witnesses, researched Sony BMG's representations to consumers, and tested the consumer products at issue.  The recitation in this section is also based on the facts gathered through the litigation, settlement negotiations, consultations with outside consultants, and confirmatory discovery.

4.      Sony BMG is the second largest owner and distributor of recorded music in the world.  In an effort to place restrictions on the ability of consumers to use, copy or transfer the digital content, including digital music files, on the compact discs ("CDs") that Sony BMG distributes, Sony BMG has included anti-copying software, known as "digital rights management" software or "DRM" on many of its CDs since 2003.

5.      Sony BMG first introduced a line of CDs containing a DRM software program known as MediaMax 3.0, designed and licensed to Sony BMG by SunnComm International, Inc., and MediaMax Technology Corp. (collectively, "SunnComm"), in September 2003.  In January 2005, Sony BMG initiated an effort to include DRM software on at least 50 percent of all CDs manufactured and sold through 2005, with the intent of including some form of DRM software on all CDs manufactured and sold by Sony BMG by the end of the year.  As part of this effort, in January 2005, Sony BMG introduced a line of music CDs containing a DRM program called Extended Copy Protection ("XCP"), designed and licensed to Sony BMG by First 4 Internet, Ltd.  Other music CDs marketed and sold by Sony BMG in 2005 contained an enhanced version of the MediaMax DRM software, commonly known as MediaMax 5.0.   Sony BMG

2

manufactured more than 20 million CDs containing MediaMax software, and approximately 5 million CDs containing XCP software.

6.      The central feature of these two Sony BMG DRM software programs is that they limit the consumer to making no more than three copies of the DRM-protected CD.  The DRM programs also:  (a) prevent the consumer from listening to the digital audio files on the CD through any computer program or digital music player other than those manufactured or licensed by Sony BMG or Microsoft; (b) cause information to be exchanged electronically between the user's computer and Sony BMG; (c) install automatically onto the consumer's computer; and (d) fail to include a program or mechanism to uninstall the DRM software from the consumer's computer at a later time.  Consumers who purchased CDs containing these DRM programs were not aware of these restrictions and features, as Sony BMG did not disclose this information on the CD packaging or "jewel" cases, in the course of the DRM software installation process, or elsewhere.

7.      In addition to these restrictions and features, the XCP software used by Sony BMG on its CDs contains a cloaking mechanism, commonly referred to as a "rootkit," that automatically installs on the user's computer without the user's knowledge, and hides files, Registry keys and other computer system objects from diagnostic and security software.  These "rootkits" effectively disable computer security protection programs and expose consumers who place XCP CDs into their computers to various types of "malware," such as viruses and spyware promulgated by third parties, who use rootkits to hide their malicious actions from antivirus software, spyware blocking programs, and system management utilities.  ("Malware" refers to software designed to infiltrate or damage a computer system without the owner's consent, and includes computer viruses, "Trojan horses," spyware and adware.) The rootkit contained on the Sony BMG XCP CDs creates a unique risk to consumers, moreover, because it automatically

installs itself on the consumer's computer and does not contain a way for consumers to easily detect, remove or uninstall it.   The XCP security vulnerability was not just theoretical; by November 10, 2005, reports of the first virus written to exploit the XCP security vulnerability made the news.

8.     The restrictions, limitations and computer security vulnerabilities associated with Sony BMG's DRM software were not widely known until October 2005, when computer security expert Mark Russinovich inadvertently discovered that a Sony BMG CD he had purchased and installed on his computer, *Get Right With The Man* by Van Zant, had placed a rootkit, hidden device drivers and other hidden applications on his computer.   Mr. Russinovich first published his findings on a blog he devotes to research and commentary on issues of computer software and computer security – on October 31, 2005, and November 4, 2005, respectively.   The affidavit of Mr. Russinovich is submitted herewith.

9.     In various news interviews on or about November 1, 2005, representatives of Sony BMG and First 4 Internet (the Company that authored the XCP software) said that the disclosures in the EULA for the XCP software were adequate, despite the fact that the EULA did not inform end users that the software automatically installs on a user's system, installs hidden software and does not have an uninstaller.   Sony BMG and First 4 Internet maintained that the use of a cloaking mechanism in connection with the XCP software was an acceptable practice, and rejected the notion that the XCP software was a legitimate concern for computer users.

10.     While publicly denying wrongdoing, Sony BMG began to make available software updates or "patches" that were intended to allow computer users to close any security gaps posed by its DRM software.   Many consumers and independent experts reported that the updates developed by Sony BMG were difficult for consumers to obtain and cumbersome to use.

According to Mark Russinovich, the Sony BMG patch was unsafe and had the potential to cause end users' systems to crash and lose data.

11.     By early November 2005, Sony BMG had developed an uninstaller for the XCP software. Sony BMG did not publicize the uninstaller on its website, did not make the uninstaller available as a freely accessible download as it did the patch, and required users to submit two requests for the uninstaller and then wait for further instructions to be emailed. While consumers tried to navigate the difficult process of obtaining an uninstaller from Sony BMG, the XCP rootkit remained on their systems and continued to expose them to malware.

12.     On November 14, 2005, the Kamber Firm filed a complaint on behalf of James Michaelson and Ori Edelstein in the Southern District of New York, entitled *Michaelson v. Sony BMG Music, Inc.*, Case No. 05-cv-9575 (NRB) (S.D.N.Y.). The case was assigned to the Hon. Naomi Reice Buchwald. Also on November 14, 2005, Girard Gibbs filed an action on behalf of Dora Rivas in this Court, entitled *Rivas v. Sony BMG Music Entertainment, Inc.,* Case No. 05-cv-9598 (S.D.N.Y.). (Dora Rivas is the sister of Rosemary Rivas, an associate with Girard Gibbs. Rosemary Rivas has not taken part in any aspect of this litigation, and has no pecuniary interest in this matter.) These actions alleged that Sony BMG's manufacture, sale and distribution of DRM-enhanced music CDs, especially in the absence of appropriate warnings and disclosures, violated the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, New York State deceptive consumer practice laws and false advertising statutes, and the common law. Two other related actions — *Potter v. Sony BMG Music Entertainment*, Case No. 05-9607 (S.D.N.Y.); and *Klewan v. Arista Holdings, Inc., d/b/a Sony BMG Music Entertainment, Inc.*, Case No. 05-cv-9609 (S.D.N.Y.) – were filed in this Court on the same date. In December 2005, two (2)

additional consumer class actions raising substantially identical claims were filed in this Court.[1]

