# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re:

SONY BMG CD
TECHNOLOGIES LITIGATION

Case No. 1:05-cv-09575-NRB

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

**GIRARD GIBBS**
 **& De BARTOLOMEO LLP**
Daniel C. Girard (Pro Hac Vice)
Jonathan K. Levine (JL-8390)
Elizabeth C. Pritzker (Pro Hac Vice)
Aaron M. Sheanin (Pro Hac Vice)
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800

**KAMBER & ASSOCIATES, LLC**
Scott A. Kamber (SK-5794)
19 Fulton Street, Suite 400
New York, NY 10038
Telephone: (877) 773-5469

*Class Counsel*

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................. 3

   A.   Nature Of The Parties' Dispute ...................................................................... 3

   B.   The Consumer Class Action Lawsuits .......................................................... 6

   C.   The Settlement ............................................................................................... 8

III.   THE SETTLEMENT MERITS FINAL APPROVAL BY THE COURT .............. 10

   A.   The Legal Standards For Final Approval Require That The Settlement
        Be Fair, Adequate, And Reasonable .......................................................... 10

   B.   The Legal Standards for Final Approval ..................................................... 12

      1.   The Settlement Negotiations Were Conducted At Arm's-Length,
           Are Procedurally Fair, And Are Entitled To A Presumption Of Fairness ........... 13

      2.   The Settlement Is Substantively Fair, Reasonable And Adequate ...................... 15

         a.   Complexity, Expense and Likely Duration of Litigation ................................. 16

         b.   The Reaction of the Class to the Settlement ................................................... 18

         c.   Stage of Proceedings and Discovery Completed ............................................. 20

         d.   The Risks of Prevailing (Establishing Liability, Establishing Damages,
              and Maintaining the Class Through Trial) ....................................................... 22

         e.   Ability of Defendants to Withstand a Greater Judgment ................................. 23

         f.   Range of Reasonableness of Settlement in Light of Best Possible
              Recovery and Risks of Litigation .................................................................... 23

IV.    CONCLUSION ............................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

Amchem Prods., Inc. v. Windsor
521 U.S. 591 (1997) ............................................................................................ 23

City of Detroit v. Grinnell Corporation
495 F.2d 448 (2d Cir. 1974) ............................................................... 15, 16, 18

D'Amato v. Deutsche Bank
236 F.3d 78 (2d Cir. 2001) ................................................................. 13, 16, 23

In re Am. Bank Note Holographics, Inc. Sec. Litig.
127 F. Supp. 2d 418 (S.D.N.Y. 2001) ............................................. 12, 13, 14, 16

In re Austrian & German Bank Holocaust Litig.
80 F. Supp. 2d 164 (S.D.N.Y. 2000) ................................................... 13, 20, 21

In re Compact Disc Minimum Advertised Price Antitrust Litig.
216 F.R.D. 197 (D. Me. 2003) ............................................................................ 12

In re DoubleClick, Inc. Privacy Litig.
154 F. Supp. 2d 497 (S.D.N.Y. 2001) .............................................................. 22

In re Lloyd's Am. Trust Fund Litig.
2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) .............................. 17, 21

In re Lucent Techs. Inc. Sec. Litig.
307 F. Supp. 2d 633 (D.N.J. 2004) .................................................................. 20

In re McDonnell Douglas Equip. Leasing Sec. Litig.
838 F. Supp. 729 (S.D.N.Y. 1993) .................................................................. 14

In re Metropolitan Life Deriv. Litig.
935 F. Supp. 286 (S.D.N.Y. 1996) .................................................................. 17

In re Michael Milken & Assocs. Sec. Litig.
150 F.R.D. 46 (S.D.N.Y. 1993) ........................................................................ 23

In re PaineWebber Ltd. P'ships Litig.
171 F.R.D. 104 (S.D.N.Y. 1997), aff'd 117 F.3d 721 (2d Cir. 1997) ...................... 13, 14, 16

In re Prudential Sec. Inc. Ltd. P'ships Litig.
163 F.R.D. 200 (S.D.N.Y. 1995) ...................................................................... 12

In re Sumitomo Copper Litig.
189 F.R.D. 274 (S.D.N.Y. 1999) ........................................................................................ 22

In re Toys "R" Us Antitrust Litig.
191 F.R.D. 347 (E.D.N.Y. 2000) ........................................................................................ 22

In re Visa Check/MasterMoney Antitrust Litig.
192 F.R.D. 68 (E.D.N.Y. 2000) .......................................................................................... 23

In re W. Union Money Transfer Litig.
2004 U.S. Dist. LEXIS 29377 (E.D.N.Y. Oct. 19, 2004) .................................................... 14

Joel A. v. Giuliani
218 F.3d 132 (2d Cir., 2000) ................................................................................ 10, 12, 15

Malchman v. Davis
706 F.2d 426 (2d Cir. 1983) ............................................................................................... 12

Maley v. Del Global Techs. Corp.
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ........................................................................... 17, 24

Newby v. Enron Corp.
394 F.3d 296 (5th Cir. 2004) ............................................................................................. 21

Newman v. Stein
464 F.2d 689 (2d Cir. 1972) ............................................................................................... 23

Slomovics v. All for a Dollar, Inc.
906 F. Supp. 146 (E.D.N.Y. 1995) ................................................................................ 13, 21

State of West Virginia v. Chas. Pfizer & Co.
314 F. Supp. 710 (S.D.N.Y. 1970), aff'd, 440 F.2d 1079 (2d Cir. 1971),
cert. denied, 404 U.S. 871 (1971) ...................................................................................... 22

Thompson v. Metro. Life Ins. Co.
216 F.R.D. 55 (S.D.N.Y. 2003) .............................................................................. 12, 14, 16

Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.
396 F.3d 96 (2d Cir. 2005) .................................................................................... 12, 15, 23

**STATUTES**

18 U.S.C. § 1030 ................................................................................................................. 6

Fed. R. Civ. P. 23 .......................................................................................................... 10, 11

Fed. R. Civ. P. 23(e)(1)(A) ................................................................................................. 10

**OTHER AUTHORITIES**

Manual for Complex Litigation, Fourth (2004)
§§ 21.632-35 ................................................................................................................. 10