Throughout November and December 2005, fifteen other class action complaints raising

substantially similar claims were filed in state and federal courts around the country.[2]

13.     In addition to initiating a technical and legal dialogue with Sony BMG directed at

exploring the possibility of securing a prompt resolution of this litigation, Class Counsel began

working closely with other plaintiffs' counsel to coordinate the pending cases, avoid duplication

and inefficient activity and limit procedural gamesmanship and competition among plaintiffs'

counsel.  See Manual For Complex Litigation, Fourth, § 10.22 (2004) ("In some cases the

attorneys coordinate their activities without the court's assistance, and such efforts should be

encouraged.").  Following a series of telephone conferences, Sony BMG and all plaintiffs'

counsel in the actions then pending in the Southern District of New York agreed to an

---

[1]  The additional actions filed in this Court include:  *Riciutti v. Sony BMG Music Entertainment*, Case No. 05-cv-10190 (S.D.N.Y.) (Dec. 5, 2005), and *Maletta v. Sony BMG Music Entertainment*, Case No. 05-cv-10637 (S.D.N.Y.) (Dec. 19, 2005).

[2]    The actions filed in jurisdictions other than the United States District Court for the Southern District of New York include:  *Guevara v. Sony BMG Music Entertainment*, Cal. Superior Court Case No. BC342359 (Nov. 1, 2005); *Gruber v. Sony Corp. of America*, Cal. Superior Court Case No. BC342905 (Nov. 9, 2005); *Stynchula v. Sony Corp. of America*, Cal. Superior Court Case No. BC343100 (Nov. 15, 2005); *DeMarco v. Sony BMG Music*, United States District Court for the District of New Jersey Case No. 2:05-cv-05485-WHW-SDW (Nov. 17, 2005); *Cooke v. Sony BMG Music*, District of Columbia Superior Court Case No. 05-0009093 (Nov. 18, 2005); *Hull v. Sony BMG Music Entertainment*, Cal. Superior Court Case No. BC343383 (Nov. 21, 2005*)*; *Burke v. Sony BMG Music Entertainment Corp*., Cal. Superior Court Case No. 857213 (Nov. 22, 2005); *Maletta v. Sony BMG Music Entertainment Corp*., Cal. Superior Court Case No. BC 343615 (Nov. 28, 2005); *Xanthakos v. Sony BMG Music Entertainment*, LLC, District of Columbia Superior Court Case No. 05-0009203 (Nov. 28, 2005); *Bahnmaier v. Sony BMG Music Entertainment,* Oklahoma District Court Case No. CJ 2005 06968 (Nov. 28, 2005); *Jacoby v. Sony BMG Music Entertainment*, New York Superior Court Case No. 05/116679 (Nov. 30, 2005); *Ponting v. SonyBMG Music Entertainment, LLC*, United States District Court for the Central District of California Case No. CV-05-08472-JFW-AJWx (Dec. 2, 2005); *Melcon v. Sony BMG Music Entertainment*, United States District Court for the Northern District of California, Case No. C-05-5084-MHP (Dec. 8, 2005); *Klemm v. Sony BMG Music Entertainment*, United States District Court for the Northern District of California Case No. C-05-5111-BZ (Dec. 9, 2005); and *Black v. Sony BMG Music Entertainment*, United States District Court for the District of New Mexico Case No. CIV-05-1315 WDS/RLP (Dec. 19, 2005).

organizational structure and the provisions of a case management order.  On December 1, 2005, the Honorable Naomi Reice Buchwald entered Case Management Order No. 1 ("CMO No. 1") consolidating all related actions then pending in the Southern District of New York as *In re SONY BMG CD Technologies Litigation*, Case No. 1:05-cv-9575-NRB (S.D.N.Y.).  CMO No. 1 provided that any related action subsequently filed in or transferred to the United States District Court for the Southern District of New York would be consolidated with *In re SONY BMG CD Technologies Litigation* absent timely objection.  The Court also appointed Girard Gibbs and the Kamber Firm as Plaintiffs' Co-Lead Counsel, and the firms of Milberg Weiss Bershad & Schulman LLP, Kirby McInerney & Squire, LLP, and Giskin & Solotaroff, LLP as Plaintiffs' Executive Committee.

14.     Class Counsel also sought the coordination and cooperation of counsel in cases outside the Southern District of New York.  These efforts were generally successful and resulted in the formal or informal coordination of most cases that had been filed by late November.  The refusal of counsel in a minority of cases to coordinate their efforts required the filing of a petition under California law to coordinate a series of cases pending in California state courts.

### B.     Settlement Negotiations

15.     In mid-November 2005 Scott Kamber of the Kamber Firm began a series of discussions and meetings with Sony BMG directed at the technical aspects of the case, the need for immediate remediation and the prospects Class a motion for injunctive relief would succeed. The goal of the discussions was to explore Sony BMG's willingness to:  (i) stop the sale of CDs equipped with the XCP rootkit as soon as possible; (ii) eliminate continued risk/damage from the XCP disks presently in circulation; (iii) remedy the harm that had been caused to class members; (iv) address the risks of an exploit being found on the disks encoded with MediaMax and any

other DRM software used in the future; and (v) waive the enforcement of certain EULA provisions.

16.    On or about November 16, 2005, Sony BMG and Mr. Kamber discussed potential remedies for the DRM issues raised in the *Michaelson* complaint.  Mr. Kamber also made clear that a failure to take immediate actions regarding the XCP issue could result in a motion for injunctive relief.

17.    From November 16, 2005, through November 21, 2005, Mr. Kamber and other counsel worked to prepare for a November 21 meeting with Sony BMG.  Mr. Kamber prepared for the meeting by consulting with Mark Russinovich and Matt Curtain.  On behalf of the plaintiffs, the meeting was attended by Mr. Kamber, plaintiffs' counsel Himmelfarb and Solotoroff, Matt Curtain and Mark Russinvovich (by telephone).  Sony BMG was represented at the meeting by counsel, including Jeffrey Jacobson and Jeffrey Cunard.