Newberg on Class Actions (2002)
4 Herbert Newberg & Alba Conte, § 11.25 ......................................................... 10

Newberg on Class Actions (2002)
4 Herbert Newberg & Alba Conte, § 11.41 .................................................. 10, 16

## I.   **INTRODUCTION**

On January 6, 2006, the Court preliminarily approved the proposed settlement of a class action brought on behalf of American consumers who bought or used music compact discs ("CDs") containing Digital Rights Management ("DRM") software marketed and sold by Defendant Sony BMG Music Entertainment, Inc. ("Sony BMG").   As the Court observed in its Hearing Order, the proposed Settlement offers significant, multiple benefits to the Settlement Class, including:

- A prompt recall of Sony BMG CDs that use DRM software containing a harmful "rootkit" which, when the CD is inserted into a computer, is alleged to render the computer more vulnerable to "malware," including "viruses," "Trojan Horses," and "spyware";

- A simple return program that allows consumers to exchange CDs containing this harmful software for identical, "clean" CDs;

- Cash incentives and free music downloads to induce Class members to exchange their CDs;

- Publication and distribution of free utility programs that allow consumers either to fix security vulnerabilities associated with Sony BMG's DRM software, or to remove the software altogether;

- A moratorium on Sony BMG's use of specified DRM software on CDs manufactured for distribution in the United States through 2007; and

- A commitment to adopt "best practices" for any DRM software that Sony BMG develops and intends to use on CDs, going forward, including comprehensive testing by independent security personnel to screen out known security risks, and improved disclosures for consumers.

Final approval of the proposed settlement will bring six consolidated class actions pending in this Court and at least fifteen class actions pending in courts around the United States to an early and successful conclusion.

There is no obstacle to final approval. Notice was given through a variety of media and communication channels, including by electronic mail ("email") to over 2.3 million consumers and subscribers of artist fan email lists known to Sony BMG; internet publications; internet advertising using popular search engines, such as Google™ and Yahoo!™; interactive internet "banner" advertising; electronic links to Sony BMG's and Class Counsels' websites; written communications to Sony BMG-authorized music distributors; press releases issued by both Sony BMG and Class Counsel; a settlement administration website (www.sonybmgcdtechsettlement.com); and publication notice in newspapers and magazines with a combined U.S. circulation of more than 12.3 million. (See Affidavit of Kim Ness ("Ness Aff."), ¶ 6.)

The Settlement was negotiated by counsel experienced in consumer class actions, who were thoroughly familiar with the legal and factual issues in the case, and aggressively protected their clients' interests through hard-fought and arm's-length negotiations. The settlement achieves every reasonable litigation objective advanced by the plaintiffs in the litigation. Plaintiffs' computer security expert, Mark Russinovich, who discovered the "rootkit" and security problems hidden in Sony BMG's "XCP" software program, has submitted a declaration attesting that the settlement "is the best-case outcome for affected consumers." (Affidavit of Mark Russinovich ("Russ. Aff."), ¶ 38.) The Settlement is entitled to a strong initial presumption that it is a fair, adequate, and reasonable compromise for the Class as a whole.

While there is still considerable time for class members to comment on the settlement, there are no indications of consumer dissatisfaction with the settlement or logistical impediments to participation. There is no suggestion of collusion, on the contrary,

there is every indication the settlement is the product of thoughtful and effective negotiation.

The Court should grant final approval of the Settlement, as proposed.

## II.      STATEMENT OF FACTS

### A.      Nature Of The Parties' Dispute

This case arises out of the incorporation of "Digital Rights Management" or "DRM" software programs into music CDs by Sony BMG, the second largest owner and distributor of recorded music. DRM is an umbrella term that is used by the computer and digital media industries to describe a form of anti-copying software that restricts the use, copying and transfer of digital content, including digital music files contained on CDs. (See Russ. Aff., ¶ 8.)

Sony BMG first introduced a line of CDs containing a DRM software program known as MediaMax 3.0, designed and licensed to Sony BMG by SunnComm International, Inc., and MediaMax Technology Corp. (collectively, "SunnComm"), in September 2003. (CAC, ¶ 1; Russ. Aff., ¶ 21.) In January 2005, Sony BMG increased its efforts to include DRM software on CDs manufactured and sold through 2005, with the intent of including some form of DRM software on all Sony BMG CDs by the end of the year. As part of this effort, in January 2005, Sony BMG introduced a line of CDs containing DRM called Extended Copy Protection ("XCP") designed and licensed to Sony BMG by First 4 Internet, Ltd. ("F4I"). (CAC, ¶ 1; Russ. Aff., ¶ 8.) Other music CDs

3

marketed and sold by Sony BMG in 2005 contained a second version of MediaMax software, MediaMax 5.0. (CAC, ¶ 44.[1])

The central feature of these two Sony BMG DRM software programs is that they limit the number of copies (to three) that a consumer can make of the CD. (CAC, ¶ 2.) The DRM programs also: (a) prevent the consumer from listening to the digital audio files on the CD through any computer program or digital music player other than those manufactured or licensed by Sony BMG or Microsoft; (b) have the potential to "phone home" by contacting SONY BMG through the internet and communicating information that could track the consumer's behavior; (c) install automatically onto the consumer's computer; and (d) fail to include a program or mechanism to uninstall the DRM software from the consumer's computer at a later time. (CAC, ¶ 2; Russ. Aff., ¶¶ 9-13, 21.) Consumers who purchased MediaMax or XCP CDs containing these programs were not aware of these restrictions and features, as Sony BMG did not disclose this information on the CD "jewel" cases, in the course of the software installation process, or elsewhere. (CAC, ¶ 2; Russ. Aff., ¶¶ 8, 9, 12, 21.)