18.    Throughout the November 21 meeting and ensuing discussions, Class Counsel offered the services of Mark Russinovich to Sony BMG in order to ensure the effectiveness of a pre-settlement remediation program for the Class.  Class Counsel also discussed the issue of effective notice and the accurate communication to class members of the risks associated with the XCP software and the availability of any patches or uninstalls that Sony BMG might make available.  The discussions included the utilization of banner ad functionality as a method of notice to the Class.  Prior to the November 21, 2005 meeting, Sony BMG had not contemplated the utilization of banner ad functionality for this purpose.  On November 29, Mr. Kamber and Daniel Girard of Girard Gibbs met with Sony BMG's counsel to continue to explore potential settlement terms.

19.    From the time the actions were filed until settlement was achieved, counsel worked on a continuous basis, logging hours throughout the holiday season, including Christmas

day.   Throughout the negotiation process, every aspect of the settlement was extensively discussed, informed by the knowledge, experience and analysis of Class Counsel and their retained technical consultants.

20.     Following the entry of CMO No. 1, Class Counsel began formal settlement negotiations.  As settlement negotiations evolved over several weeks, Class Counsel began to prepare the settlement documents, including the proposed form of notice and claim form, settlement agreement, preliminary approval papers, and text for an interactive official settlement website.

21.     In early December 2005, Class Counsel and Sony BMG met to negotiate settlement terms, and circulated the first working draft of a settlement agreement.  On or about December 12, 2005, Class Counsel shared the working draft of the Settlement Agreement with the Executive Committee.   On or about the same time, at the request of Sony BMG, Class Counsel shared certain drafts of settlement documents with plaintiffs' counsel in *Ricciuti v. Sony BMG Music Entertainment*, Case No. 05-cv-10190 (S.D.N.Y.), a newly filed action in the United States District Court for the Southern District of New York.  Although filed after the entry of CMO No. 1, it had not yet been consolidated with *In re SONY BMG CD Technologies Litigation* by the Clerk's office pursuant to CMO No. 1.

22.     On December 18, 2005, Class Counsel participated in a further settlement conference with Sony BMG in New York.  As a result of their case not yet being consolidated, the *Ricciuti* plaintiffs were again included at the request of Sony BMG.  At the conclusion of this settlement conference, which continued late into the night, the parties prepared a memorandum of understanding ("MOU").  Class Counsel, counsel for Sony BMG, and counsel for the *Ricciuti* plaintiffs signed the MOU.

23.     On December 28, 2005, Class Counsel, counsel for Defendants and counsel for the *Ricciuti* plaintiffs signed the Settlement Agreement, and Plaintiffs filed a Consolidated Amended Class Action Complaint ("CAC") on behalf of the Plaintiffs and Class Representatives named in the consolidated actions.

24.     On December 28, 2005, Class Counsel filed a motion for preliminary approval of the proposed settlement.   The specific benefits of settlement are detailed in that Settlement Agreement.    Generally speaking, however, the Settlement Agreement provides relief to Settlement Class Members, defined as "all natural persons or entities in the United States who purchased, received, came into possession of or otherwise used one or more MediaMax CDs and/or XCP CDs."  The relief provided by the Settlement Agreement is detailed in the Settlement Agreement at paragraphs III through V and includes the following:

- An immediate recall of all XCP CDs;

- An ongoing return and exchange program to enable consumers to return XCP CDs to Sony BMG and receive an identical, "clean" non-DRM protected CD;

- Publication and distribution of free, effective, and independently-tested software utility programs to allow consumers either to update XCP and MediaMax software on their computers, and thereby eliminate any security vulnerabilities associated with such software, or to uninstall and remove the software altogether;

- Cash incentives and free music downloads for Class members;

- Sony BMG's agreement not to manufacture or distribute MediaMax CDs or software for at least two years;

- Sony BMG's agreement not to collect personal information from consumers through DRM software, without consumers' express and affirmative consent;

- Sony BMG's agreement to waive certain legal rights specified in the EULAs associated with XCP and MediaMax CDs and software;

- Significant injunctive relief that requires Sony BMG to implement several, new "best practices" for any DRM software that Sony BMG develops and intends to use on CDs, over the next two years, including (a) testing by independent security personnel to screen out and eliminate potential security risks, and (b) improved disclosures about the nature and effect of such DRM software on CD packaging, in future EULAs, and throughout the software installation process;

- "Most favored nations" protection, which preserves the enforcement resources of government authorities across the nation, while at the same time affording Settlement Class Members any and all additional benefits as may be obtained by government authorities through such enforcement efforts;

- A release that excludes claims by individual consumers for consequential damage to a computer or network alleged to have resulted from interaction between Sony BMG's XCP or MediaMax software and other software or hardware installed on such computer or network;

- A simple claims form and claims administration process; and

- Comprehensive notice to the Class via email, internet publications and search engines, outreach to Sony BMG's network of music distributors and retailers, internet "banner" advertisements, press releases, and publication in weekly and daily newspapers and magazines with a combined circulation of more than 12.3 million.

25.     The Settlement Agreement entered into by the parties achieves Plaintiffs' objectives for this litigation.  As set out in the Consolidated Amended Class Action Complaint, these objectives include:   (a) prompt elimination and removal of any and all computer vulnerabilities associated with Sony BMG's XCP and MediaMax CDs and software; (b) a mechanism to allow consumers to easily exchange Sony BMG DRM-protected CDs for identical CDs or music downloads that do not contain DRM software; (c) compensation for Class members, in the form of cash and music downloads, to expedite the exchange of affected CDs for "clean" versions; (d) a moratorium on Sony BMG's use of MediaMax DRM software; (e) a mandate that Sony BMG conform its DRM practices and DRM notification procedures to the requirements of the Consumer Fraud and Abuse Act, New York State consumer protection statutes, and common law; and (f) requiring Sony BMG to adopt a "best practice" approach to

future DRM software applications, to screen out and eliminate potential security risks associated with any such software, and provide consumers with clear, plain-language disclosures, on CD packaging, in EULAs, and elsewhere, about the nature and effect of such DRM software.