In addition to these restrictions and features, the XCP software contains a cloaking mechanism, commonly referred to as a "rootkit," that automatically installs on the user's computer without the user's knowledge, and hides files, Registry keys and other computer system objects from diagnostic and security software. (Russ. Aff., ¶¶ 5-10.) These "rootkits" effectively disable computer security protection programs and expose consumers to various types of "malware" promulgated by third parties, who use rootkits to hide viruses, spyware and other malicious programs from antivirus and spyware blocking

---

[1] As alleged in the Complaint, and confirmed through discovery, Sony BMG manufactured more than 20 million MediaMax CDs and approximately 5 million XCP CDs during the relevant period. (CAC, ¶¶ 33, 44.)

programs and system management utilities. (Russ. Aff., ¶ 5.) The rootkit contained on the XCP CDs is an especially insidious security risk to consumers, moreover, because it automatically installs on the consumer's operating system without his or her knowledge, and does not contain a way for consumers to easily detect, remove or uninstall it. (Russ. Aff., ¶¶ 9-13.) According to computer systems and security experts, "there are no legitimate uses for rootkit technologies." (Russ. Aff., ¶ 5.)

The restrictions, limitations and computer security vulnerabilities associated with Sony BMG's DRM software were completely unknown to consumers until October 2005, when computer security expert Mark Russinovich inadvertently discovered that a Sony BMG CD he had purchased and installed on his computer, *Get Right With The Man* by Van Zant, had placed a rootkit, hidden device drivers and other hidden applications on his computer. (Russ. Aff., ¶¶ 7-10, 14.) Mr. Russinovich first published his findings on his web log or "blog" – an Internet website maintained by Mr. Russinovich in which he posts research and commentary on issues of computer software and computer security – on October 31, 2005, and November 4, 2005, respectively. (Russ. Aff., ¶¶ 7, 14.) The initial response of Sony BMG and F4I to Mr. Russinovich's findings was to deny that they had done anything wrong. In a National Public Radio interview on November 4, 2005, Sony BMG's President of Global Digital Business, Thomas Hesse, stated: "Most people I think don't even know what a rootkit is. So, why should they care about it?" (Russ. Aff., ¶ 15.)

At the same time it was issuing public denials of wrongdoing, Sony BMG quickly developed software updates or "patches" to allow computer users to close security gaps posed by its DRM software. (Russ. Aff., ¶ 16-17, 22.) The updates developed by Sony BMG, however, were difficult for consumers to obtain, and cumbersome to use. (Russ.

Aff., ¶¶ 16-18.) Worse, some of these updates and patches caused additional security vulnerabilities for consumers. (CAC, ¶ 3; Russ. Aff., ¶ 16.)

On approximately November 29, 2006, iSEC Partners, a security research and consulting firm, reported that it had discovered a security vulnerability associated with Sony BMG's MediaMax software, namely that the software creates a risk of a "privilege escalation attack." (Russ. Aff., ¶ 22.) In a privilege escalation attack, a standard or low-rights user with access to a computer system can exploit a security weakness to log into an application as an administrator and make changes to the system that only an administrator would be able to make under normal circumstances. (Id.) Such a security vulnerability is not uncommon. Unlike XCP, MediaMax does not contain a rootkit that installs hidden files on the user's computer and evades detection from firewalls, anti-spyware and anti-virus software. (Russ. Aff., ¶ 23.)

### B.    The Consumer Class Action Lawsuits

In response to these concerns and Sony BMG's public denials of wrongdoing, beginning on November 14, 2005, four class action lawsuits were filed in the United States District Court for the Southern District of New York, alleging that Sony BMG's manufacture, sale and distribution of DRM-enhanced music CDs, especially in the absence of appropriate warnings and disclosures, violated the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, New York State deceptive consumer practice laws and false advertising statutes, and state and federal common law.[2] Pre-filing investigation revealed

---

[2]    The original lawsuits are: Michaelson v. Sony BMG Music, Inc., S.D.N.Y. 05-cv-9575; Rivas v. Sony BMG Music Entertainment, Inc., S.D.N.Y. Case No. 05-cv-9598; Potter v. Sony BMG Music Entertainment, S.D.N.Y. Case No. 05-9607; and Klewan v. Arista Holdings, Inc., d/b/a Sony BMG Music Entertainment, Inc., S.D.N.Y. Case No. 05-cv-9609. All were consolidated as SONY BMG CD Technologies Litigation, S.D.N.Y. Case No. 1:05-cv-09575 (NRB) ("the Consolidated Action").

that EULAs associated with the software contained a choice of venue clause providing for litigation only in the State of New York. Bringing the litigation in the United States District Court for the Southern District of New York obviated the potential for delay as the parties litigated the enforceability of the venue clause, thereby promoting the interests of consumers in protecting their computers from the dangers associated with the software.

Given their background and experience in technology-oriented class action litigation, the Girard Gibbs & De Bartolomeo and Kamber firms were selected to serve as Plaintiffs' Co-Lead Counsel, by the consensus of Plaintiffs' counsel who had appeared in the Consolidated Action. (Joint Affidavit of Daniel C. Girard and Scott A. Kamber ("Joint Aff."), ¶ 13.) On December 1, 2005, the Court entered Stipulation and Case Management Order Number 1 ("CMO No. 1"), consolidating the four actions as In Re SONY BMG CD Technologies Litigation, S.D.N.Y. Case No. 1:05-cv-09575 (NRB) ("the Consolidated Action"), and appointing these firms as Plaintiffs' Co-Lead Counsel. Following consolidation, two add-on cases were filed and consolidated with the Consolidated Action.[3] Additional class action complaints raising substantially similar claims also were filed in jurisdictions other than the Southern District of New York, in November and December 2005.[4] On December 28, 2005, Plaintiffs' Co-Lead Counsel filed a Consolidated Amended Class Action Complaint ("CAC") on behalf of all Plaintiffs and Class Representatives named in the Consolidated Action.

---

[3]   The two add-on actions are: Riciutti v. Sony BMG Music Entertainment, S.D.N.Y. Case No. 05-cv-10190 (Dec. 5, 2005) (consolidated on Dec. 15, 2005), and Maletta v. Sony BMG Music Entertainment, S.D.N.Y. Case No. 05-cv-10637 (Dec. 19, 2005) (consolidated on Dec. 27, 2005).

[4]   The actions filed in jurisdictions other than the United States District Court for the Southern District of New York are identified in the Settlement Agreement, ¶ I.D.