**C.    The District Court Grants Preliminary Approval Of The Settlement**

26.    On January 6, 2006, the Court held a hearing at which Class Counsel argued in support of the motion for preliminary approval of the proposed settlement.    Toward the conclusion of the hearing, the parties advised the Court of the possibility they would seek approval of one or more amendments to the Settlement Agreement and conforming amendments to the notice to be given to class members.    The Court preliminarily approved the proposed settlement, provisionally certified the class, appointed Girard Gibbs and the Kamber Firm to serve as Class Counsel, and directed that notice be given to the class.

27.    On January 31, 2006, Class Counsel and Sony BMG filed a stipulation and supporting memorandum to modify the Settlement Agreement and forms of notice.    The proposed modifications were as follows:  (a) Sony BMG's agreement to publish the Summary Settlement Notice in English and Spanish-language publications beyond those specified in the Settlement Agreement; (b) the provision of a cash payment to Settlement Class Members who make claims but do not take advantage of the right to download music; (c) Sony BMG's agreement to provide an alternate benefit of equivalent or greater value to any Settlement Class Member for whom Sony BMG is unable to provide a replacement CD or album download within a reasonable time; and (d) a rolling extension of the deadline by which individuals who become Settlement Class Members after May 1, 2006 may opt-out of the settlement.    On February 1, 2006, the Court entered an Order granting the stipulation.

28. On February 8, 2006, the parties and the *Ricciuti* plaintiffs filed a stipulation which details the "alternate benefit" provision of the Settlement Agreement with greater specificity. On February 15, 2006, the Court entered an Order granting the stipulation.

### D. The Parties Seek Transfer Of All Federal Actions To This Court

29. This litigation has been subject to two motions for consolidation and transfer before the Judicial Panel on Multidistrict Litigation ("the Panel"). On December 13, 2005, the *Ricciuti* plaintiffs' motion before the Panel to consolidate all proceedings in the United States District Court for the Northern District of California was served on Class Counsel, shortly after counsel for the *Ricciuti* plaintiffs received Class Counsel's draft of an agreement providing for settlement of the litigation in the Southern District of New York. Counsel for the *Ricciuti* plaintiffs also had filed an action entitled *Melcon v. Sony BMG Music Entertainment, et al.*, Case No. C-05-5084-MHP, in the United States District Court for the Northern District of California.

30. On December 23, 2005, Sony BMG filed a second motion for consolidation and transfer before the Panel. Sony BMG asked that the Panel consolidate and transfer all actions to the United States District Court for the Southern District of New York.

31. On January 3, 2006, the *Ricciuti* plaintiffs amended their motion for consolidation and transfer to ask that the Panel transfer all cases to the United States District Court for the Southern District of New York.

32. At the January 6, 2006 preliminary approval hearing, the Court advised the parties that it was amenable to accepting transfer of all related cases pending before the Panel.

33. On January 9, 2006, Class Counsel worked with counsel for Sony BMG and other plaintiffs' counsel to coordinate the Multidistrict Litigation briefing.

34. On January 17, 2006, Class Counsel filed a memorandum on behalf of the Settlement Class in support of the motions to transfer the actions to the United States District

Court for the Southern District of New York.  No opposition to the motions for consolidation and transfer of the actions to this Court was filed.  As of the date of this affidavit, the Panel has yet to rule on the pending motions.

  **E.**   **Notice Is Disseminated In Accordance With The Hearing Order**

  35. Counsel for Sony BMG advised Class Counsel that on or about February 15, 2006, the long form settlement notice approved by the Court was sent by email to 1.1 million Settlement Class Members who had given their email addresses to Sony BMG or were subscribers of artist fan email lists known to Sony BMG.  In consultation with Class Counsel, the settlement notice was sent by email to an additional 1.2 million Settlement Class Members on or about March 2, 2006.

  36. Sony BMG retained Rust Consulting as the Claims Administrator.  Rust Consulting has attested that beginning on or about February 10, 2006, the Summary Settlement Notice was published in *People*, *Rolling Stone*, *USA Today*, the *Atlanta Journal Constitution*, the *Austin American Statesman*, the *Chicago Tribune*, the *Dallas Morning News*, the *Los Angeles Times*, the *Miami Herald*, the *New York Daily News*, the *New York Post* and the *San Francisco Chronicle*.  We are also informed that a Spanish-language version of the Summary Settlement Notice was published in *El Nuevo Herald* (Florida), *Hoy* (New York), *La Opinion* (California), *Rumbo* (Texas) and *La Subasta Houston* (Texas).

  37. Rust Consulting, in consultation with Class Counsel and counsel for Sony BMG, created an official settlement administration website, accessible at www.sonybmgcdtechsettlement.com (the "Website").  Between February 1, 2006 and February 15, 2006, Class Counsel conducted tests of and made recommendations regarding the Website's interactive capabilities to ensure its accessibility and functionality.  These recommendations were incorporated in the Website that went "live" and became available to process the claims of

Settlement Class Members on or about February 15, 2006.  The Website includes, among other things, information about the class action settlement, official settlement documents, an on-line claims process, and downloadable utilities to update and uninstall Sony BMG's DRM software.

38.     We are informed and believe that on or about February 15, 2006, Sony BMG:  (a) placed internet advertisements for the Website with popular search engines, such as Google™ and Yahoo! ™; (b) made written communications to Sony BMG-authorized music distributors referring them and their customers to the settlement and the XCP recall campaign in particular; and (c) caused the interactive "banner advertising" features of its DRM CDs to inform Settlement Class Members about the settlement and to provide Settlement Class Members with a hyperlink to the Website.  Class Counsel had worked with Sony BMG to create these banner advertisements in a manner that is effective and will provide notice to Settlement Class Members.

39.     On or about February 16, 2006, Class Counsel and Sony BMG issued press releases regarding the settlement in accordance with the terms of the Settlement Agreement.  On or about March 8, 2006, Class Counsel sent via email a copy of a press release announcing the settlement to a list of more than 200 of Sony BMG's music retailers and distributors, including Tower Records, Wal-Mart, Sam's Club, Best Buy, Amazon.com, Musicland and Circuit City, for redistribution to their personnel, affiliates and customers.

40.     All of these forms of notice were provided to Settlement Class Members in accordance with the Hearing Order entered January 6, 2006.