C.    **The Settlement**

Talks between Sony BMG and Class Counsel concerning the need for immediate remediation and Plaintiffs' prospects for injunctive relief prompted comprehensive settlement discussions of all claims asserted in the litigation.  (See Joint Aff., ¶ 15-20.) Sony BMG's willingness to concede (for purposes of settlement discussions) many of the essential facts alleged by the Plaintiffs, and the potential for a prompt and complete resolution of the litigation, dictated a departure from "business as usual" litigation tactics. (Joint Aff., ¶¶ 15-19, 51; see also Affidavit of Dora Rivas ("Rivas Aff."), ¶ 11.)  Put another way, in the face of Defendants' desire to seek an expedited resolution of the litigation for the benefit of consumers, Plaintiffs' Co-Lead Counsel acted promptly to position the case for possible resolution.  Among other things, Co-Lead Counsel made their expert, Mark Russinovich, available for direct "tech to tech" communications with Sony BMG, to ensure the parties were on common ground on technological issues.  (Joint Aff., ¶¶ 17-18; Russ. Aff., ¶¶ 24-25.)  Counsel also undertook the task of organizing the various plaintiffs and lawsuits around the country, to prevent wheel-spinning and competition among plaintiffs' lawyers, and to ensure that any proposed settlement addressed all of the potential problems associated with the Sony BMG software.  (Joint Aff., ¶¶ 13-14; Rivas Aff., ¶ 12.)

Following the entry of CMO No. 1, and aided by Mr. Russinovich's technical expertise, Co-Lead Counsel then engaged Sony BMG in intensive, often daily, formal settlement conferences.  (Joint Aff., ¶¶ 20-23; Russ. Aff., ¶¶ 25-28.)  The product of these negotiations is the Settlement Agreement filed December 28, 2005, and amended by court-approved stipulation on February 1, 2006 and February 15, 2006.  (Joint Aff., ¶¶ 23-24, 27-28; Russ. Aff., ¶ 20.)  The benefits of settlement are detailed in that Agreement.  Generally

8

speaking, the Settlement provides substantial relief to Class members, defined as "all natural persons or entities in the United States who purchased, received, came into possession of or otherwise used one or more MediaMax CDs and/or XCP CDs." These benefits include:

- Immediate recall of all XCP CDs;

- An ongoing return and exchange program to enable consumers to return XCP CDs to Sony BMG and receive identical, "clean" non-DRM protected CDs;

- Publication and distribution of free, effective and independently-tested software utility programs to allow consumers either to update XCP and MediaMax software on their computers, and thereby eliminate any security vulnerabilities associated with such software, or to uninstall and remove the software altogether;

- Cash incentives and free music downloads for Class members;

- Sony BMG's agreement not to manufacture or distribute MediaMax CDs or software for at least two years;

- Sony BMG's agreement not to collect personal information from consumers through DRM software, without consumers' express and affirmative consent;

- Sony BMG's agreement to waive certain legal rights specified in EULAs associated with XCP and MediaMax CDs and software;

- Significant injunctive relief that requires Sony BMG to implement several, new "best practices" for any DRM software that Sony BMG develops and intends to use on CDs over the next two years, including (a) testing by independent security personnel to screen out and eliminate potential security risks, and (b) improved disclosures about the nature and effect of such DRM software on CD packaging, in future EULAs, and throughout the software installation process;

- "Most favored nations" protection, which preserves the enforcement resources of government authorities across the nation, while at the same time affording Class members any and all additional benefits as may be obtained by government authorities through such enforcement efforts;

- A release that is typical in scope for the Class, and excludes claims by individual consumers for consequential damage to a computer or network;

- A simple claims form and claims administration process; and

- A comprehensive notice campaign.

On January 6, 2006, the Court conditionally certified a Settlement Class, preliminarily approved the Settlement, and appointed Class Counsel. (Hearing Order, ¶¶ 1, 5, 6.) As described below, the Settlement satisfies all legal standards for final approval.

## III.   THE SETTLEMENT MERITS FINAL APPROVAL BY THE COURT

### A.   The Legal Standards For Final Approval Require That The Settlement Be Fair, Adequate, And Reasonable

Rule 23(e)(1)(A) of the Federal Rules of Civil Procedure states: "The court must approve any settlement, voluntary dismissal or compromise of the claims, issues, or defenses of a certified class." Fed. R. Civ. P. 23(e)(1)(A). Obtaining court approval of a class action settlement is a two-step process. The first step requires the court to preliminarily evaluate the proposed Settlement to determine whether the Settlement is fair, adequate and within the range of reasonableness such that Notice of Settlement should be given to the Class. See Manual for Complex Litigation, Fourth ("Manual") §§ 21.632-35, at 320-23 (2004); see also 4 Herbert Newberg & Alba Conte, Newberg on Class Actions ("Newberg") § 11.25, at 38-39 (4th ed. 2002). The second step requires the court to review the Settlement and determine, in light of several factors, whether the Settlement, taken as a whole, is fair, reasonable and adequate to all concerned, and not a product of collusion. Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir., 2000); see also Manual §§ 21.634-35, at 322-23; Newberg § 11.41.

The required first step of the Court's approval process has been completed here. This Court reviewed the Settlement, granted preliminary approval, and directed that Notice of Settlement be given to the Class.  (See Hearing Order.)  Consistent with the Hearing Order, Notice of Settlement was given through a variety of approved media and communication channels, including by email to more than 2.3 million consumers and subscribers of artist fan email lists known to Sony BMG; internet publications; internet advertising using popular search engines, such as Google™ and Yahoo!™; interactive internet "banner" advertising[5]; electronic links to Sony BMG and Plaintiffs' counsel's websites; written communications to Sony BMG-authorized music distributors; press releases issued by both Sony BMG and Plaintiffs' counsel; a settlement administration website (www.sonybmgcdtechsettlement.com); and by publication in newspapers and magazines with a combined U.S. circulation of nearly 12 million.  (See Hearing Order, ¶ 8, 10; see also Joint Aff., ¶ 36; Ness Aff., ¶ 6.)  Additionally, the Notice of Settlement was translated from English into Spanish, and published in leading Spanish-language daily newspapers in California, Florida, New York and Texas beginning on or about February 10, 2006.  (Ness Aff., ¶ 6.)  These Spanish-language publications, alone, reach over 400,000 people.  (See Ness Aff., ¶ 6.)  In a consumer class action such as this, where direct notice to class members is unavailable, such an extensive and wide-reaching notice campaign satisfies due process and the mandates of Fed. R. Civ. P. 23.  See In re Compact Disc

---

[5]    Banner advertisements are interactive or "hot-linked" advertisements placed on web sites.   When a computer user "clicks" on the banner advertisement, he or she is automatically connected to a designated website.   In the course of negotiations, Class Counsel and their technical consultant obtained Sony BMG's agreement to use the "phone home" features of the XCP and MediaMax technologies, where available, as a unique means of giving notice of the Settlement to the Class.  (Russ. Aff., ¶¶ 26-27, 34.)  Here, when a consumer clicks on the banner advertisement, he or she is sent directly to the settlement administration web site.