## II.     THE REACTION TO THE SETTLEMENT

41.     The claims process began on or about February 15, 2006 when the Website went "live."  Under the proposed settlement, class member benefits were available as of February 15, 2006 and will continue to be available until at least December 31, 2006.  The deadline for

submitting comments regarding the proposed settlement is May 1, 2006 – nearly one month after the date these motions are filed with the Court.  Based on our experience with class action settlements, we anticipate that the parties will receive additional comments from Settlement Class Members within a few days of the Court-ordered deadline.

42.     Mark Russinovich, Plaintiffs' technical expert, states that the settlement provides significant relief for those affected consumers who purchased, received, or used one or more of the 22 million XCP or MediaMax CDs manufactured and distributed in the United States to date. (Russinovich Aff., ¶ 34.)  Mr. Russinovich confirms that the settlement's required injunctive relief and "best practice" provisions for future DRM software use provide additional, significant benefit for millions of consumers.  (Russinovich Aff., ¶¶ 36-38.)  In Mr. Russinovich's opinion, based on his experience as a computer software and computer security analyst, the settlement "is the best case outcome for affected consumers" under the circumstances.  (Russinovich Aff., ¶ 38.)

43.     The Class Representatives echo Mr. Russinovich's views.  According to Dora Rivas, the proposed settlement meets all of the objectives of this litigation.  She believes the settlement is in the best interests of the class members.  (Rivas Aff., ¶ 17.)  Ori Edelstein states that "the proposed Settlement achieves all of the major goals of the litigation and compares favorably with the results the Class could expect to achieve after a complex and costly trial." (Edelstein Decl., ¶ 10.)  Alexander Guevara attests:  "[T]he proposed Settlement permits an immediate resolution of the problems resulting from the installation of DRM software on Sony BMG CDs without the risk, delay, and expense of trial."  (Guevara Decl., ¶ 11.)

44.     So far, the public response to the settlement has also been favorable.  The settlement has received considerable media attention and is the subject of spirited discussion on the internet.  The commentary in internet discussions about the settlement runs the gamut – from

laudatory comments about the breadth of relief available for consumers, to generalized condemnations of DRM software, Sony BMG's business practices, class action lawyers and the class representatives.   We found no indication from our survey of public reaction to the settlement that consumers were having difficulty understanding the terms of the settlement, exchanging their CDs, securing downloads or otherwise availing themselves of the relief afforded by the settlement.  Our legal assistants, who have responded to calls and emails from class members, also find no indication of dissatisfaction on the part of consumers with the settlement or logistics problems.

## III.    THE COMPLEXITIES AND RISKS ASSOCIATED WITH THIS LITIGATION

45.    This settlement is the product of adversarial negotiations conducted at arm's length by experienced counsel for plaintiffs and defendants, with a firm understanding of the strengths and weaknesses of their claims and defenses.  Class Counsel, who have considerable experience in complex litigation and class actions, are well-qualified to evaluate the complexities and risks associated with this litigation.

46.    Girard Gibbs has considerable experience in consumer protection actions involving emerging technologies and telecommunications.  Some of these cases include *In re MCI Non-Subscriber Rates Litigation*, MDL No. 1275 (S.D. Ill.) (co-lead counsel) ($88 million settlement); *Allen Lund Company v. Business Discount Plan*, Case No. CV-98-1500-DDP (C.D. Cal.) (lead) (full refund of overcharges for "slamming" small business long distance service);  *In re PayPal Litigation*, Case No. 02-01227 JF PVT (N.D. Cal.) (co-lead counsel) (aggregate $14 million settlement and substantial injunctive relief for alleged violations of Electronic Fund Transfer Act); *In re iPod Cases,* Case No. 436509 (J.C.C.P. No. 4355) (San Mateo Superior Court) (co-lead counsel) (injunctive relief and $14.8 million in cash, store credits and services); *In re Looksmart Litigation*, Case No. CGC-02-407778 (San Francisco Superior Court) (co-lead

counsel) ($15 million in cash and services); *Tompkins v. Proteva, Inc., et al.*, Case No. 99 CH 12012 (Circuit Court of Cook County) (co-counsel) ($5.1 million cash fund); *Steff v. United Online, et al.*, Case No. BC 265953 (Los Angeles Superior Court) (lead counsel) (injunctive relief and cash payments).

47.     Scott Kamber and his firm are also experienced in tech-related class actions. These actions include:  *In re WebTV Networks Litig.*, Case No. CV 793511 (Santa Clara Sup. Ct.) (consumer class action for false advertising); *Blackford v. At Home Corp. et al.*, Case No. 416131 (San Mateo Sup. Ct.) (consumer class action relating to internet connectivity); *Wormley v. GeoCities*, Case No. 196032 (Los Angeles Sup. Ct.) (consumer class action for privacy violations that is believed to be the first internet privacy case to recover a benefit for impacted class members); *Tepper v. AT&T et al.*, Case No. 99/18034 (New York Supreme Ct., Westchester County) (consumer class action regarding use of improper boosting of signal strength for cellular phones); *Stassi et al. v. Loch Harris et al*., No. GN 200180 (Dist. Ct., 201st Jud. Dist., Travis County, Tex.) (derivative action on behalf of technology development company that successfully obtained dissolution of corporation and distribution of assets to shareholders); *In re Command Systems*, Case No. 98-cv-3279 (AKH) (SDNY) (securities class action against technology company in which participating shareholders recovered over 80% of their losses).

48.     The Sony DRM litigation presented various legal and technological challenges. Class Counsel are unaware of any prior litigation brought on behalf of consumers arising out of the unauthorized installation of a rootkit.  Understanding this exploit and the vulnerability it created for consumers was crucial to the case.  The release by Sony BMG of utilities to patch or update their content protection software required frequent technical consultation. (Russinovich Aff., ¶¶ 24-29.)  To negotiate for appropriate remedies, Class Counsel had to develop a thorough

understanding of the technologies implicated and their interaction with personal computer systems maintained by consumers.

49.     Negotiations over each of the benefits available to consumers as a result of the settlement were complex.  Each of these issues required an adequate understanding of the technology involved and the impact of the software on consumers' computer systems. Seemingly straight-forward matters, such as the best practicable form of notice, were complicated by the need to determine the extent to which the "banner advertisement" technology in the CDs themselves could be used to provide information about the settlement directly to Settlement Class Members.