Minimum Advertised Price Antitrust Litig., 216 F.R.D. 197, 203 (D. Me. 2003) (approving notice plan employing combination of print advertisements, electronic publication and website publication for a class consisting of millions of unidentified CD purchasers.)

Plaintiffs now ask that the Court undertake the analysis required in the second stage of the settlement process, and evaluate the Settlement for final approval.

### B. The Legal Standards for Final Approval

As discussed above, in determining whether to grant final approval, the Court must determine whether the proposed Settlement is "fair, adequate, and reasonable, and not a product of collusion." Joel A., 218 F.3d at 138. Final approval of a proposed class action settlement "is within the court's broad discretion." In re Am. Bank Note Holographics, Inc. Sec. Litig., 127 F. Supp. 2d 418, 423 (S.D.N.Y. 2001).

In exercising this broad discretion, the Court "must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." Id. at 424 (citation omitted). Generally speaking, "to survive appellate review," the Court "must show it has explored comprehensively all relevant factors" and made "its own independent valuation of fairness and reasonableness." Malchman v. Davis, 706 F.2d 426, 434, 436 (2d Cir. 1983). The Court's discretion, however, "should be exercised in light of the general policy favoring settlement." Thompson v. Metro. Life Ins. Co., 216 F.R.D. 55, 61 (S.D.N.Y. 2003). "[T]here is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions." In re Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 209 (S.D.N.Y. 1995) (citations omitted); see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 117 (2d Cir. 2005).

In evaluating the Settlement for final approval, the Court first examines whether the settlement negotiations were procedurally fair, i.e., free from collusion, and then whether the terms of settlement are substantively fair, in that they provide fair, reasonable and adequate relief to the Class as a whole. See, e.g., In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000); Slomovics v. All for a Dollar, Inc., 906 F. Supp. 146, 149 (E.D.N.Y. 1995). The Settlement satisfies these legal requirements.

### 1.   The Settlement Negotiations Were Conducted At Arm's-Length, Are Procedurally Fair, And Are Entitled To A Presumption Of Fairness

A settlement is procedurally fair if it was negotiated at arm's-length by counsel with experience in class action litigation. See D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001). "So long as the integrity of the arm's length negotiation process is preserved … a strong initial presumption of fairness attaches to the proposed settlement." In re Am. Bank Note Holographics, 127 F. Supp. 2d at 426 (quoting In Re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 127 (S.D.N.Y. 1997), aff'd 117 F.3d 721 (2d Cir. 1997).

The Settlement is entitled to this strong initial presumption of procedural fairness. As both Class Counsel and Sony BMG's counsel can attest, it was achieved through hard-fought, arm's-length negotiations by experienced class action counsel. (See Joint Aff., ¶ 45.) Class Counsel understood that consumers required a prompt and effective means to protect themselves against the security vulnerabilities of Sony BMG's XCP and MediaMax software, and moved swiftly to retain computer security analyst, Mark Russinovich, as a technical expert for the Class. (Russ. Aff., ¶ 24.) Supported by Mr. Russinovich's expertise and their own class action experience, Class Counsel engaged Sony BMG's experienced counsel in a series of lengthy, adversarial negotiations, both in person and by teleconference. (Joint Aff., ¶¶ 15-23 ; Russ. Aff., ¶¶ 7, 25.) Under the circumstances, there

13

is strong presumption that the resulting Settlement is procedurally fair, reasonable and adequate. See, e.g., Thompson, 216 F.R.D. at 61, 64 (finding a strong initial presumption of fairness attached to a proposed settlement where settlement negotiations were extensive, hard-fought, and took place at arm's length between experienced and skilled attorneys for both plaintiffs and defendants).

Moreover, "great weight is accorded to the [settlement] recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." PaineWebber, 171 F.R.D. at 125 (citation omitted); see also In re Am. Bank Note Holographics, 127 F. Supp. 2d at 428; In re McDonnell Douglas Equip. Leasing Sec. Litig., 838 F. Supp. 729, 738 (S.D.N.Y. 1993) (observing that "in analyzing a proposed settlement, courts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching") (citation omitted). Here, qualified and experienced class action counsel recommend final approval. (Joint Aff., ¶ 54.) These recommendations come without suggestion of collusion. Class Counsel negotiated all settlement terms and moved for preliminary approval of the Settlement, well before the parties even met to discuss or negotiate the amount of attorneys' fees to be paid by Sony BMG to Plaintiffs' counsel for their successful litigation efforts. (See, inter alia, Settlement Agreement ["Settl."], ¶ IX.A-C; Transcript of Proceedings of January 6, 2006, at p.24:1.19 – p.25.1.11; and Joint Aff., ¶¶ 55-56). Such facts are further evidence that the parties' settlement negotiations were adversarial, at arm's length, and free of collusion. See In re W. Union Money Transfer Litig., No. CV-01-0335, 2004 U.S. Dist. LEXIS 29377, at *29-30 (E.D.N.Y. Oct. 19, 2004) (citing, as support that settlement negotiations were not collusive, the fact that "it was not until . . . after the parties had reached an agreement in principle with respect to all of the substantive issues and terms of the settlement, that class

14

counsel and defendants' counsel began to negotiate the amount of attorney fees that class counsel would be entitled to receive under the settlement agreement").

The Settlement is the product of hard-fought, non-collusive negotiations between adversarial parties, and comes before the Court upon the recommendation of counsel well familiar with the litigation. As such, it warrants the Court's final approval.