50.     Further complicating the litigation was the fact that the attorneys general of several states and the Federal Trade Commission were pursuing separate investigations into Sony BMG's use of DRM software.  An action by the Attorney General of the State of Texas against Sony BMG remains pending.   To account for these government inquiries, Class Counsel negotiated a "most favored nations" provision of the settlement requiring Sony BMG to augment benefits to all Settlement Class Members if Defendants provide additional benefits to a subset of them through the settlement of a government inquiry.

51.     The subject matter of the litigation posed additional complexity and risks.  First, the restrictions, limitations, and computer security issues associated with Sony BMG's DRM software, while unknown to consumers until October 2005, posed an immediate harm to consumers.  This harm included installation of a hidden "rootkit" on consumers' computers, the creation of attendant security vulnerabilities, the potential for collection of private data without consumers' knowledge, and other concerns.   This harm had to be addressed without delay through injunctive relief secured voluntarily or through litigation.  Adoption of a "business as usual" approach to the litigation would have left consumers vulnerable to computer hackers and

third parties seeking to exploit the security vulnerabilities associated with the Sony BMG XCP and MediaMax DRM technologies.

52.     Second, this case involved the interaction of software with millions of consumers' computers, presenting vexing problems of proof, as the dangers posed by the XCP and MediaMax software are inherently transitory.  The likelihood that Sony BMG or a software security company would develop and release on a widespread basis effective utilities to patch, update or uninstall Sony BMG's content protection software created a risk that Plaintiffs would not have been able to establish damages.  At some point, the advent of new software and computer systems would have undermined any effective remedy that could have been achieved through litigation.

53.     Third, there is a significant risk that the diversity of computer systems and software configurations and evidentiary obstacles would have caused individual issues to predominate in the litigation, thus precluding class certification.

54.     We believe the risks associated with pursuing this litigation, and the attendant delay and expense, considered in relation to the benefits available through settlement, make settlement the only responsible choice.  There is little reason to think that contentious motion practice and discovery battles would yield a more favorable result.  The prompt resolution of this case on the favorable terms achieved through the settlement is an outstanding result in light of the complexities and risks of the litigation.

IV.   **CLASS COUNSEL AND SONY BMG HAVE AGREED TO A REASONABLE FEE PAYMENT THAT WILL NOT IN ANY WAY AFFECT THE BENEFITS AVAILABLE FOR SETTLEMENT CLASS MEMBERS**

A.   **The Fee Agreement Between Class Counsel and Sony BMG**

55.   To ensure that counsel would retain their focus on finalizing and implementing the settlement, the parties agreed to defer fee negotiations until after the Court granted preliminary approval.

56.   As of the signing of the Settlement Agreement, the parties agreed only that Plaintiffs' counsel were entitled to a reasonable fee to be paid by Defendants, that the fee award would not affect the benefits to Settlement Class Members, and that Class Counsel and Sony BMG would attempt to reach agreement on a reasonable fee.   The Settlement Agreement memorializes these terms as follows:

> A.   As of the date this Settlement Agreement was executed, the Parties have not substantially discussed either the amount of attorneys' fees or costs that Plaintiffs' counsel may ask the Court to award them.  It is, however, the understanding of the Parties that Plaintiffs' counsel will apply for an award of attorneys' fees and reimbursable expenses in accordance with legal principles, that any fees and costs applied for and ultimately awarded by the Court will be paid by Defendants, and that Defendants' payment of Plaintiffs' attorneys' fees and reimbursable expenses will not affect the Settlement Benefits provided to Settlement Class Members in any way.

> B.   The Parties will seek to reach agreement on the amount of attorneys' fees and reimbursable expenses to be applied for.  If the Parties reach agreement on the subject of fees and/or costs to be awarded to Plaintiffs' counsel prior to the sending of notice to Settlement Class Members, the Full Settlement Notice will reflect that agreement.

(Settlement Agreement, IX.A-B.)

57.   Class Counsel and Sony BMG have entered into an agreement concerning the payment of attorneys' fees and litigation expenses ("Attorneys' Fee Agreement").  A true and correct copy of that agreement is attached hereto as Exhibit A.  Under the Attorneys' Fee

21

Agreement, Sony BMG agrees not to oppose an application by Class Counsel and the firms identified Class Counsel's fee application for attorneys' fees of $2,300,000 and reimbursement of expenses of up to $75,000, subject to additional terms described below.  (Exh. A, ¶ II.A.)  In accordance with the Court's CMO No. 1 and the Settlement Agreement, Class Counsel undertook to negotiate a single, agreed fee payment that would subsequently be allocated among participating plaintiffs' counsel in accordance with their respective contributions.  See Manual For Complex Litigation, Fourth, § 40.23 (2004) ("In cases in which the court may award fees, time and expense records should ordinarily be submitted through lead counsel, if one has been appointed, in order to assist lead counsel in monitoring the activities of co-counsel and in preparing a single, consolidated report for filing with the court.").

58.     Class Counsel requested time and expense information from all plaintiffs' counsel, and received in return sworn declarations from virtually all participating counsel.  The declarations of plaintiffs' counsel who submitted their time and expenses to Class Counsel ("Fee Declarations") are being filed with the Court in the accompanying Appendix In Support Of Class Counsel's Application For Award Of Attorneys' Fees, Reimbursement Of Expenses, And Incentive Awards To Named Plaintiffs.

59.     On March 30, 2006, Class Counsel were notified by one of the counsel for plaintiffs in Ricciuti, Melcon and Hull, who are represented by the firms of Lerach Coughlin, Stoia, Geller, Rudman & Robbins LLP, Green Welling LLP, Lawrence E. Feldman & Associates, and the Electronic Frontier Foundation ("the Ricciuti Group"), that the Ricciuti Group's counsel were refusing to submit time and expense data to Class Counsel and were intending instead to file a separate application for attorneys' fees.  A true and correct copy of the March 30, 2006 letter from Jeff Friedman to Daniel C. Girard is attached hereto as Exhibit B.