### 2. The Settlement Is Substantively Fair, Reasonable And Adequate

The Second Circuit holds that a "trial judge's views" of any proposed class action settlement "are accorded great weight . . . because [s]he is exposed to the litigants, and their strategies, positions and proofs. . . .   Simply stated, [s]he is on the firing line and can evaluate the action accordingly." Joel A., 218 F.3d at 139 (citation omitted).

Trial courts examine the substantive fairness, adequacy, and reasonableness of a class action settlement in the light of nine factors set forth in City of Detroit v. Grinnell Corporation, 495 F.2d 448 (2d Cir. 1974). The Grinnell factors are:

(1)    the complexity, expense and likely duration of the litigation;

(2)    the reaction of the class to the settlement;

(3)    the stage of the proceedings and the amount of the discovery completed;

(4)    the risks of establishing liability;

(5)    the risks of establishing damages;

(6)    the risks of maintaining the class action through the trial;

(7)    the ability of defendants to withstand a greater judgment;

(8)    the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9)    the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Grinnell, 495 F.2d at 463 (citations omitted); see also Wal-Mart, 396 F.3d at 117.

15

"All nine factors need not be satisfied, rather, the court should consider the totality of these factors in light of the particular circumstances." Thompson, 216 F.R.D. at 61 (citing D'Amato, 236 F.3d at 86). In applying these factors, moreover, the Court should be mindful of the "strong judicial policy in favor of settlements, particularly in the class action context." PaineWebber, 147 F.3d at 138. "The compromise of complex litigation is encouraged by the courts and favored by public policy." 4 Newberg § 11:41, at 87.

As detailed below, the Settlement is substantively fair under the Grinnell analysis.

### a.   Complexity, Expense and Likely Duration of Litigation

The subject matter of this litigation is complex, as is its scope, and it is likely that both sides would have incurred substantial expense had the case been fully litigated.

The case concerns three versions of DRM software (XCP, MediaMax 3.0 and MediaMax 5.0), all designed for and used on over 22 million music CDs marketed and sold by Sony BMG since 2003. The technical aspects of that software, and the interaction of each software version with users' computers and computer operating systems, had to be evaluated and understood by Plaintiffs' counsel and by retained computer experts with background and experience in software architecture and computer security. (See Russ. Aff., ¶ 24, 28.) The wide-spread consumer concerns presented by the litigation also attracted investigative inquiries into Sony BMG's conduct by the Federal Trade Commission as well as the attorneys general of several states – a fact that underscores the complex nature of the litigation. See In re Am. Bank Note Holographics, 127 F. Supp. 2d at 424 (noting that, for final settlement approval purposes, "[t]he pendency of . . . Federal civil and criminal investigations added layers of complexity to an already complex matter")

In light of these complexities, litigating this case through trial, or possibly appeal, would entail significant expense, including but not limited to the cost of depositions and

other formal discovery, expert witness expenses, pre-trial motions to test the viability of the relief, trial, and appeal. Such expenditures cannot be justified, given that the Settlement provides the full range of relief sought by the litigation now. (Russ. Aff., ¶¶ 24-39.) See In re Lloyd's Am. Trust Fund Litig., No. 96 Civ. 1262, 2002 U.S. Dist. LEXIS 22663, at *64 (S.D.N.Y. Nov. 26, 2002) (concluding that "[s]ettlement . . . results in a substantial and tangible present recovery, without the attendant risk of appeal and delay of trial and post-trial proceedings"). This factor strongly militates in favor of settlement. See, e.g., Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (concluding that "[d]elay, not just at the trial stage but through post-trial motions and the appellate process would cause Class Members to wait years for any recovery"); In Re Metropolitan Life Deriv. Litig., 935 F. Supp. 286, 294 (S.D.N.Y. 1996) (concluding that "settlement would undoubtedly be in the best interest of all parties" in light of the "effort and expense that would be required to take [the] case to and through trial").

Moreover, the restrictions, limitations, and computer security issues associated with Sony BMG's DRM software, while unknown to consumers until October 2005, posed an immediate harm to consumers – including installation of a hidden "rootkit" on consumers' computers, the creation of attendant security vulnerabilities, the potential for collection of private data without consumers' knowledge, and other concerns. These harms had to be addressed immediately through the injunctive relief measures afforded by Settlement. (Russ. Aff., ¶ 18, 25, 38; Rivas Aff., ¶¶ 11-13.) Delaying resolution would simply have enabled computer hackers to exploit the security vulnerabilities associated with XCP and MediaMax technologies – with no concomitant benefit to Class members. (Ibid.) These concerns weigh heavily in favor of approving the Settlement now. See Maley, 186 F. Supp. 2d at 362.

b.      **The Reaction of the Class to the Settlement**

The second Grinnell factor asks the Court to evaluate the reaction of the Class to the Settlement.  Class Counsel and the Court have received only two (2) letters from Class members who raise objections to the Settlement.  In the first letter, objector Nall complains that the MediaMax compensation available to him – a free MP3 download of the MediaMax CD he purchased, a second free MP3 download of one of several album choices provided for by the Settlement, and a free uninstaller to enable him to remove MediaMax software from his computer – are not "physical and tangible things that exist in the real world," and as such afford him no real benefit.  In the second letter, objector Leitner complains that, while he never installed  MediaMax CD to his computer, a free MP3 download of the same album he purchased "does not remedy" his concern that he must remember not to use the MediaMax CD on his computer to avoid installation of MediaMax software on his computer.

While it is true that MP3 music downloads are digital files, and thus do not take the form of "physical" CDs, the audio music files on these downloads are of the same songs as those contained on the physical MediaMax CDs.  Unlike the MediaMax CDs, however, the MP3 downloads available through settlement contain no DRM software of any kind.  Their music content may be copied, without limitation, to a portable MP3 player (such as an iPod) or to a blank "physical" CD.  Moreover, Class members are not required to return their MediaMax CDs to Sony BMG to obtain these benefits.  They can retain their MediaMax CDs, and fully enjoy the benefits of a physical CD, in their home or car stereos, or on a portable CD player, unhindered by any concerns they have about the existence or impacts of computer software contained on those CDs.  If they do not wish to keep their MediaMax CDs, they can sell them, dispose of them, or give them away.