60.     As represented in the Attorneys' Fee Agreement, "Sony BMG believes that the time expended and costs incurred by Plaintiffs' Class Counsel, and/or at the direction of Plaintiffs' Class Counsel, all of which is included in [Class Counsel's fee request], are the only time and expenses for counsel for Plaintiffs or Settlement Class Members compensable by SONY BMG in this matter."  (Exh. A, ¶ II.B.)    Under the terms of the Attorneys' Fee Agreement, Sony BMG reserves the right to object to any applications for fees and/or expenses by any other counsel (including the *Ricciuti* Group), if the amount requested exceeds $250,000, individually or collectively.   Sony BMG represents in the agreement that "based on the information that it has, [Sony BMG] expects to object to any such request(s) to the extent that it or they individually or collectively exceed US$400,000."  (Id.)

61.     Under the Attorneys' Fee Agreement, Sony BMG and Class Counsel have agreed that if the Court awards more than $400,000 to the *Ricciuti* Group or any other counsel filing separate fee applications, individually or collectively, then Class Counsel's agreed-upon fee award would be reduced on a dollar-for-dollar basis to limit Sony BMG's total fee payment to $2,775,000.  Id., ¶ II.F. Class Counsel will therefore oppose any application by the *Ricciuti* Group's counsel and other plaintiffs' counsel to the extent they collectively seek an amount in excess of $400,000.

**B.     The Requested Fees, Expenses And Incentive Awards Are Reasonable**

**1.     Attorneys' Fees**

62.      Class Counsel and Plaintiffs' Executive Committee devoted more than 2,751 professionals' hours to the case for a total lodestar of $1,186,504.  The services provided by these firms included:  conducting a pre-filing investigation and analysis; retaining experts and identifying and interviewing witnesses; testing the application of the software products at issue to personal computers; drafting the initial complaints and Consolidated Amended Class Action

Complaint; negotiating the Settlement Agreement and all amendments with counsel for Defendants; drafting all settlement documents; drafting all papers in support of preliminary and final approval of the settlement; communicating with the Court; appearing at the preliminary approval at the January 6, 2006 hearing; coordinating plaintiffs' counsel's response to the motions for consolidation and transfer before the Panel, and drafting papers in support of the same; drafting the confidentiality agreement governing the exchange of information in confirmatory discovery; preparing a confirmatory discovery plan; negotiating the scope of confirmatory discovery with counsel for Defendants; reviewing and analyzing documents produced as part of confirmatory discovery; working with counsel for Defendants and the Claims Administrator to implement notice and the claims process; communicating with Settlement Class Members about the terms of the settlement and claims process; and monitoring the claims process.

63.    In addition to the time recorded by Class Counsel and the Executive Committee who provided services at the direction of Class Counsel, other Plaintiffs' counsel report more than 1,416 additional hours of professional time spent on the litigation.  (As much of the work done by other Plaintiffs' counsel involved research not undertaken at the request of Class Counsel, such work will be compensated based on Class Counsel's evaluation of the extent to which the work involved conferred a benefit on the Settlement Class or otherwise materially advanced the objectives of the litigation.)

64.    All counsel attest that their lodestar is calculated from contemporaneous, daily time records, which Plaintiffs' counsel regularly prepared and maintained in the ordinary course of business.  Plaintiffs' counsel's rates are their actual current rates.  A true and correct summary of the hours, lodestar and expenses of Plaintiffs' counsel is attached hereto as Exhibit C.

65.     Considering only the time recorded by Class Counsel and the Executive Committee, the agreed fee of $2.3 million would result in a multiplier of less than two.  Thus, there can be no suggestion that the proposed fee agreement, which is the product of arm's-length negotiations, will confer a windfall of Plaintiffs' counsel.

### 2.     Litigation Expenses

66.     Plaintiffs' counsel report that they have reasonably and necessarily incurred $69,788 in unreimbursed expenses in the prosecution of the litigation.  See Exh. C.  As described in the Fee Declarations, these expenses include:  court fees; consultant fees; photocopying; telephone; overnight delivery services; legal research services including Lexis-Nexis and Westlaw; postage; messenger services; travel; and meals.

67.     As described in the Fee Declarations, the expenses incurred in this case are reflected in the books and records of each of Plaintiffs' counsel's firms.  These books and records are prepared from expense vouchers, check records and other contemporaneously-recorded billing records.  They are an accurate record of expenses incurred in this litigation.

### 3.     Incentive Awards

68.     Class Counsel is requesting incentive awards to the named Plaintiffs and others identified in Exhibit D attached hereto, in the amount of $1,000 each.  Per the Settlement Agreement, Defendants have agreed not to oppose these awards and will pay them, if approved by the Court.

69.     The incentive awards requested are justified in light of the initiative Plaintiffs took in coming forward to represent the class, are reasonable in consideration of the overall benefit conferred on the Settlement Class, and should be approved.

C.      **Fee And Expense Figures Of Class Counsel Girard Gibbs**

70.      Based on the records of Girard Gibbs, the firm has spent at least 1,493 hours on this matter, representing a lodestar at their current hourly rates of $602,413.  In addition, to date in this case Girard Gibbs has incurred $27,928 in expenses.  Girard Gibbs's expense detail is set forth in Exhibit E, attached hereto.  The expenses Girard Gibbs incurred are reflected in our books and records which were prepared from expense vouchers, check records and other contemporaneously-recorded billing records.  They are an accurate record of expenses the firm incurred in this litigation.

71.      The hourly rates for the timekeepers included in the lodestar figure for Girard Gibbs are as follows:

| Attorneys | Hours | Rate |
|---|---|---|
| Daniel C. Girard (P) | 281.20 | $580.00 |
| Eric H. Gibbs (P) | 56.60 | $480.00 |
| A.J. De Bartolomeo (P) | 24.90 | $460.00 |
| Jonathan K. Levine (P) | 18.20 | $450.00 |
| Elizabeth C. Pritzker (P) | 283.90 | $450.00 |
| Aaron M. Sheanin (A) | 362.10 | $390.00 |
| Dylan S. Hughes (A) | 206.40 | $340.00 |
| Lindy K. Lucero (A) | 109.80 | $300.00 |

| Support Staff | Hours | Rate |
|---|---|---|
| Antonia Vincente | 42.00 | $120.00 |
| Adam M. Conley | 64.00 | $140.00 |
| Andrea Winternitz | 42.51 | $140.00 |

72.      Although most of Girard Gibbs' practice consists of representing consumers and investors in class action and contingent-fee litigation, Girard Gibbs also provides services on an hourly-rate basis.  A list of representative clients includes NuSkin International, Inc., a New York Stock Exchange company; Kennetech Corporation; the State of Wisconsin Investment Board; the California Public Employees' Retirement System; the California State Teachers' Retirement System; the Kansas Public Employees' Retirement System; Certain Underwriters at

Lloyd's, an insurance syndicate; and various professional services firms and individuals, including an accounting firms, the former chief executive officer of a publicly traded company and the former managing director and officer of a privately held investment banking firm. The hourly rates set forth for Girard Gibbs's attorneys and paralegals are the firm's current, customary rates for non-contingent matters.