The objectors' complaint that the Settlement does not provide for recall or replacement of MediaMax CDs, a point of discussion in many of the web logs described above, requires a separate response. The remedies available to purchasers of XCP CDs, as compared with those available to purchasers of MediaMax CDs, are commensurate with the harms associated with the version of the DRM software. The XCP recall, exchange and incentive portions of the Settlement are necessary to address the specific harm to consumers posed by XCP - the installation of a rootkit that installs hidden files on the user's computer and evades detection from firewalls, anti-spyware and anti-virus software. (See Settl., ¶¶ I.F, III.B; Russ. Aff., ¶¶ 5, 10, 23, 30-33.) The XCP recall and exchange program enables consumers to return an XCP CD for an identical CD without the software, and is coupled with cash and download incentives available under the Settlement, to provide a strong market mechanism to ensure that these CDs are removed from marketplace. (Settl., ¶¶ III.C-D; Russ. Aff., ¶¶ 29-31.) Unlike XCP, MediaMax does not contain a rootkit, and does not require a similar recall or exchange incentive. (See Russ. Aff., ¶ 23.) Instead, the Settlement provides MediaMax claimants with software designed to address the specific user security risk associated with the MediaMax software or, alternatively, to safely remove software from their computers. (Settl., ¶¶ I.H., III.L-M; Russ. Aff., ¶¶ 5, 10, 23, 30-33.) Sony BMG's willingness to provide downloads to purchasers of MediaMax CDs can be attributed in large part to Sony BMG's interest in restoring customer good will, given that the security risks associated with use of those CDs do not pose the same level of danger to end users and their computer systems as XCP.. (Settl., ¶¶ III.E-F, S-V, IV.A-B; Russ. Aff., ¶¶ 34-37.) (Settl., ¶¶ III.E-F, S-V, IV.A-B; Russ. Aff., ¶¶ 34-37.) Because the Settlement ensures that benefits are properly tied to each Class member's level of harm, it is fair, reasonable, and adequate, and warrants final approval by the Court.

Mr. Nall separately complains that he does not like the range of album choices available for download by MediaMax claimants, without identifying any particular selections he would have liked to see included. Individual tastes in music differ, and there is no set of downloads that will please everyone. The essence of settlement, however, is compromise. The content of the download portion of the MediaMax compensation was a negotiated aspect of the settlement, and the resulting list is the product of the parties' efforts to provide Class members a wide range of music genres to select from when claiming Settlement benefits available to them.

Neither objection rebuts the presumption that the Settlement, taken as a whole, is a fair, reasonable, and adequate compromise for the Class as a whole. With the deadline for submitting formal objections still nearly one month away, Class Counsel anticipates that additional Class members may wish to voice their opinion about the Settlement. "A certain number of [comments and] objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members." See In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d at 175 (citation omitted). Class Counsel will respond in full to any further comments or objections on reply.

### c.    **Stage of Proceedings and Discovery Completed**

Aware of the urgent need for immediate and effective relief for consumers, the parties used all diligent efforts to reach this Settlement at the soonest practicable point in the litigation. (Joint Aff., ¶¶ 15-24, 51; Russ. Aff., ¶¶ 24-29; Rivas Aff., ¶¶ 10-12.) "[S]ettlements reached early are still favored." In re Lucent Techs. Inc. Sec. Litig., 307 F. Supp. 2d 633, 644 (D.N.J. 2004).

Here, despite its factual and legal complexities, the Settlement was achieved without the need for formal discovery. This is entirely appropriate. As many courts observe, it is

the speed, fairness, and adequacy of relief afforded by settlement that are the yardsticks for final approval – not the extent of formal discovery undertaken in the case. See Newby v. Enron Corp., 394 F.3d 296, 306 (5th Cir. 2004) ("Formal discovery is not a necessary ticket to the bargaining table. . . . Generally speaking, a settlement should stand or fall on the adequacy of its terms.") (citations omitted); see also In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d at 174 (S.D.N.Y. 2000) (approving settlement when "no formal discovery was conducted in this case, [and] plaintiffs were afforded several opportunities to extensively review records"). So long as the parties had sufficient information "to intelligently evaluate the desirability of settlement," the Court can – and should – find that a substantial factual basis exists to support the Settlement, and approve it accordingly. See Slomovics v. All for a Dollar, Inc., 906 F. Supp. at 150.

The fact that a comprehensive settlement was achieved through the early, informed efforts of counsel is a factor that weighs squarely in favor of settlement approval. Slowing the negotiations to pursue formal discovery, while leaving Class members vulnerable to continuing computer security vulnerabilities, would have prejudiced, rather than advanced, the goals of the litigation. (See Rivas Aff., ¶ 11.) The essential factual circumstances informing the parties' negotiations were not disputed by Sony BMG, (Joint Aff., ¶ 16; Rivas Aff., ¶ 12.), and Class Counsel came to the settlement table only after developing a thorough factual understanding of the case – one that was informed, in part, by the technical guidance of expert Mark Russinovich. (Joint Aff., ¶ 17; Russ. Aff., ¶¶ 24-29.) Counsel confirmed their understanding following Settlement by examining more than 1.1 million pages of documents produced by Sony BMG as confirmatory discovery. (Joint Aff., ¶ 62.) These factors all weigh in favor of settlement approval. See In re Lloyd's Am. Trust Fund Litig., 2002 U.S. Dist. LEXIS 22663 at *43 (approving settlement where "Plaintiffs'

examination of the facts . . . did not cease when settlement discussions began, and Plaintiffs' counsel continued to conduct discovery to confirm that any settlement they negotiated would serve the interests of the Class").

> **d.    The Risks of Prevailing (Establishing Liability, Establishing Damages, and Maintaining the Class Through Trial)**

"[N]o matter how confident one may be of the outcome of litigation, such confidence is often misplaced." State of West Virginia v. Chas. Pfizer & Co., 314 F. Supp. 710, 743-44) (S.D.N.Y. 1970), aff'd, 440 F.2d 1079 (2d Cir. 1971), cert. denied, 404 U.S. 871 (1971). Here, while Plaintiffs were confident of their ability to prevail, the risk of ultimately establishing liability did exist. The case involved the interaction of software on millions of consumers' computers. Continuing the litigation also would have required detailed expert testimony, and presented vexing problems of proof, as the harms posed by the XCP and MediaMax software are individualized and inherently transitory. (Joint Aff. ¶ 52.) See In Re DoubleClick, Inc. Privacy Litig., 154 F. Supp. 2d 497, 521-526 (S.D.N.Y. 2001) (observing difficulties in pleading and proving $5,000 threshold for "damage" and "loss" to computer or computer data under Consumer Fraud and Abuse Act).