73.     The hourly rates charged by Girard Gibbs have been approved as reasonable by several federal and state courts over the past four years. Courts have granted applications for fees based on the lodestar-multiplier method and for reimbursement of costs by Girard Gibbs in the following recent matters: May 2002: *Mager v. First Bank of Marin*, Case No. CV-S-00-1524-PMP (D. Nev.); February 2003: *Mitchell v. American Fair Credit Ass'n.*, Case No. 785811-2 (Cal. Super. Ct. Alameda County); February 2003: *Mitchell v. Bankfirst*, Case No. C-97-1421-MMC (N.D. Cal.); May 2003: *Mackhouse v. Good Guys*, Case No. 2002-049656 (Cal. Super. Ct. Alameda County); September 2003: *Steff v. United Online*, Case No. BC 265953 (Cal. Super. Ct. Los Angeles County); October 2003: *In re Looksmart Litigation*, Case No. 02-407778 (Cal. Super. Ct. San Francisco County); September 2004: *Cromwell v. Sprint Communications*, Case No. CV 99-2125 GTV (D. Kan.); March 2005: *Landreneau v. Fleet Financial*, Case No. 01-26-B-MI (M.D. La.); September 2005: *In re iPod Cases*, Case No. JCCP 4355 (Cal. Sup. Ct. San Mateo County); December 2005: *Puckett v. Pacific Bell Internet Services*, Case No. 1-04-CV-019724 (Cal. Super. Ct. Santa Clara County); March 2006: *Lehman v. Blue Shield of California*, Case No. CGC-03-419349 (Cal. Super. Ct. San Francisco County).

74.     Attached hereto as Exhibit F is a true and correct copy of the Girard Gibbs firm resume.

**D.** **Fees And Expense Figures Of Class Counsel Kamber & Associates**

75.     The Kamber Firm, including attorneys and paralegals, has spent at least 952 hours in connection with the Sony BMG Litigation.  At customary hourly rates, this time reflects a lodestar of $463,969.  In addition, the Kamber Firm has incurred $23,730 in expenses to date in this case. The time reported by the Kamber Firm includes time recorded by counsel associated with the firm for their expertise and experience in technology-related class actions.  These attorneys either practice by themselves or are affiliated with law firms who are not otherwise involved in this litigation and who are not otherwise represented in the declarations included with this application for payment of attorneys' fees and expenses.  Their inclusion in this declaration is consistent with the basis on which the Kamber Firm retained their assistance.  The Kamber Firm assigned and supervised all tasks performed by such associated counsel and the billing rates applied to such counsel are consistent with the rates charged by them in the ordinary course of their own practice.

76.     The hourly rates for the timekeepers included in the lodestar figure for the Kamber Firm are as follows:

| **Attorneys** | **Hours** | **Rate** |
|---|---|---|
| S. Kamber | 858.75 | $500.00 |
| C. Cantor | 5.70 | $350.00 |
| C. Sandberg | 22.75 | $450.00 |
| E. Odette | 25.00 | $275.00 |
| J. Halebian | 5.75 | $610.00 |
| R. Shelquist | 20.25 | $475.00 |
| **Support Staff** | | **Rate** |
| R. Whitener | 14.75 | $160.00 |

77.     The hourly rates set forth above are the firm's current, customary rates for contingent and non-contingent matters alike.

78.     In the compilation of the expense figures, I directed that the figures reported for telephone, WestLaw/LEXIS, outside photocopying, outside facsimile, and messenger charges reflect amounts that the Kamber Firm actually paid, with no mark-up, and that reimbursement sought for airfare be limited to the coach rate.   A true and correct photocopy of the Kamber & Associates firm resume is attached hereto as Exhibit G.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## V.    CONCLUSION

For the reasons set forth above and in the accompanying memoranda in support of plaintiffs' motion for final approval of the proposed Settlement and Class Counsel's motion for attorneys' fees, reimbursement of expenses, and incentive awards, we respectfully submit that: (1) the settlement is fair, reasonable and adequate and should be approved; and (2) the application for an award of attorneys' fees, reimbursement of expenses, and incentive awards is also fair, reasonable and adequate, and should be granted.

We declare under penalty of perjury under the laws of the United States of America and the States of California and New York that the foregoing is true and correct.

_____
Daniel C. Girard

_____
Scott Kamber

State of California        )
County of San Francisco  )

Subscribed and sworn to (or affirmed) before me on this 6th day of April, 2006 by Daniel C. Girard, personally known to me to be the person who appeared before me.



ZACKARY M. LYONS
Commission # 1362719
Notary Public - California
San Francisco County
My Comm. Expires Jun 28, 2006

Signature _____

## V.    **CONCLUSION**

For the reasons set forth above and in the accompanying memoranda in support of plaintiffs' motion for final approval of the proposed Settlement and Class Counsel's motion for attorneys' fees, reimbursement of expenses, and incentive awards, we respectfully submit that: (1) the settlement is fair, reasonable and adequate and should be approved; and (2) the motion for an award of attorneys' fees, reimbursement of expenses, and incentive awards is also fair, reasonable and adequate, and should be granted.

We declare under penalty of perjury under the laws of the United States of America and the States of California and New York that the foregoing is true and correct.

Daniel C. Girard

Scott Kamber

STATE OF New Jersey )
                        :ss:
COUNTY OF   Essex )

Subscribed and sworn to me this
6th day of April 2006.

Notary Public

Anne Baglivo Fitzpatrick
Attorney - at - Law of
the State of New Jersey