Even if Plaintiffs overcame the risk of establishing a legal basis for liability, "the history of litigation is replete with cases in which plaintiffs succeeded at trial on liability, but recovered no damages, or only disappointing damages, at trial, or on appeal." See In re Sumitomo Copper Litig. 189 F.R.D. 274, 283 (S.D.N.Y. 1999) (citations omitted). "The complexities of proving and calculating damages increase geometrically in class actions." In re Toys "R" Us Antitrust Litig., 191 F.R.D. 347, 353 (E.D.N.Y. 2000) (citation omitted). That risk is even more apparent where, as here, the quantification and magnitude of damages would have certainly required "a battle of the experts at trial, with no guarantee of

the outcome in the eyes of the jury." In re Michael Milken & Assocs. Sec. Litig., 150 F.R.D. 46 (S.D.N.Y. 1993).

While the Court previously issued an order certifying a Settlement Class, the order was conditional, and for settlement purposes only. (Hearing Order, ¶ 1.) The Court was not required to "inquire whether the case, if tried, would present intractable management problems . . . for the proposal [before the Court] is that there be no trial." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997). Absent settlement, decertification is always a possibility, as the case progresses, additional facts become known, and issues arise. See In Re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. 68, 89 (E.D.N.Y. 2000). Each of these factors weighs in favor of settlement approval.

### e.      Ability of Defendants to Withstand a Greater Judgment

The relief provided by the Settlement is both substantial and immediate. Plaintiffs could have insisted on continuing the litigation in an effort to secure a potentially higher sum of money from Sony BMG; however, the delay, expense and uncertainty of that exercise would have provided no correlative benefit to the Class. Here, the proper course for the Court is to evaluate the Settlement in light of other factors that support approval. See D'Amato, 236 F.3d at 86.

### f.      Range of Reasonableness of Settlement in Light of Best Possible Recovery and Risks of Litigation

"There is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion – and the judge will not be reversed if the appellate court concludes that the settlement lies within that range." Wal-Mart, 396 F.3d at 119 (citing Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)).

This Court should find that the proposed Settlement falls within the "range of reasonableness," for the simple reason that it substantially achieves all of Plaintiffs' objectives for this litigation. These objectives are described, among other places, in Plaintiffs' Consolidated Amended Class Action Complaint. They include: (1) prompt elimination and removal of computer vulnerabilities associated with the XCP and MediaMax software (CAC, ¶¶ 60-67, 86-87); (2) compensation for affected Class members (id., ¶¶ 67, 73, 79, 84, 88, 93, 101); (3) and an injunction preventing Sony BMG from including harmful DRM software on its CDs in the future (id., Prayer ¶ C); (4) a mandate that Sony BMG conform its business practices to the requirements of the Consumer Fraud and Abuse Act (id., ¶ 67); and (5) Sony's commitment to adopt "best practices" for future DRM software.  (Id., ¶¶ 28-32, 53, 67, 69-70, 74, 76-79, 82-84).  As Mr. Russinovich attests in his detailed affidavit, the substantial relief provided by the Settlement "address[es] all of the concerns raised by Sony BMG's software and the litigation." (Russ. Aff., ¶¶ 29-38.)  The Class Representatives reach the same conclusion.  (See Rivas Aff., ¶ 14; Declaration of James Michaelson ("Michaelson Decl."), ¶ 17; Declaration of Class Representative Ori Edelstein ("Edelstein Decl."), ¶ 10; see also Declaration of Alexander Guevara Decl. ("Guevara Decl."), ¶ 9-11.)

The "best possible" recovery assumes success on both liability and damages, as well as the ability of Defendants to pay the judgment. See Maley, 186 F. Supp. 2d at 365.  This Settlement satisfies this standard.  It "achieves all of the goals of the litigation, and greatly benefits consumers." (Russ. Aff., ¶ 29; see also Edelstein Decl., ¶ 10 ("[T]he proposed Settlement achieves all of the major goals of the litigation and compares favorably with the results the Class could expect to achieve after a complex and costly trial.").)

24

The substantial benefits achieved by Settlement must be weighed against the risks of continuing the litigation through pre-trial motions, summary judgment, trial, and appeal. Delay is an important factor, here, as consumers faced the prospect of continued harm to their computers had relief through settlement not been achieved.  (See Guevara Decl., ¶ 11 "[T]he proposed Settlement permits an immediate resolution of the problems resulting from the installation of DRM software on Sony BMG CDs without the risk, delay, and expense of trial.").) Settling now, for relief that is substantial and certain, precludes delay and avoids uncertain outcomes at trial and on appeal.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court grant final approval of the Settlement Agreement and enter the proposed Final Order in Connection with Settlement Proceedings.

DATED:  April 6, 2006                 Respectfully submitted,

**GIRARD GIBBS & De BARTOLOMEO LLP**

By:

Daniel C. Girard (Pro Hac Vice)
Jonathan K. Levine (JK-8390)
Elizabeth C. Pritzker (Pro Hac Vice)
Aaron M. Sheanin (Pro Hac Vice)
601 California Street, Suite 1400
San Francisco, California 94108
Telephone:  (415) 981-4800

**KAMBER & ASSOCIATES LLC**
Scott A. Kamber (SK-5794)
19 Fulton Street, Suite 400
New York, NY  10038
Telephone:  (877) 773-5469

***Class Counsel***

Peter Safirstein
Jennifer Czeisler
**MILBERG WEISS BERSHAD & SCHULMAN LLP**
One Pennsylvania Avenue
New York, New York  10119
Telephone:  (212) 594-5300

Ira M. Press
**KIRBY MCINERNEY & SQUIRE LLP**
830 Third Avenue
New York, New York  10022
Telephone:  (212) 317-2000

Jason L. Solotaroff
**GISKAN & SOLOTAROFF LLP**
207 West 25th Street
New York, New York  10001
Telephone:  (212) 847-8315

***Plaintiffs' Executive Committee Counsel***