EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re SONY BMG CD TECHNOLOGIES LITIGATION | Civil Action No. 1:05-cv-09575-NRB |
|  | CLASS ACTION |
| This Document Relates To: | THE RICCIUTI CLASS |
| ALL ACTIONS. | REPRESENTATIVES' [CORRECTED] MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................1

    A.    Counsel for the Ricciuti Class Representatives Are Comprised of
Nationally Recognized Firms in the Area of Privacy and Security Issues
and Consumer Class Actions ...........................................................................2

    B.    The Ricciuti Class Representatives Have Led the Way in Protecting the
Class's Security and Privacy Rights in This Case ...................................................4

    C.    Background of Sony BMG's Conduct...................................................................4

II.   THE RICCIUTI CLASS REPRESENTATIVES' EFFORTS
TO PROTECT THE CLASS ...................................................................6

    A.    The Ricciuti Class Representatives Conducted a Public
Awareness Campaign to Notify Class Members and Pressure Sony BMG
to Correct its Actions ...................................................................6

    B.    Sony BMG Agrees to a Partial Remedy for XCP CDs
with Ricciuti Class Representatives.........................................................7

    C.    The Ricciuti Class Representatives Continue to
Pursue Relief for MediaMax Class Members.........................................................8

    D.    The Ricciuti Class Representatives Assisted Government Investigations.............10

    E.    The Ricciuti Class Representatives Work to Protect Class Member Rights,
While Girard/Kamber Appoints Themselves as Interim Class Counsel...............11

    F.    Girard/Kamber Participates in a "Reverse Auction" to Settle
the Ricciuti Class Representatives' Claims .........................................................14

    G.    Girard/Kamber and Sony BMG Invite the Ricciuti Class Representatives
to "Bless" the Terms of the Settlement...................................................................15

    H.    The Ricciuti Class Representatives' Agreement to Settle
Included Continued Monitoring by EFF.................................................................17

    I.    Because of the Danger of the Security Flaws and Privacy Violations Due
to Sony BMG's Conduct, the Ricciuti Class Representatives Continue to
Raise Public Awareness of the Settlement Agreement Terms...............................21

III.  ARGUMENT..........................................................................................22

    A.    The Standard ..........................................................................................22

Page

B.    Application of the *Goldberger* Factors to the Ricciuti Class Representatives' Fee Request ...............................................................25

    1.    The Time and Labor Expended by Class Counsel.....................................25

    2.    The Magnitude and Complexity of this Case ............................................26

    3.    Counsel for the Ricciuti Class Representatives Undertook Significant Risk in Litigating this Case ..................................27

    4.    The Ricciuti Class Representatives Did Not Build Upon Government Efforts; Rather, Counsel for Ricciuti Class Representatives Assisted the Government's Efforts.................................29

    5.    The Quality of Representation and the Result Achieved...........................30

    6.    The Requested Fee Is Reasonable in Relation to the Settlement..............33

        a.    A Proper Valuation of the Settlement Should Include the Estimated Value of All Benefits to the Class.................................33

        b.    Counsel's Requested Percentage Is Below the Norm in This Circuit .........................................................................................35

    7.    Public Policy Favors the Requested Fee Award ........................................37

C.    Application of the Lodestar "Cross-Check" ........................................................38

    1.    Multiplier Requested Is Reasonable ........................................................38

    2.    Counsel's Rates Are at or Below Market ..................................................39

D.    Counsel's Request for Reimbursement of Expenses Should Be Granted.............40

IV.    CONCLUSION.................................................................................................................40

# TABLE OF AUTHORITIES

**Page**

*675 Chelsea Corp. v. Lebensfeld*,
    No. 95 Civ. 6239 (SS), 1997 U.S. Dist. LEXIS 14076
    (S.D.N.Y. Sept. 1997)..................................................................................................19

*Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*,
    54 F.3d 69 (2d Cir. 1995) .........................................................................................33

*Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*,
    No. 96 Civ. 0583, 2002 WL 1315603
    (S.D.N.Y. June 17, 2002)..........................................................................................23

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)...................................................................................................22

*Cosgrove v. Sullivan,*
    759 F. Supp. 166 (S.D.N.Y. 1991)......................................................................38, 39

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)..................................................................................28, 29

*Dolgow v. Andersen*,
    43 F.R.D. 472 (E.D.N.Y. 1968) ...............................................................................37

*Foster v. Boise-Cascade, Inc.*,
    577 F.2d 335 (5th Cir. 1978) ....................................................................................25

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975)......................................................................................20

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)................................................................................ *passim*

*Hale v. Citibank, N.A.*,
    198 F.R.D. 606 (S.D.N.Y 2001) ..............................................................................13

*Hall v. Cole*,
    412 U.S. 1 (1973)......................................................................................................34

*In re Am. Bank Note Holographics, Inc., Sec. Litig.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)............................................................23, 28, 40

**Page**

*In re Brand Name Prescription Drugs Antitrust Litig.*,
No. 94 C 897, 2000 WL 204112
(N.D. Ill. Feb. 10, 2000)...............................................................................29

*In re Brown Co. Sec. Litig.*,
355 F. Supp. 574 (S.D.N.Y. 1973)..............................................................27

*In re Cont'l Illinois Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) ......................................................................28

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
No. 98 CV 4318 HB, 2001 WL 709262
(S.D.N.Y June 22, 2001)..............................................................................36

*In re Ikon Office Solutions*,
194 F.R.D. 166 (E.D. Pa. 2000)..................................................................40

*In re Indep. Energy Holdings PLC Sec. Litig.*,
302 F. Supp. 2d 180 (S.D.N.Y. 2003)........................................................40

*In re Int'l Murex Techs. Corp. Sec.*,
No. 93 CV 336 (JG), 1996 WL 1088899
(E.D.N.Y. Dec. 4, 1996) ..............................................................................36

*In re Lloyd's Am. Trust Fund Litig.*,
No. 96 Civ. 1262, 2002 WL 31663577
(S.D.N.Y. Nov. 26, 2002) ............................................................................24

*In re Lucent Techs., Inc. Sec. Litig.*,
327 F. Supp. 2d 426 (D.N.J. 2004) ............................................................39

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
985 F. Supp. 410 (S.D.N.Y. 1997)..............................................................28

*In re RJR Nabisco, Inc. Sec. Litig.*,
No. 88 Civ. 7905, 1992 WL 210138
(S.D.N.Y. Aug. 24, 1992) ..................................................................*passim*

*In re Rite Aid Corp. Sec. Litig.*,
146 F. Supp. 2d 706 (E.D. Pa. 2001) .........................................................38

*In re Rite Aid Corp. Sec. Litig.*,
269 F. Supp. 2d 603 (E.D. Pa 2003) ..........................................................40

**Page**

*In re Sumitomo Copper Litig.*,
 74 F. Supp. 2d 293 (S.D.N.Y. 1999)..................................................................29

*In re Twinlab, Corp. Sec. Litig.*,
 187 F. Supp. 2d 80 (E.D.N.Y. 2002) .................................................................24

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
 724 F. Supp. 160 (S.D.N.Y. 1989)......................................................................24

*In re Visa Check/Mastermoney Antitrust Litig.*,
 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...............................................................38

*In re Warner Commc'ns Sec. Litig.*,
 618 F. Supp. 735 (S.D.N.Y. 1985).....................................................................39

*Kaplan v. Rand*,
 192 F.3d 60 (2d Cir. 1999)..................................................................................34

*Kopet v. Esquire Realty Co.*,
 523 F.2d 1005 (2d Cir. 1975)..............................................................................34

*Kurzweil v. Philip Morris Cos.*,
 No. 94 Civ. 2373 (MBM), 1999 U.S. Dist. LEXIS 18378
 (S.D.N.Y. Nov. 30, 1999) ...................................................................................39

*Maley v. Del Global Techs. Corp.*,
 186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................................................23, 29, 39

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
 __ U.S. __, 125 S. Ct. 2764 (2005).......................................................................3

*In re NASDAQ Market-Makers Antitrust Litig.*,
 187 F.R.D. 465...............................................................................................25, 39

*Neuberger v. Shapiro*,
 No. 97-7947, 1998 U.S. Dist. LEXIS 18807
 (E.D. Pa. Nov. 25, 1998)......................................................................................20

*Reynolds v. Benefit Nat'l Bank*,
 288 F.3d 277 (7th Cir. 2002) ..................................................................... *passim*

*Roberts v. Texaco, Inc.*,
 979 F. Supp. 185 (S.D.N.Y. 1997).....................................................................33

**Page**

*Romstadt v. Apple Computer*,
    948 F. Supp. 701 (D. Ohio 1996)..................................................................20

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
    91 F. Supp. 2d 942 (E.D. Tex. 2000) ......................................................25, 33

*Sheppard v. Consol. Edison Co. of New York, Inc.*,
    No. 94-CV-0403(JG), 2002 WL 2003206
    (E.D.N.Y. Aug. 1, 2002) ..........................................................................33

*Slomovics v. All for a Dollar, Inc.*,
    906 F. Supp. 146 (E.D.N.Y. Dec. 4, 1996) ..............................................36

*Snapp v. Topps Co. Inc.*,
    No. 93-CV-0347 JG, 1997 WL 1068687
    (E.D.N.Y. Feb. 12, 1997) ....................................................................33, 35

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ...................................................................35

*Steiner v. Williams*,
    No. 99 CIV. 10186, 2001 WL 604035
    (S.D.N.Y. May 31, 2001)...........................................................23, 33, 34

*Strougo v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003).................................................23, 24, 25

*Susman v. Lincoln Amer. Corp.*,
    561 F.2d 86 (7th Cir. 1977) .....................................................................13

*Teachers' Ret. Sys. v. A.C.L.N., Ltd.*,
    No. 01-CV-11814(MP), 2004 U.S. Dist. LEXIS 8608
    (S.D.N.Y. May 14, 2004)..........................................................................27

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .................................................................33

*Walmart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2nd Cir. 2005).....................................................................36

*Weiss v. Mercedes-Benz of N. Am.*,
    899 F. Supp. 1297 (D.N.J. 1995) .............................................................39

Page

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 23(g) ..............................................................................................12, 13

18 U.S.C.
    §1030.................................................................................................................27

California Civil Code
    §1770, *et seq* .....................................................................................................7
    §1780(d).............................................................................................................22

California Code of Civil Procedure
    §1021.5..............................................................................................................22

N.Y. Gen. Bus. Law
    §349(h)..............................................................................................................22
    §350(e)..............................................................................................................22

**SECONDARY AUTHORITIES**

1 Alba Conte, *Attorney Fee Awards*
    §2.06 (2d ed. 1993) ..........................................................................................39

## I.     INTRODUCTION

Tom and Yvonne Ricciuti, Mary Schumacher, Robert Hull, Joseph Halpin, and Edwin Bonner (hereinafter referred to as "Ricciuti class representatives" and "EFF group") hereby move this Court for an award of attorneys' fees in the amount of $*1,846,480.16* and expenses in the amount of $*90,148.66* to be paid by defendants Sony BMG Music Entertainment ("Sony BMG"), First4Internet Ltd., SunnComm International Inc. and MediaMax Technology Corp (collectively "defendants").

This above request is based, in part, on three expert declarations submitted herewith. First, Dr. Steven M. Bellovin, Professor of Computer Science, Columbia University, and an expert in computer security, declares that defendants' use and sale of CDs with the XCP and MediaMax 5.0 software had the potential to aid attackers seeking to take over computer systems. Dr. Bellovin also states that Sony BMG "employed the (XCP) rootkit to hide its own DRM software, presumably to prevent its removal by the system owner administrator.  However there was no mechanism to prevent it from concealing other, more malicious software."  Declaration of Steven M. Bellovin in Support of Ricciuti Class Representatives Motion for an Award of Attonreys' Fees and Reimbursement of Expenses ("Bellovin Decl."), ¶4.

Second, Dr. Larry Ponemon, Chairman of the Ponemon Institute, a research organization dedicated to advancing privacy and data protection practices, declares that there is an estimable cost to class members associated with spyware, such as the XCP and MediaMax 5.0 software. Declaration of Larry Ponemon in Support of the Ricciuti Class Representatives' Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Ponemon Decl."), ¶4.

Third, Aram A. Sinnreich, Doctoral Fellow and Lecturer at the USC Annenberg School for Communication, and Managing Partner of Radar Research, offers his opinion regarding the

maximum potential benefits to class members provided by particular terms set forth in the Settlement Agreement.  These terms include Sony BMG's agreement to:  (1) exchange CDs containing XCP and MediaMax 5.0 Software for CDs without copyright protection software; (2) pay shipping charges under the XCP exchange program; (3) provide free downloads to class members in MP3 format; (4) waive certain EULA provisions; and (5) stop using for two years XCP and MediaMax "copy protection" software on CDs sold to the public.  Declaration of Aram Sinnreich in Support of the Ricciuti Class Representatives' Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Ponemon Decl."), ¶2.

Based on these declarations referred to above, the potential benefit to class members set forth in the Settlement Agreement can be conservatively valued to exceed $250 million.  As such, counsel for the Riccutti class representatives' fee request equals less than one-percent (1%) of the benefit made available to the class, and equals a two-times multiplier on counsels' lodestar.

A.    **Counsel for the Ricciuti Class Representatives Are Comprised of Nationally Recognized Firms in the Area of Privacy and Security Issues and Consumer Class Actions**

The Electronic Frontier Foundation ("EFF") is a non-profit organization that is an international authority on legal issues involving digital rights, such as those presented here.  By mobilizing more than 50,000 concerned citizens through its Action Center, EFF is the leading advocate for consumer rights in electronic privacy issues.  Declaration of Cindy A. Cohn in Support of the Ricciuti Class Representatives' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Cohn Decl."), Ex. A.  EFF has a paying membership of 10,400 people and almost 48,000 people subscribe to EFF's weekly newsletter.  Join Declaration of Counsel in Support of Ricciuti Class Representations' Motion for an Award of Attorneys' Fees

and Reimbursement of Expense ("Joint Decl."), ¶4.  EFF also has a large Internet presence.  One measure ranks EFF's website at 9,304 in Internet traffic, reaching 189,000,000 users in the last three months alone, according to an Internet site that tracks Internet traffic and website popularity.   *See* Declaration of Reed R. Kathrein in Support of the Ricciuti Class Representatives' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Kathrein Decl."), Ex. 1.  This is compared to the lower ranking of Sony BMG's website of 64,963, with traffic of only 32,000,000 users in the last three months.  Kathrein Decl., Ex. 2. Most recently, EFF litigated against entities affiliated with Sony BMG one of the most important copyright cases involving digital music rights ever decided by the U.S. Supreme Court.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, __ U.S. __, 125 S. Ct. 2764 (2005).

Lerach Coughlin Stoia Geller Rudman & Robbins LLP is one of the largest class action firms in the county, with attorneys specializing in securities, consumer, insurance, healthcare, human rights, employment discrimination and antitrust class actions.  Kathrein Decl., Ex. 3. Green Welling LLP ("Green Welling") is also one of the leading firms in the nation for consumer class actions.  Declaration of Robert S. Green in Support of the Ricciuti Class Representatives' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Green Decl."), Ex. A.  Lawrence E. Feldman & Associates has extensive experience practicing in the area of protecting the rights of artists and consumers in the music industry.  Declaration of Lawrence E. Feldman in Support of the Ricciuti Class Representatives' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Feldman Decl."), Ex. A.[1]

---

[1]    The Joint Declaration and declarations from Reed R. Kathrein, Cindy A. Cohn, Robert S. Green and Lawrence E. Feldman, complete with detailed time and expense records, are submitted in support of this motion.  The Ricciuti class representatives are also moving for attorneys' fees on behalf of the Rothken Law Firm LLP and the Law Offices of Mallison &

**B.    The Ricciuti Class Representatives Have Led the Way in
Protecting the Class's Security and Privacy Rights in This Case**

On January 6, 2006, this Court appointed the Ricciuti class representatives – who comprise six of the thirteen named class representatives in the settlement agreement ("Settlement Agreement") – to represent the conditionally certified class.  The Ricciuti class representatives have been primary actors in trying to protect the class, by pressuring defendants to:  (1) take corrective actions; (2) compensate class members; and (3) limit or prevent future harm to consumers.  In addition to being responsible for the substantive terms set forth in the Settlement Agreement, the Ricciuti class representatives identified unknown security vulnerabilities in defendants' MediaMax software and worked with security experts (and Sony BMG) to "patch" the vulnerability.  Moreover, from the moment Sony BMG's conduct was uncovered, the Ricciuti class representatives have conducted a public awareness campaign to notify consumers that defendants' conduct has potentially invaded their privacy and jeopardized consumers' computer security.

**C.    Background of Sony BMG's Conduct**

Sony BMG is the world's second largest music company, responsible for approximately one-quarter of all album sales in the United States.  Beginning in 2003, Sony BMG began distributing millions of CDs that include so-called "copy protection" software.  Kathrein Decl., Ex. 4.  If a consumer attempts to play or copy one of these CDs on their computer, software is installed that restricts the number and kind of copies that the computer can make.  Largely

---

Martinez, who filed suit on behalf of the plaintiff in *Klemm v. Sony BMG Music Entertainment*, *et al.*, Case No. 05-05111 (N.D. Cal., filed on Dec. 9, 2005).  The declarations of Ira P. Rothken and Stan S. Mallison summarizing their fees and expenses are submitted with this motion.

unknown to consumers, however, this type of software can greatly restrict legal use of one's CD and cause or facilitate harm to one's computer.  Bellovin Decl., ¶¶3-7.

At issue in this case are two distinct types of "copy protection" software, XCP and MediaMax.  Sony BMG sold CDs with these two types of "copy protection" software and attempted to include them on an ever-increasing number of CDs.  The software's true functionality and dangers associated therewith were hidden from the public.  While Sony BMG claims to have placed the software on music CDs to protect their copyright, in truth the software does much more, including hiding files on users' computers.  Critically, each of the two kinds of software contained numerous security flaws that opened up consumers' computers to *viruses and attacks*.  Bellovin Decl., ¶¶3-7.  Sony BMG created this danger to consumers for one reason – to protect its profits, while trying to avoid disclosing to consumers that their use of the CDs would be restricted by the software.  For example, this software prohibits a user from playing the discs on software other than the CDs' proprietary software.  This may adversely effect sound quality and limit a consumer's ability to transfer songs to a music library.  The software also limits the format that a user may "rip" songs to, such as formats playable on Apple's iPod.  Sinnreich Decl., ¶¶3-4.

But Sony BMG's illegal conduct did not start and end with hidden computer software that limited consumers' use of their purchased CDs, while exposing millions of music listeners to computer viruses and attacks.  Both XCP and MediaMax 5.0 included functionality that enabled BMG to watch consumers' behavior in their own home.[2]  Once installed, the software instructed a user's computer to "phone home" to servers controlled by Sony BMG.  If Sony BMG desired,

---

[2]     Counsel for Sony BMG has represented that only a subset of CDs with MediaMax 5.0 software have this "phone home" capability.

this function could report details back to Sony BMG regarding the ***user's listening habits***. Belloving Decl., ¶8.  This Trojan horse was no accident.

As if these characteristics are not bad enough, versions of this software placed on millions of CDs installed itself ***without clear notice to consumers***.  In fact, the software on the MediaMax 3.0 CDs installed silently before any user agreement – a EULA – even appeared. Even once the EULA did appear on those CDs, and on all other XCP CDs, the agreement's terms were misleading and failed to clearly and conspicuously disclose that XCP or MediaMax software would be installed on the user's computer.  Further, the EULA's terms misleadingly portrayed the purpose of the software, representing the software was necessary to play the contents of the CD on one's computer.  The software was only "necessary" because Sony BMG made it so.  Nor did the EULA disclose that the software would "phone home" when played.

## II.   THE RICCIUTI CLASS REPRESENTATIVES' EFFORTS TO PROTECT THE CLASS

### A.   The Ricciuti Class Representatives Conducted a Public Awareness Campaign to Notify Class Members and Pressure Sony BMG to Correct its Actions

Beginning on November 3, 2005, only four days after Sony BMG's stealth conduct first became public, EFF notified its membership of more 10,000 people and the public that the Sony BMG root kit was an issue with serious security and privacy concerns. Joint Decl., ¶9.  In an article published on their website on November 3, 2005, EFF discussed these concerns with the XCP CDs and the even more problematic security issues concerning the XCP "update." Kathrein Decl., Ex. 5.

After communicating with industry experts and conducting factual investigation, on November 9, 2005, EFF identified and published a list of 20 CDs that contained the XCP software on their website.   Kathrein Decl., Ex. 6.   Included in the November 9, 2005

announcement was a list of three CDs that used the MediaMax software.  *Id.*  This was the first time that it was publicly suggested that the MediaMax CDs from Sony BMG had similar security and privacy issues as the XCP software.  Joint Decl., ¶10.  On November 9, 2005, EFF also published an article calling into question Sony BMG's EULA agreement, and the many unconscionable provisions inserted into the EULA that violated end-user's rights.  Kathrein Decl., Ex. 7; Joint Decl., ¶11.

>   **B.**     **Sony BMG Agrees to a Partial Remedy for XCP CDs**
>              **with Ricciuti Class Representatives**

In conjunction with notifying its members and the public regarding Sony BMG's conduct and after investigating the facts in further detail, on November 14, 2005, EFF sent a formal demand letter to Sony BMG and its counsel pursuant to Cal. Civ. Code §1770, *et seq*.  Kathrein Decl., Ex. 8; Joint Decl., ¶13.  EFF published a version of this demand letter as an "open letter" to the public.  Kathrein Decl., Ex. 9; Joint Decl., ¶13.  The demand letter addressed the security and privacy concerns of both the XCP and MediaMax software and listed ten specific, detailed demands for relief.  *Id*.  Included therein, the Ricciuti class representatives demanded that Sony BMG:  (1) recall all XCP and MediaMax CDs and offer replacements to customers; (2) widely publicize the security risks associated with the infected CDs; (3) cooperate with antivirus companies to facilitate removal of the XCP and MediaMax software from users' computers, including an opportunity to download corrective software; (4) employ rigorous testing procedures on any future digital rights management ("DRM") technology Sony BMG may use; and (5) certify future CDs containing content protection software will not electronically communicate to Sony BMG nor initiate the download of any software without prior informed consent of the user.  Kathrein Decl., Ex. 8; Joint Decl., ¶14.

On November 14, 2005, Sony BMG publicly announced it would agree to an exchange program for its *XCP* CDs.  Over the next few days, the EFF group extensively negotiated the terms set forth in its demand letter with Sony BMG's counsel, including the XCP exchange and the problems EFF discovered with the MediaMax CDs.  Kathrein Decl., Exs. 10-12; Joint Decl., ¶¶15-17.  On November 18, 2005, Sony BMG formally responded to EFF's demand letter and private negotiations.  Sony BMG committed to take twelve specific steps in response to the demand letter, among which included:  (1) stop manufacturing CDs with XCP software; (2) withdraw existing CDs with XCP software from the distribution chain; (3) provide a notice program through retailers and electronic means; (4) provide an update for XCP to "uncloak" XCP; (5) provide an uninstaller; (6) test the uninstaller and update through a third-party; and (7) notify antivirus companies that security issues have been raised.  Kathrein Decl., Ex. 13; Joint Decl., ¶18.  Despite Sony BMG's substantial commitments to meet the Ricciuti class representatives' demands, Sony BMG refused to take similar corrective actions regarding the MediaMax software – software present on more than *four* times the number of CDs than the XCP CDs.[3]  Kathrein Decl., Ex. 13; Joint Decl., ¶18.

### C.     The Ricciuti Class Representatives Continue to Pursue Relief for MediaMax Class Members

Due in significant part to Sony BMG's refusal to address the MediaMax software issues, on November 21, 2005, EFF and their co-counsel filed a class action in California state court. Kathrein Decl., Ex. 15; Joint Decl., ¶19.  The EFF group's ongoing investigation revealed that the number of MediaMax CDs presenting security vulnerabilities exceeded the number of XCP

---

[3]     In its notice to the attorney generals under the Class Action Fairness Act, defendants represented that the class consists of at least 3 million XCP CDs, 4.2 million MediaMax Version 5.0 CDs and 9.5 million MediaMax Version 3.0 CDs.  Kathrein Decl., Ex. 14.

CDs.  On November 30, 2005, EFF provided evidence to Sony BMG of a specific MediaMax security problem that had not been publicly disclosed.  Kathrein Decl., Ex. 16; Joint Decl., ¶21. In the letter to Sony BMG, the Ricciuti class representatives identified the existence and details of the security threat, and stated they would give Sony BMG time to create a security "patch" before releasing details of how the software could be exploited.  *Id.*  After receiving this letter, Sony BMG requested that the Ricciuti class representatives wait 24 hours before publicly releasing this information regarding MediaMax security vulnerabilities.  Kathrein Decl., Ex. 17; Joint Decl., ¶22.  The Ricciuti class representatives agreed, releasing the information only privately to the major antivirus companies.  *Id.*  The Ricciuti class representatives shared their expert's report on the MediaMax security vulnerabilities and agreed to allow Sony BMG time to develop a patch.  *Id*.  The Ricciuti class representatives did not release these security vulnerabilities publicly, to avoid exploitation by computer hackers.  Joint Decl., ¶23.

Throughout the next week, EFF provided Sony BMG access to its security experts, iSec partners, and attempted to work with Sony BMG to create a security patch for the MediaMax security flaw.  Kathrein Decl., Exs. 18-22; Joint Decl., ¶24.  Because Sony BMG continued to refuse to meet all of EFF's demands for relief, the Ricciuti class representatives continued to actively pursue litigating the case against defendants.  Kathrein Decl., Ex. 23.  While the Ricciuti class representatives worked with Sony BMG to resolve the MediaMax security vulnerabilities, the Riciutti class representatives also continued their factual investigation and prepared a motion for preliminary injunction against the continued sale of MediaMax CDs.  Joint Decl., ¶25.  The EFF group informed Sony BMG that, in the event Sony BMG continued to refuse to remedy the MediaMax security issues, including the security flaw, the Ricuitti class representatives were prepared to file their motion for preliminary injunction.  Joint Decl., ¶26.  However, due in large

part to the joint efforts between the EFF group and Sony BMG to create and implement a "patch" to fix the MediaMax security flaw, the Ricciuti class representatives agreed not to file their motion for preliminary injunction.   Joint Decl., ¶¶27-28.   Based on these efforts, on December 6, 2005, Sony BMG and EFF *jointly* announced to the public both the security vulnerability in the MediaMax software and the availability of a patch.  Kathrein Decl., Ex. 24.

### D. The Ricciuti Class Representatives Assisted Government Investigations

During this period, the EFF group focused on getting Sony BMG to limit the harm and potential harm that Sony BMG had created.   Throughout this period of fast-moving investigation and discovery of security vulnerabilities and potential privacy violations, the Ricciuti class representatives also communicated with government agencies interested in and investigating these technology issues.   For example, on November 22, 2005, the Texas Attorney General contacted the Ricciuti class representatives.  Joint Decl., ¶30.  After discussing the security flaws in the MediaMax software, the Ricciuti class representatives provided work-product to the Texas Attorney General regarding MediaMax and its producer, SunnComm.   Joint Decl., ¶30.   This work-product contributed to the Texas Attorney General amending his complaint to add MediaMax claims on December 21, 2005.  Kathrein Decl, Exs. 25-26; Joint Decl., ¶30.

Similarly, on December 15, 2005, the Federal Trade Commission ("FTC") contacted EFF indicating they were considering a formal investigation into defendants' conduct.   Joint Decl., ¶31.   EFF freely shared with the FTC its work-product concerning the problems with the MediaMax software.  *Id.*

Even after the Settlement Agreement was signed in this action on December 28, 2005, the Ricciuti class representatives continued to assist government entities in their investigative efforts. For example, on January 4, 2006, EFF spoke with the Florida Attorney General regarding the

troubled MediaMax software, including the "call home" features, the lack of pre-sale notice to consumers regarding the flawed MediaMax software, and Sony BMG's failure to provide customers with assistance in using the MediaMax and XCP updates and uninstallers.  Joint Decl., ¶32.  EFF also continued their communications with the Texas and Illinois Attorney Generals. Kathrein Decl., Ex. 27; Joint Decl., ¶33.

> ### E. The Ricciuti Class Representatives Work to Protect Class Member Rights, While Girard/Kamber[4] Appoints Themselves as Interim Class Counsel

While the EFF group engaged in factual investigation, employed and worked with experts to identify and solve the ongoing security flaws, negotiated with Sony BMG regarding the same, and assisted government law enforcement entities, Girard/Kamber raced to the courthouse to appoint themselves to act as interim "class counsel."  In so doing, they focused on procedural machinations – rather than the best interests of the class – as evidenced by Girard/Kamber's conduct.

For example, on November 14, 2005, while the Ricciuti class representatives sent and made public their demand letter to Sony BMG and negotiated with Sony BMG regarding the security and privacy issues, on the same day Girard/Kamber filed four lawsuits – all in the Southern District of New York – *within hours of each other*.  *See Michaelson et al. v. Sony BMG Music, Inc. et al.*, Case No. 1:05-cv-09575 (S.D.N.Y., filed on Nov. 14, 2005); *Rivas v. Sony BMG Music Entertainment*, Case No. 1:05-cv-9598 (S.D.N.Y., filed on Nov. 14, 2005); *Jeffrey Potter v. Sony BMG Music Entertainment*, Case No. 1:05-cv-9607 (S.D.N.Y., filed on Nov. 14, 2005); and *Klewan et al. v. Arista Holdings Inc., doing business as Sony BMG Music*

---

[4]   "Girard/Kamber" is the law firms of Girard Gibbs & De Bartolomeo LLP ("Girard") and Kamber & Associates ("Kamber").

*Entertainment*, Case No. 1:05-cv-9609 (S.D.N.Y., filed on Nov. 14, 2005). As explained below, the firms filing these four lawsuits coincidentally make up the "leadership group" in this consolidated action.

During the week of November 28, 2005, the EFF group worked together with Sony BMG to provide millions of consumers a patch for the MediaMax security flaw. Unbeknownst to the EFF group, Girard/Kamber orchestrated the filing of the first Case Management Order ("CMO") in this Court by stipulation with defendants, appointing Girard/Kamber as "class counsel" and naming the rest of these plaintiffs' counsel to the "executive committee." *See* Stipulation and Case Management Order, filed December 1, 2005. This self-appointment as "class counsel" gave little consideration to the provisions of Federal Rule of Civil Procedure 23(g). Rule 23(g) requires that the court must appoint class counsel, and consider the following factors:

- the work counsel has done in identifying or investigating potential claims in the action;

- counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action;

- counsel's knowledge of the applicable law; and

- the resources that counsel will commit to representing the class.

Fed. R. Civ. Proc. 23(g). The Court may further consider other matters pertinent to counsel's ability to fairly and adequately represent the interests of the class. *Id.*

Sony BMG stipulated to the terms of the CMO. Disturbingly, even though Sony BMG had been working and negotiating with the EFF group for weeks, Sony BMG chose to withhold the fact of its parallel conduct with Girard/Kamber from the EFF group.

The CMO's terms purported to transfer before this Court all actions filed in the Southern District of New York covering matters alleged in their ***coordinated*** complaints and appointed Girard/Kamber as interim "class counsel." Tellingly, nothing in these four complaints

- 12 -

demonstrate significant work identifying or investigating potential claims in the action – a prerequisite to being appointed class counsel under Fed. R. Civ. Proc. 23(g).  To the contrary, while the CMO's terms were drafted broadly to capture all cases, not one of the four coordinated complaints contained any allegations concerning Sony BMG's illegal use of MediaMax software.  *See*, *e.g.*, *Michaelson et al. v. Sony BMG Music, Inc. et al.*, Case No. 1:05-cv-09575 (S.D.N.Y., filed on Nov. 14, 2005).   Case investigation took a back seat to procedural gamesmanship.  Girard/Kamber sought to gain control (in concert with Sony BMG) over the authority to settle all issues related to Sony BMG's conduct.

One of the two self-anointed class counsel is Kamber.  Another Rule 23(g) factor is the resources counsel will commit to representing the class.  From the resume submitted by Mr. Kamber, it is unclear whether he is a sole practitioner with resources available to have committed to fighting Sony BMG here.  The other class counsel is the Girard firm.  In their zeal to wrest control over settlement authority on behalf of millions of consumers, it appears that Girard's firm was retained by a relative of an attorney working at Girard's firm.  *See generally* Declaration of Diana M. Schneider in Support of the Ricciuti Class Representatives' Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses.

In similar situations, courts have found that family relationships between class representatives and class counsel create a conflict, or at least the appearance of impropriety, sufficient to find the family member of class counsel inadequate to serve as a plaintiff to represent the class.  *See*, *e.g.*, *Susman v. Lincoln Amer. Corp.*, 561 F.2d 86 (7th Cir. 1977) (family member of plaintiff counsel found to be inadequate as class representative); *see also Hale v. Citibank, N.A.*, 198 F.R.D. 606 (S.D.N.Y 2001).  At the very least, class counsel should have disclosed this information to the Court when seeking interim appointment as class counsel.

- 13 -

**F.     Girard/Kamber Participates in a "Reverse Auction" to Settle the Ricciuti Class Representatives' Claims**

On December 5, 2005, Sony BMG called the Ricciuti class representatives and indicated that it would like to enter into comprehensive settlement agreements, beyond the XCP recall and the agreements that had already been reached during the MediaMax security patch negotiations. Joint Decl., ¶34.

A short two days later, however, Sony BMG informed the EFF group for the first time that they had commenced parallel settlement negotiations with Girard/Kamber. Sony BMG had never disclosed their stipulated CMO filing prior to this time. Joint Decl., ¶35. The Ricciuti class representatives immediately made contact with the other plaintiffs' counsel. Despite authorization from Sony BMG, Girard/Kamber resisted sharing information regarding their progress or settlement terms negotiated to date. Kathrein Decl., Exs. 28-30; Joint Decl., ¶37.

In light of the procedural posture, and lack of factual investigation regarding the MediaMax software, counsel for the Ricciuti class representatives had great concern that Girard/Kamber was going to release MediaMax class members' claims without adequately protecting the interests of those class members. Joint Decl., ¶36.

On December 18, 2005, counsel for the Ricciuti class representatives flew to New York to meet with the Girard/Kamber and defendants for settlement negotiations. Based on several material representations made at that time by both Girard/Kamber and Sony BMG, the Ricciuti class representatives agreed to delay objecting to the CMO appointing Girard/Kamber "class counsel," pending further settlement negotiations and additional terms to be included in the Settlement Agreement. Joint Decl., ¶40.

One of the most troubling aspects of this class action settlement is the flavor of "reverse auction" that permeated the negotiations. A "reverse auction" is "the practice whereby the

defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant."  *See Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002).  Where the potential for a reverse auction exists, courts have held that these circumstances demand "close[] scrutiny."  *Id.* at 283.

Here, the Ricciuti class representatives aggressively pursued Sony BMG at a time Sony BMG was facing a public relations disaster.  Kathrein Decl., Ex. 31 (statement from Sony BMG that they "share the concerns of consumers regarding these discs.").  Faced with the Ricciuti class representatives' investigation and discovery of security vulnerabilities in the MediaMax software and a potential preliminary injunction, Girard/Kamber's apparent immediate acquiescence to Sony BMG's standing settlement offer substantially undermined the class's settlement position.  Joint Decl., ¶41.  By its actions, Girard/Kamber effectively limited Sony BMG's liability to class members and shifted those interested in providing greater relief to the class into objector status.

### G.   Girard/Kamber and Sony BMG Invite the Ricciuti Class Representatives to "Bless" the Terms of the Settlement

On December 13, 2005, the Ricciuti class representatives were "invited" to participate in the settlement negotiations on the eve of Girard/Kamber and Sony BMG executing the Settlement Agreement.  Joint Decl., ¶39.  The Ricciuti class representatives had to make a critical choice of whether to attempt midnight-hour improvements to the terms of the settlement and to monitor the enforcement thereof, or to become an objector.  Due to all of the work done and relief obtained to date, and the hope to improve the settlement terms, the Ricciuti class representatives flew to New York.

During this meeting, it was clear that Girard/Kamber was not demanding additional relief for MediaMax purchasers, other than the MediaMax patch and uninstaller that the Ricciuti class representatives had previously worked with Sony BMG to create and deploy.  Joint Decl., ¶42. Despite a total lack of investigation or even a ***representative plaintiff*** on the part of Girard/Kamber, Girard/Kamber was prepared to release all EULA and MediaMax claims.  Joint Decl., ¶43.  Not one of the Girard/Kamber complaints had at that time any MediaMax or EULA allegations.  *Id.*  Those claims were made only in the complaints filed by the Ricciuti class representatives.  *Id.*  Even more troubling, no plaintiff in Girard/Kamber's complaints was even an alleged purchaser of MediaMax CDs, and thus, no Girard/Kamber plaintiff could have been an adequate class representative.  *Id.*

The release of claims without due investigation or consideration is a hallmark sign of a reverse auction.  *See Reynolds* 288 F.3d at 285 (in holding that the district judge abused his discretion in approving the settlement, the court noted "[t]wo classes were absorbed into the settlement even though their claims were sharply different from those of the classes represented by the settlement counsel"); Joint Decl., ¶43.  Moreover, the negotiations revealed that the EFF group's demands outlined on November 14, 2005 (and agreed to by Sony BMG on November 18, 2005), made up the bulk of the relief for the XCP purchasers.  Kathrein Decl., Ex. 8 *with id.*, Ex. 13; Joint Decl., ¶42.

As a direct result of the EFF group's negotiations in New York, the terms of the Settlement Agreement now make available $52.48 million in compensation for MediaMax class members, in the form of an exchange program and MP3 downloads.  Joint Decl., ¶¶44-45; Sinnreich Decl., ¶¶2, 12-13.  Other additional terms in the Settlement Agreement include Sony BMG's agreement to stop manufacturing XCP and MediaMax CDs for a term of two years.

- 16 -

Affadavit of Elizabeth C. Pritzker in Support of Plaintiffs' Application for Preliminary Approval of Class Action Settlement ("Pritzker Aff."), Ex. C at 27; Sinnreich Decl., ¶¶16-17.  These terms (valued, in excess of $136 million), combined with Sony BMG's earlier agreed-upon MediaMax patch and uninstaller added significant value to those class members who purchased MediaMax CDs.  Sinnreich Decl., ¶¶2, 16,-17; Bellovin Decl., ¶¶10-12.

After securing several material improvements to the Settlement Agreement, counsel for the Ricciuti class representatives agreed to execute the Settlement Agreement based on two important conditions.   Joint Decl., ¶46.   First, the Ricciuti class representatives would be designated as class representatives in the Settlement Agreement.  Pritzker Aff., Ex. C at 49; Joint Decl., ¶46.  Thus, Girard/Kamber would be required to get authorization from the Ricciuti class representatives to modify the Settlement Agreement.  Second, the EFF group would be expressly designated as a monitor to the terms of the Settlement Agreement because of their expertise and experience in this area.  Kathrein Decl., Exs. 32-33; Joint Decl., ¶46.

## H. The Ricciuti Class Representatives' Agreement to Settle Included Continued Monitoring by EFF

As set forth in the Settlement Agreement, the monitor is responsible for overseeing several material terms of the settlement, including:

- To periodically monitor the XCP exchange program and ensure that Sony BMG is providing the appropriate replacement CDs, incentives and MediaMax compensation;

- To receive information from Sony BMG regarding the total number of class members who have downloaded the XCP update and uninstaller and/or the MediaMax update and uninstaller, and submitted claims for compensation;

- To review and comment on all instructions provided to Settlement Class members on how to use the updates and uninstallers for XCP and MediaMax;

- To explore and discuss with Sony BMG other methods for publicizing and disseminating the updates and uninstallers for XCP and MediaMax; and

- • To be notified if Sony BMG releases an update addressing a confirmed security vulnerability and to meet and confer on an appropriate cause of action (including seeking relief from the Court) if Sony BMG determines it cannot effectively address such a confirmed security vulnerability.

Pritzker Aff., Ex. C at 11.  Despite Girard's/Kamber verbal and written representations to the EFF group, Girard/Kamber stalled for months from effectuating a written agreement with EFF, designating EFF to monitor these particular terms of the Settlement Agreement.  Kathrein Decl., Ex. 34; Joint Decl., ¶47.  This has permitted Sony BMG to refuse to deal with the EFF group and its demands that Sony BMG timely provide important settlement information to the EFF group. Joint Decl., ¶47.  This has effectively shut off meaningful information flow to assess Sony BMG's compliance with the terms of the Settlement Agreement.  Joint Decl., ¶47.

Several events after the signing of the Settlement Agreement have demonstrated that a monitoring role is important to protect the interests of the class.  For example, after the Settlement Agreement was signed, based on repeated requests for information to Sony BMG, the Ricciuti class representatives discovered that the Settlement Agreement's notice provisions for purchasers of CDs containing the MediaMax software is not what it appears.  Joint Decl., ¶48. Sony BMG represented during negotiations that banner notice to class members would be possible for both XCP and MediaMax CDs.  Pritzker Aff., Ex C at 33-34; Joint Decl., ¶48. Banner notice occurs when a user inserts a CD into a computer and the computer queries Sony BMG (or SunnComm's website) for content. Joint Decl., ¶48.  At that point, a link to the full settlement notice will appear on the computer user's screen.  Joint Decl., ¶48.

The truth is that almost all of MediaMax CDs are simply incapable of this function.  The Settlement Agreement clearly provides for notice by this manner for both XCP and MediaMax CDs.  *See* Pritzker Aff., Ex. C at 33.  On February 10, 2006, it was finally disclosed to Ricciuti class representatives that such notice was not possible for the 37 MediaMax 3.0 CDs at all, and

was possible for only six out of 27 MediaMax 5.0 CDs.  Joint Decl., ¶49.  This disclosure occurred over a month after counsel for Sony BMG met with counsel for the Ricciuti class representatives on January 6, 2006 and negotiated the banner notices' look and feel for the CDs that contain both MediaMax versions 3.0 and 5.0.  Joint Decl., ¶50.  Because of this deception to the Ricciuti class representatives, the Ricciuti representatives attempted to negotiate further notice to the purchasers of CDs containing MediaMax software.   Joint Decl., ¶50.   The Settlement Agreement contemplated providing such additional notice.  Pritzker Aff., Ex. C at 34 ("The Parties agree that if, for any reason the Notice is not or cannot be first provided before February 1, 2006, the Parties will confer in good faith and recommend to the Court that the date by which any Settlement Class Member must seek to receive one or more of the Settlement Benefits . . . be extended accordingly.").  However, Sony BMG refused to agree with the EFF group to provide further notice.  Joint Decl., ¶51.

Second, Girard/Kamber and defense counsel amended the Settlement Agreement without consulting any of the Ricciuti class representatives (six out of thirteen total named plaintiffs). Joint Decl., ¶52.  This amendment, stipulated to by Girard/Kamber and Sony BMG and submitted for this Court's approval, potentially allowed the consideration for the class to be changed at the discretion of Girard/Kamber and Sony BMG – all without proper notice to the class.  Joint Decl., ¶52.  This is a direct violation of the Settlement Agreement's terms, and a breach of class counsel's duty.  *See* Pritzker Aff., Ex. C at 44 ("The Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of all affected Parties or their successors-in-interest."); *see also 675 Chelsea Corp. v. Lebensfeld*, No. 95 Civ. 6239 (SS), 1997 U.S. Dist. LEXIS 14076 (S.D.N.Y. Sept. 1997) ("It is well settled that an attorney's failure to inform his or her client of a settlement offer made by an adverse party can

support a claim of attorney malpractice."); *Neuberger v. Shapiro*, Civil Action No. 97-7947, 1998 U.S. Dist. LEXIS 18807, *11 (E.D. Pa. Nov. 25, 1998) ("As in all litigation, plaintiffs' counsel are obligated to keep their clients informed of the progress in the case . . . .").

On February 3, 2006, the Ricciuti class representatives sent a letter to this Court notifying it of their objection.   Kathrein Decl., Ex. 35; Joint Decl., ¶53.   The Court requested that Girard/Kamber, defendants and the Ricciuti class representatives work out an agreement or attend a case management conference.   Kathrein Decl., Ex. 36.   After this Court-ordered discussion, all parties reached an agreement to a second amendment, filed on February 15, 2006, curing the defect.  Joint Decl., ¶53.

Such conduct as described above by defendants and Girard/Kamber has placed the Ricciuti class representatives – who are signatories to the Settlement Agreement – into the awkward position of acting as "quasi-objectors" to the Settlement Agreement at times.   One Court has explained this strange three-front war as follows:

> Though in theory Mr. Romstadt should himself be allied with the Texas plaintiff (and vice-versa), that natural alliance has been severed by Apple.  At this point, Mr. Romstadt finds himself in an adversary position, fighting a two or three front war on behalf of himself and the class . . . .

*Romstadt v. Apple Computer*, 948 F. Supp. 701, 707 (D. Ohio 1996); *see also Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) ("[a]s an objector, [plaintiff] was in an adversary relationship with both plaintiffs and defendants").   While the Ricciuti class representatives have not relished this role, it has been an unfortunate but necessary by-product of this particular settlement dynamic.[5]

----

[5]   Girard/Kamber may try to excuse their conduct by asserting that the Ricciuti class representatives could simply file objections with the Court rather than pointing to the offending conduct in their fee application.   First, the Ricciuti class representatives signed the Settlement

I.    **Because of the Danger of the Security Flaws and Privacy Violations Due to Sony BMG's Conduct, the Ricciuti Class Representatives Continue to Raise Public Awareness of the Settlement Agreement Terms**

The Ricciuti class representatives have continued as active advocates of this Settlement Agreement because of the importance of the security and privacy issues created by the XCP and MediaMax CDs.   The computer security firm Computer Associates observed that the "XCP.Sony.Rootkit . . . represents a large threat to both corporate and consumer users' system integrity" and "enables hackers and other spyware to hide files with impunity."  Kathrein Decl., Ex. 37 at 2.  The United States Computer Emergency Readiness Team (US-CERT), part of the Department of Homeland Security that is charged with the task of "protecting the nation's Internet infrastructure" has stated that the XCP rootkit "can pose a security threat."  Kathrein Decl., Ex. 38.  The National Vulnerability Database, a vulnerability database that integrates all publicly available U.S. Government vulnerability resources and provides references to industry resources, ranks the XCP software with a vulnerability of 5.6, and MediaMax software with a vulnerability of 4.9, both medium vulnerabilities.  Kathrein Decl., Exs. 39, 40.

Unwilling to depend on the defendants, who have business interests adverse to providing prominent and repeated notice to the public, EFF has started a "get out the vote" campaign with its own banner notices to its 10,000 members.  Joint Decl., ¶54.  EFF has also notified almost 48,000 people through their newsletter.  Joint Decl., ¶55.  This "get out the vote" campaign has resulted in 12 offline or online press stories about the settlement, and 47 blog postings about the

---

Agreement, which contained a provision requiring the parties to support the settlement – which they do.  Pritzker Aff., Ex. C at 40.  Class counsel has subtly reminded the Ricciuti class representatives of this obligation.  *See* Kathrein Decl., Ex. 33.  Second, courts have expressly recognized the value to the class that accompanies efforts by counsel to monitor class counsel's and defendants' conduct.  *See Reynolds*, 288 F.3d at 289.

settlement, including many websites using EFF banners and seven republications of EFF's press releases.  Joint Decl., ¶55.  Additionally, since March 1, 2006, EFF's webpage devoted to the Sony BMG Settlement has received over 30,000 page views.  Since March 14, 2006, when records started being maintained, the link to "submit a claim" on EFF's website, which links directly to the sonybmgtechsettlement.com website, has been clicked 2143 times, the link to the list of affected CDs has been clicked 5648 times and the links to learn more about the benefits of submitting a claim have been clicked 2757 times.  Joint Decl., ¶56.  Moreover, Lawrence E. Feldman & Associates has directly notified over 400,000 potential class members through various direct mail techniques.  Feldman Decl., ¶3.

## III.   ARGUMENT

### A.     The Standard

When a class action settlement creates a common fund or confers some other substantial benefit on a class, the costs of the litigation, including an award of reasonable attorneys' fees, are recoverable from the fund as a whole.[6]  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  Here, defendants have agreed to pay plaintiffs' attorneys' fees and expenses separately, and their payment "will not affect the Settlement Benefits . . . in any way."  Pritzker Aff., Ex C at 36.  The

---

[6]     By its terms, the Settlement Agreement provides for the Ricciuti class representatives to make an application for attorneys' fees separate from "class counsel."  *See* Pritzker Aff., Ex. C, at 36 ("It is . . . the understanding of the Parties that Plaintiffs' counsel will apply for an award of attorneys' fees and reimbursable expenses").  The Ricciuti class representatives also have standing to move for attorneys' fees under several statutes violated by defendants.  For example, in the *Ricciuti* complaint, Case No. 1:05-cv-09575 (S.D.N.Y., filed on Nov. 14, 2005), plaintiffs would be entitled to attorneys' fees under N.Y. Gen. Bus. Law and §349(h) §350(e).  In the *Melcon* action, Case No. 3:05-cv-05084 (N.D. Cal., filed on Dec. 8, 2005), pending in the Northern District of California and also consolidated with this case, plaintiffs would be entitled to attorneys' fees under the Consumers Legal Remedy Act, Cal. Civ. Code §1780(d), and under Cal. Civ. Proc. Code §1021.5.

purpose, however, remains the same:  "encouraging counsel to pursue meritorious claims on behalf of a class of individuals who could not afford to litigate their individual claims."  *Steiner v. Williams*, No. 99 CIV. 10186, 2001 WL 604035, at *1 (S.D.N.Y. May 31, 2001).

Courts have traditionally used two methods to calculate attorneys' fees in common fund cases:  (1) the percentage method – which awards attorneys' fees based on a percentage of the common fund or benefit created for the class; and (2) the lodestar/multiplier method – which awards attorneys' fees based on the total lodestar of the hours reasonably expended by class counsel multiplied by counsel's reasonable hourly rate, plus a lodestar multiplier if deemed appropriate.  Although the Second Circuit has held that both the percentage and lodestar/multiplier methods are available to district courts in calculating attorneys' fees in common fund cases (*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000)), the clear preference among the courts in this Circuit is to use the percentage method rather than the '"cumbersome, enervating, and often surrealistic process' of lodestar computation."  *Id.*; *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*, No. 96 Civ. 0583, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002) (noting that the trend in the Second Circuit "appears to be the utilization of the percentage method").[7]

The reason for this pronounced preference for the percentage method is the widespread recognition that it avoids "the needless complications and dubious merits of the lodestar

---

[7]     *See also In re Am. Bank Note Holographics, Inc.*, Sec. Litig., 127 F. Supp. 2d 418, 431 (S.D.N.Y. 2001) (noting that the trend of the district courts in this Circuit is to use the percentage method); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (same); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) ("there is a strong consensus . . . in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 484 (S.D.N.Y. 1998) ("[T]here is strong support for the percentage approach from district courts in this Circuit.").

approach." *Strougo*, 258 F. Supp. 2d at 261.  As the oft-cited court in *In re Union Carbide Corp.*

*Consumer Prods. Bus. Sec. Litig*., 724 F. Supp. 160 (S.D.N.Y. 1989), observed:

> Experience . . . has finally taught us that convoluted judicial efforts to evaluate the lodestar, and see to it that the lodestar hours were reasonable and necessary, and that the case was not overmanned or the time overbooked, are extremely difficult to say the least, and unrewarding.   Such efforts produce much judicial papershuffling, in many cases with no real assurance that an accurate or fair result has been achieved.
>
> *       *       *
>
> [A percentage fee] award is consistent with the new learning (old wine in a new bottle) . . . which new learning we believe will . . . take us back to straight contingent fee awards bereft of largely judgmental and time-wasting computations of lodestars and multipliers.  These latter computations, no matter how conscientious, often seem to take on the character of so much Mumbo Jumbo.  The do not guarantee a more fair result or a more expeditious disposition of litigation.

*Id.* at 165, 170.

In contrast, "[t]he percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system."  *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002); *see also In re Twinlab*, Corp. Sec. Litig. 187 F. Supp. 2d 80, 85 (E.D.N.Y. 2002) ("Courts favor the percentage of the fund method because lodestar 'created an unanticipated disincentive to early settlements,' tempted lawyers to run up their hours, and 'compel[ed] district courts to engage in a gimlet-eyed review of line-item fee audits.") (citations omitted).  It also permits the judge to focus on the quality of the lawyers' efforts rather than on how many hours they billed.

*NASDAQ*, 187 F.R.D. at 485.[8]  "In addition, the percentage method is consistent with and, indeed, is intended to mirror, practice in the private marketplace where contingent fee attorneys typically negotiate percentage fee arrangements with their clients."  *Strougo*, 258 F. Supp. 2d at 262; *see also In re RJR Nabisco, Inc. Sec. Litig.*, No. 88 Civ. 7905, 1992 WL 210138, at *7 (S.D.N.Y. Aug. 24, 1992) ("[w]hat should govern such awards is not the essentially whimsical view of a judge, or even a panel of judges, as to how much is enough in a particular case, but what the market pays in similar cases").

No matter which method is chosen, the fees awarded in common fund cases must be "reasonable" and "based on scrutiny of the unique circumstances of each case."  *Goldberger*, 209 F.3d at 47, 53.  *Goldberger* sets forth the following six factors a reviewing court should consider in evaluating what constitutes a reasonable fee:  "'(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation . . . ; (3) the risk of the litigation; (4) the quality of the representation [measured by result]; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'"  *Id.* at 50 (citation omitted).  The Ricciuti class representatives' requested fee is reasonable – if not conservative – by any of these measures.

 **B. Application of the *Goldberger* Factors to the Ricciuti Class Representatives' Fee Request**

  **1. The Time and Labor Expended by Class Counsel**

Counsel for the Ricciuti class representatives has expended significant time and effort pursuing this action on behalf of the Ricciuti class representatives and the class.  As discussed

---

[8] "'The hourly rate approach . . . frequently [bears] little or no relationship to the value of the services performed in anything but the most routine work.  A flash of brilliance by a trial lawyer may be worth far more to his client than hours or days of plodding effort.'"  *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 964 (E.D. Tex. 2000) (quoting *Foster v. Boise-Cascade, Inc.*, 577 F.2d 335, 337 n.1 (5th Cir. 1978)).

more fully above and in the declarations submitted with this motion, counsel for the Ricciuti class representatives conducted an extensive investigation of the issues involved in the case, which included: (1) retaining and consulting with experts in software security and privacy; (2) conducting many hours of research on Sony BMG's undisclosed software (particularly the MediaMax software); (3) advising law enforcement officials; and (4) extensive work on the notice campaign to consumers.  The Ricciuti class representatives' counsel has also engaged in numerous detailed negotiation sessions with both defense counsel and Girard/Kamber – all in an effort to quickly and effectively maximize the results for the class.  In that time, the Ricciuti class representatives have collectively devoted more than 2,200 hours to this litigation, with a resulting lodestar of $923,240.08.

<strong>2.      The Magnitude and Complexity of this Case</strong>

The complexity of the litigation is another factor examined by courts evaluating the reasonableness of attorneys' fees requested by counsel.  *See Goldberger*, 209 F.3d at 50.  This action involved technical and complex issues.  First and foremost, this case involved identifying and understanding technical aspects of defendants' software programs and the potential dangers created thereby.  For example, the use of a rootkit conceals other software running on a computer, including dangerous worms or viruses.  Bellovin Decl., ¶4.  This may facilitate one's ability to compromise computers, turning the computers into bots that are used to send spam and launch denial of service attacks as a form of extortion.  Bellovin Decl., ¶10.  If an ISP detects such behavior, its general response is to disable the affected account – leaving a customer denied all Internet access for some time.  Bellovin Decl., ¶10.  Counsel identified and worked with experts to help create a patch and uninstaller to address these security vulnerabilities created by the XCP and MediaMax software programs.

Second, given the issues presented as ongoing security concerns to consumers, time was of the essence to create public awareness and force defendants to take corrective actions.  Third, the Ricciuti class representatives' had to analyze a myriad of legal issues, including, the applicability of an arbitration clause, the availability of a preliminary injunction against defendants' distribution of MediaMax CDs, the applicability of common law and state unfair and deceptive acts and practices claims on this new technology and the availability of relief under the Computer Fraud and Abuse Act, 18 U.S.C. §1030.  Depositions and discovery would have taken a great deal of time, and cost hundreds of thousands of dollars.  Counsel for Ricciuti class representatives aggressively attacked this case, where defendants were represented by attorneys from nationally known and highly respected law firms.  *See In re Brown Co. Sec. Litig*., 355 F. Supp. 574, 592-93 (S.D.N.Y. 1973) (standing of opposing counsel underscores complexity of litigation and challenges faced by class counsel).  Accordingly, the magnitude and complexity of this class action supports the conclusion that the requested fee is reasonable and fair.

### 3.    Counsel for the Ricciuti Class Representatives Undertook Significant Risk in Litigating this Case

"Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation."  *Teachers' Ret. Sys. v. A.C.L.N., Ltd*., Master File No. 01-CV-11814(MP), 2004 U.S. Dist. LEXIS 8608, at *11 (S.D.N.Y. May 14, 2004).  The Second Circuit has recognized that the risk associated with a case undertaken on a contingent fee is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.  Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) (citation omitted); *Am. Bank Note Holographics*, 127 F. Supp. 2d at 432-33 (concluding it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award"); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award."). This risk encompasses not just the risk of no payment, but also the risk of underpayment. *See In re Cont'l Illinois Sec. Litig.*, 962 F.2d 566, 569-70 (7th Cir. 1992) (reversing district court's fee award where court failed to account for, among other things, risk of underpayment to counsel). Even assuming that some recovery is likely in a particular case, there is no guarantee that the recovery will be enough to fully compensate class counsel for their time and expenses. *Id.*

The reasonableness of the requested fee is also supported by an evaluation of the risks undertaken by the Ricciuti class representatives in prosecuting this class action. Counsel for the Ricciuti class representatives undertook this action on a wholly contingent-fee basis, investing a substantial amount of time and money to prosecute this action without a guarantee of compensation or even recovery of out-of-pocket expenses. Unlike counsel for defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, counsel for the Ricciuti class representatives have not been compensated for any time or expenses since this case began. Moreover, counsel for the Ricciuti class representatives would not have received any compensation or even reimbursement of expenses had this case not been successful. Finally, the Ricciuti class representatives did not simply cede to defendants' first settlement offer. To the contrary, counsel filed suit after getting substantial concessions from Sony BMG. *See* §II(c), *supra* (Sony BMG's refusal to compensate MediaMax class).

4.     **The Ricciuti Class Representatives Did Not Build Upon Government Efforts; Rather, Counsel for Ricciuti Class Representatives Assisted the Government's Efforts**

An additional factor evidencing the risk and difficulty faced by counsel for the Ricciuti class representatives is the absence of any pre-existing government investigation or lawsuit on which they could rely.  The ability of class counsel to "piggy back" or "free ride" on the fruits of the government's labor is on of the key factors courts look to in evaluating the level of risk counsel assumed.  *See Detroit*, 495 F.2d at 471 ("The tangible factors which comprise the 'risk of litigation' might be determined by asking the following questions: has a relevant government action been instituted or, perhaps, even successfully concluded against the defendant . . . .").[9]

Here, rather than follow on the heels of a government investigation, the Ricciuti class representatives actually assisted several attorney generals concerning the software at issue and dangers resulting therefrom.  As described in §II(D), *supra*, the Ricciuti class representatives provided work product to the FTC and the Texas, Illinois and Florida Attorney Generals.  The Ricciuti class representatives educated these governmental agencies and contributed to, at least in part, the Texas Attorney General amending its complaint to add claims regarding MediaMax.  Kathrein Decl, Ex. 25.  Even after the parties executed the Settlement Agreement in the present litigation, the Ricciuti class representatives continued to provide assistance to these

---

[9]     *See also Maley*, 186 F. Supp. 2d at 371 (in justifying 33.3% fee award, the court noted that class counsel "did not 'piggy back' on any prior governmental action related to Del Global"); *In re RJR Nabisco*, 1992 WL 210138, at *6 (in justifying 24.3% fee award, court noted that "plaintiffs' counsel have not taken a free ride on the efforts of a government agency"); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 293, 395 (S.D.N.Y. 1999) (in justifying 27.5% fee award, court noted that "[t]here was no governmental assist to ease the task with which Petitioners [were] confronted"); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 2000 WL 204112, at *1 (N.D. Ill. Feb. 10, 2000) (in justifying 25% award, court noted that "[t]his case was not marked by any governmental investigations or prosecutions, leaving the development of the facts in the hands of private litigants").

governmental agencies to build on the existing terms of the Settlement Agreement.   Kathrein Decl., Ex. 27.

### 5.    The Quality of Representation and the Result Achieved

The best measure of the quality of counsel's efforts is the result they achieved for the class.  *See Goldberger*, 209 F. 3d at 55 ("the quality of representation is best measured by results").  The achievement here by the Ricciuti class representatives in forcing changes in Sony BMG's behavior more than justifies counsel's fee request.   First, Sony BMG agreed to: (1) exchange its XCP CDs; (2) stop manufacturing XCP CDs; (3) withdraw XCPs from the distribution channel; (4) provide notice to XCP class members; and (5) develop and distribute an XCP patch and uninstaller.   Sony BMG committed to the EFF Group that it would take these actoins in the context of the Ricciuti class representatives' public awareness efforts, their demand letter sent to Sony BMG on November 14, 2005, and subsequent negotiations.   These events occurred well before Sony BMG and Girard/Kamber even started negotiating with Sony BMG in December 8, 2005.  *Compare* Kathrein Decl., Ex. 13 *with* Motion and Memorandum of Law in Support of Plaintiffs' Application for Preliminary Approval of Class Action Settlement, filed on December 28, 2005, at 8 (stating settlement negotiations for Girard/Kamber began in December 2005 after the signing of the first case management order on December 1, 2005).

Second, the efforts of the Ricciuti class representatives resulted in the Settlement Agreement providing relief for those class members who purchased Sony BMG CDs containing MediaMax software.   Even after the Ricciuti class representatives identified the need for, and assisted the development of, the MediaMax patch (*see* §II(c), *supra*), the Ricciuti class representatives were responsible for demanding and negotiating the inclusion of compensation for MediaMax class members in the Settlement Agreement (*see* §II(G), *supra*).   Moreover,

- 30 -

pursuing relief for MediaMax class members caused Sony BMG to stop manufacturing CDs with MediaMax software for at least two years.

Moreover, the Settlement Agreement places legal strictures on Sony BMG from collecting consumers' personal information through the "phone home" feature of its DRM software, *see*, *eg*., Pritzker aff., Ex. at 28 (IV. B.3.(g)), waives certain EULA provisions, *id.* at 24-25, and requires Sony BMG to meet certain standards when using EULAs in the future. *Id.* at 27-28.

Without question, this action resulted in substantial benefits to the class. Of critical importance, it guarantees the class that Sony BMG will not manufacture CDs with XCP or MediaMax software for two years. *Id.* at 27. In fact, Sony BMG has not manufactured XCP CDs since November 2005 and MediaMax 3.0 or 5.0 CDs since December 18, 2005. *Id.*

The significance of this about-face in Sony BMG's corporate policy regarding DRM software should not be underestimated. For example, in August 2005, Thomas Hesse, president of Sony BMG's digital group, asserted that by March 2006, all Sony BMG CDs sold in the United States would have copyright protection. Kathrein Decl., Ex. 41. In fact, during an interview on National Public Radio in November 2005, Mr. Hesse demonstrated Sony BMG's indifference to the consuming public regarding the very issues targeted in this case by commenting that "[m]ost people, I think, don't even know what a Rootkit [the "content protection" software] is, so why should they care about it?" Kathrein Decl., Ex. 42. Soon after, Sony BMG changed its public tune when a Sony BMG representative issued a statement that Sony BMG "share[d] the concerns of consumers regarding these disks." Kathrein Decl., Ex. 31. In short, this action forced Sony BMG to re-examine and change its corporate policies towards "content-protection" software. Pritzker Aff., Ex. C at 28-30. If, due in part to this litigation,

Sony BMG merely slows its rollout of content protected CDs, class member have been provided millions of dollars worth of benefit. *See*, *generally*, Sinnreich Decl. ¶17 (stating that even assuming Sony BMG replaces XCP and MediaMax software with a alternative technologies, delay caused by this litigation in meeting Sony BMG's previously announced plans to manufacture 100% Sony BMG CDs with copy protection software by March 2006 benefits the class by more than $100 million).

This Settlement Agreement also makes the following benefits available to the class: (1) between $58.62 million and $76.5 million for consumers owning CDs with XCP software; (2) $35.8 million for consumers owning CDs with MediaMax 5.0 software, and (3) $16.65 million for consumers owning CDs with MediaMax 3.0 software. *See*, Sinnreich Decl., ¶2. These estimates are based on valuing the number of non-copy protected CDs and downloadable music in MP3 format made available by the Settlement Agreement. *Id.* at ¶¶3-13.

The Settlement Agreement also provides that, to the extent Sony BMG's applicable EULA could be construed to prohibit a class member from reselling her CD(s), defendants shall waive their right to enforce these provisions. Pritzker Aff., Ex. C at 24-25. This Settlement Agreement term provides the potential value to class members in the amount of $19.68 million. Sinnreich Decl., ¶14.

Finally, it cannot be lost on the Court that Sony BMG's conduct contributed to the ever-increasing cost to computer users who must deal with the real world consequences of spyware. *See* Bellovin Decl., ¶¶9-13 . The time and expense dealing with spyware is neither speculative nor trivial. Here, defendants' software introduced security vulnerabilities and opened up computer user's to potential privacy invasions. *Id.* ¶¶3-5, 8. Just having to take the time to undue this wrong occasioned by defendants' conduct imposes costs to consumers. *See* Ponemon

Decl., ¶¶20-22 (estimated potential time cost to consumers using XCP and MediaMax 5.0 in the amount of $8.99 million based on minimum wage analysis, compared to $32.76 million using average U.S. wage rate published by the Department of Labor Statistics).

> **6.      The Requested Fee Is Reasonable in Relation to the Settlement**
>
> **a.      A Proper Valuation of the Settlement Should Include the Estimated Value of All Benefits to the Class**

"Under the 'equitable fund' doctrine, attorneys for the representative plaintiffs in a class action litigation may petition the court for compensation from ***any benefits*** which were achieved as a result of their efforts."  *Snapp v. Topps Co. Inc.*, No. 93-CV-0347 JG, 1997 WL 1068687, at *3 (E.D.N.Y. Feb. 12, 1997) (emphasis added).   When determining the total value of a class action settlement for purposes of calculating the attorneys' fee award, the court should consider both the direct compensatory relief and the economic value of any prospective injunctive relief obtained for the class.  *See*, *e.g.*, *Sheppard v. Consol. Edison Co. of New York, Inc.*, No. 94-CV-0403(JG), 2002 WL 2003206, at *7 (E.D.N.Y. Aug. 1, 2002) (in valuing total settlement for percentage-based attorneys' fee award, the court included $6.745 million in monetary relief and "an estimated $5 million in non-monetary, injunctive relief"); *Steiner*, 2001 WL 604035, at *4 ("Although the settlement in this action did not involve the payment of money by the defendants, counsel may nonetheless recover a fee if the settlement conferred a substantial non-monetary benefit . . . .").[10]

---

[10]      *See also Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 54 F.3d 69, 71 (2d Cir. 1995) (attorneys' fees may be awarded based on non-pecuniary benefit obtained for class); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997) (in determining fee award in employment discrimination case, court considered value of prospective wage increases and defendants' costs of initiating and maintaining an internal civil rights task force); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002) ("[i]ncidental or non monetary benefits conferred by the litigation are a relevant circumstance" in evaluating the reasonableness

As the Supreme Court has recognized, the rationale of the common-fund doctrines "must logically extend, not only to litigation that confers a monetary benefit on others, but also to litigation "'which corrects or prevents an abuse which would be prejudicial to the rights and interests'" of those others." *Hall v. Cole*, 412 U.S. 1, 5 n.7 (1973) (citation omitted); *see also Kaplan v. Rand*, 192 F.3d 60, 70 (2d Cir. 1999) (noting that "'well-established [rule] that non-monetary benefits, such as . . . deterring future misconduct by management may support a fee award'"); *Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir. 1975) ("[A]s the Supreme Court has developed the 'common fund' rationale for awarding attorneys fees, assessment of such fees . . . may be predicated on the conferral of benefits which are neither monetary in nature nor explicitly sought on behalf of the entire group.").

Defendants' agreement to cease using XCP and MediaMax software on Sony BMG CDs is exactly the type of substantial change in conduct benefiting the class and the public for which these courts have found attorney compensation is warranted.  Indeed, if plaintiffs had received no compensatory relief in this settlement, counsel would still be entitled to substantial attorneys' fees for Sony BMG's agreement to cease using this software in the future. *Steiner*, 2001 WL 604035, at *4.

In fact, this case was not exclusively, nor even primarily, instituted to recover compensatory relief for past conduct.  While the actual compensable harm plaintiffs claimed in this case was not incidental or insignificant by any measure, addressing the security and privacy invasion risks and eliminating or retarding defendants' deployment of this software were equally,

---

of attorneys' fees); *Shaw*, 91 F. Supp. 2d at 971 ("When considering the quality of the proposed Settlement Agreement, this Court considered both the monetary and the non-monetary benefits the class is to receive.").

if not more, important to the class and the public in the future.  Therefore, any true valuation of the benefits conferred by the Ricciuti class representatives' pursuit of this action, and the appropriate percentage to be applied, must account for these substantial benefits to the class and future consumers.

Even those courts that have not included the value of prospective injunctive relief as part of the "settlement fund" have considered the value of the injunctive relief in determining what percentage of the fund should be awarded.  *See Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("courts should consider the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees").

Counsel for the Ricciuti class representatives submitted evidence regarding the value of the benefits to the class by way of experts in the field.  These benefits include both Sony BMG's agreement to cease using the "content protection" software at issue here, as well as their agreement to continue to update the MediaMax and XCP software patches and uninstallers. Sinnreich Decl., ¶2; Ponemon Decl., ¶¶20-21; Bellovin Decl., ¶¶11-12.  Because this relief provides a substantial, compensable benefit to class members, this relief should also be considered in granting attorneys' fees.  The value of the injunctive relief here should be valued, conservatively, in excess of $100 million.

### b. Counsel's Requested Percentage Is Below the Norm in This Circuit

"There is no general rule as to what percentage of the common fund should be awarded as attorneys' fees. . . .  Many courts in this circuit have awarded between 20% and 30%, with 25% perhaps being thought of as the 'benchmark.'"  *Snapp*, 1997 WL 1068687, at *3 (awarding

25% of $2.5 million settlement fund).[11]  While the Second Circuit has criticized the use of a "benchmark" as too rigid and "an all too tempting substitute for the searching assessment that should properly be performed in each case," for those cases with significant contingency risk, however, the 25% fee award remains a prevalent benchmark.[12]  *Goldberger*, 209 F.3d at 52.

Since *Goldberger*, fee awards of 25% or more have been common in this Circuit.  One courts commented that "[i]n this district alone, there are scores of common fund cases where fees alone (*i.e.*, where expenses are awarded in addition to the fee percentage) were awarded in the range of 33-1/3% of the settlement fund.  *See* Llyod's Am. Turst, 2002 WL 31663577, at *26 (citing cases).

The Ricciuti class representatives are requesting less than a 1% fee based on a total common benefit to the class conservatively estimated at $250 million, far below the 25% benchmark and well-in-line with recent circuit authority.  *See Walmart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2nd Cir. 2005) (affirming award of 21.4% of an antitrust settlement).

---

[11]    *See also In re Int'l Murex Techs. Corp. Sec.*, No. 93 CV 336 (JG), 1996 WL 1088899, at *4 (E.D.N.Y. Dec. 4, 1996) (awarding 25% of $5.4 million settlement fund); *Slomovics v. All for a Dollar, Inc.*, 906 F. Supp. 146, 151 (E.D.N.Y. Dec. 4, 1996) (awarding 25% of $827,500 settlement).

[12]    Awards that have fallen below the 25% benchmark have typically been made in securities class actions, where, like in *Goldberger*, the court found there was minimal, if any, contingency risk associated with bringing the action.  *See*, *e.g*., *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 CV 4318 HB, 2001 WL 709262, at *5 (S.D.N.Y June 22, 2001) (awarding 15% of $18.5 million settlement noting that "the merits of this case were promising from the outset" and that "[t]here was substantial overlap between the government's [pre-existing] investigations and the plaintiffs' claims").

## 7.      Public Policy Favors the Requested Fee Award

In addition to reaching agreement quickly regarding terms involving the XCP software, here, the Ricciuti class representatives have played a valuable role in policing "class counsel" and defendants.

In this case, certain actions by Girard/Kamber have highlighted infirmities that exist in the class action device – an unprincipled determination by attorneys to control a case, even if it compromises the class's settlement position to ensure that control, all with an eye on grabbing a majority of the available attorneys' fees at the end of the day.  Defendants, such as Sony BMG in this case, are complicit by trolling for those willing to take the bait quickly and who will struggle the least once on the hook.

While this Court cannot conceivably police what happens behind the curtain of every class action settlement outside its courtroom doors, it should recognize the efforts of those who do.  The Ricciuti class representatives have repeatedly attempted to maximize the interests of the class.   Respectfully, therefore, the Ricciuti class representatives ask that their request for attorneys' fees and expenses be granted.

The Ricciuti class representatives' role in pursuing security patches on Sony BMG's flawed software, as well as working with governmental agencies and negotiating for compensation to class members, have provided tremendous benefits to the class.  For this effort, they should be rewarded.  *See Goldberger*, 209 F.3d at 51 ("'There is also commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest."); *RJR Nabisco,* 1992 WL 210138, at *7 ("The prospect of handsome compensation is held out as an inducement to encourage lawyers to bring such suits.'") (quoting *Dolgow v. Andersen*, 43 F.R.D. 472, 494 (E.D.N.Y. 1968)); *see also Reynolds*, 288 F.3d at 288 ("It is desirable to have as broad a range of participants in the fairness hearing as

- 37 -

possible because of the risk of collusion over attorneys' fees and the terms of the settlement generally.  This participation is encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee.").

**C.      Application of the Lodestar "Cross-Check"**

In *Goldberger*, the Second Circuit suggested the use of a lodestar/multiplier as a "cross-check" on the reasonableness of a percentage-based fee request.  209 F.3d at 50.  Applying such a cross-check here further demonstrates the reasonableness of the fee request.

**1.      Multiplier Requested Is Reasonable**

There is ample support within this and other Circuits for fee awards with multipliers in this range.[13]  Courts have refused to set an arbitrary ceiling on multipliers when the percentage award is fully justified by the effort, risk undertaken, and results achieved by counsel.  As the court in *Newman v. Caribiner Int'l, Inc.*, Civil Action No. 99 Civ. 2271 (S.D.N.Y.) noted in approving a 33.3% fee award that yielded a 7.7 multiplier:

> I wanted to note that, in my view, there is no difficulty with the fact candidly acknowledged in the papers that, in terms of the time expended, this is a profitable case for the plaintiffs' lawyers who worked on it.  Contingency type percentage settlements serve an important purpose. . . .  So it is important in awarding fees or approving a fee settlement in a case of this kind not to be what in my view would be blinded or distorted that in this particular case calculated on an hourly basis, this is a very large, high proportion to what the hourly charges would have been.  Taking everything all in all, there is no reason to think that this is an excessive or inappropriate fee.

---

[13]      *Cosgrove v. Sullivan*, 759 F. Supp. 166, 167 n.1, 169 (S.D.N.Y. 1991) (8.74 multiplier); *Newman*, No. 99 Civ. 2271 (7.7 multiplier); *In re RJR Nabisco*, 1992 WL 1210138, at *5 (6 multiplier); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 736 n.44 (E.D. Pa. 2001) (multiplier of up to 8.5 which the court described as "handsome" but "unquestionably reasonable").

No. 99 Civ. 2271, at 6 (S.D.N.Y., filed on Oct. 25, 2001).  *See*, *e.g.*, *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 524 (E.D.N.Y. 2003) ("The lodestar cross-check, which results in a multiplier of 3.5, further convinces me that my award is reasonable."); *NASDAQ Market.-Makers*, 187 F.R.D. at 489 (approving multiplier of 3.97 and noting that "'[i]n recent years multipliers of between 3 and 4.5 have become common'") (citation omitted); *Kurzweil v. Philip Morris Cos.*, No. 94 Civ. 2373 (MBM), 1999 U.S. Dist. LEXIS 18378, at *8 (S.D.N.Y. Nov. 30, 1999) (noting that multipliers between 3 and 4.5 are common in federal securities cases); *Maley*, 186 F. Supp. 2d at 371 ("it clearly appears that the modest multiplier of 4.65 is fair and reasonable"); *RJR Nabisco Sec. Litig.*, 1992 U.S. Dist. LEXIS 12702, at *22 (approving fees of over $17.7 million, notwithstanding objection that such an award of fees represented a multiplier of 6); *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarding fee resulting in 9.3 multiplier); *Cosgrove*, 759 F. Supp. at 167 n.1 (multiplier of 8.74); *Warner*, 618 F. Supp. at 749 (awarding multiplier of 2.26 and observing that 2.26 "appears to be at the lower end of the range of multipliers used"); *see also* 1 Alba Conte, *Attorney Fee Awards* §2.06, at 39 (2d ed. 1993) ("When a large common fund has been recovered and the hours are relatively small, some courts reach a reasonable fee determination based on large multiples of 5 or 10 times the lodestar.").  Here, the Ricciuti class representatives' requested fee equals a multiplier of 2.0.  This is far below the average of many such awards by courts in this district.

### 2.    Counsel's Rates Are at or Below Market

In determining whether the rates are reasonable, the Court should take into account the attorneys' legal reputation, experience and status.  As the accompanying declarations of counsel for the Ricciuti class representatives show, counsel are among the most prominent, experienced and well-regarded practitioners in this area.  Therefore, the hourly rates charged are reasonable

here.  *See In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 443 (D.N.J. 2004) (approving counsel's hourly rates); *In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603, 611 (E.D. Pa 2003) (same); *In re Ikon Office Solutions*, 194 F.R.D. 166, 195 (E.D. Pa. 2000) (same).

### D. Counsel's Request for Reimbursement of Expenses Should Be Granted

Counsel for the Ricciuti class representatives also request reimbursement for $90,148.66 in expenses incurred while prosecuting this action.  Counsel has submitted separate declarations attesting to the accuracy of their expenses.  These expenses are properly recovered by counsel. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (court may compensate counsel for reasonable out-of-pocket expenses necessary to the representation of the class).  Most of the amount was incurred for professional services rendered by Ricciuti class representatives' investigators, security experts, along with the costs of travel, computerized research and copying of documents.  These expenses were critical in adding value to the terms of the settlement.  The declarations of counsel submitted herewith demonstrate that the requested expenses were reasonable and appropriately incurred and therefore warrant reimbursement.  *See Am Bank. Note Holographics*, 127 F. Supp. 2d at 433.

## IV. CONCLUSION

For the foregoing reasons, and for the reasons set forth in the accompanying declarations, the Ricciuti class representatives respectfully request that the Court grant their request for an award of attorneys' fees in the amount of $1,846,480.16, along with reimbursement of $90,148.66 in reasonable costs and expenses incurred by the Ricciuti class representatives.

DATED:  April 6, 2006                   Respectfully submitted,

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
ROBERT M. ROTHMAN (RR-6090)


                        /s/ ROBERT M. ROTHMAN
                    ROBERT M. ROTHMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
REED R. KATHREIN
JEFF D. FRIEDMAN
SHANA E. SCARLETT
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

GREEN WELLING LLP
ROBERT S. GREEN
JENELLE WELLING
AVIN P. SHARMA
595 Market Street, Suite 2750
San Francisco, CA  94105
Telephone:  415/477-6700
415/477-6710 (fax)

ELECTRONIC FRONTIER FOUNDATION
CINDY COHN
FRED von LOHMANN
KIRT OPSAHL
CORYNNE McSHERRY
454 Shotwell Street
San Francisco, CA  94110
Telephone:  415/436-9333
415/436-9993 (fax)

- 41 -

LAWRENCE E. FELDMAN & ASSOCIATES
LAWRENCE E. FELDMAN
432 Tulpehocken Avenue
Elkins Park, PA  19027
Telephone:  215/885-3302
215/885-3303 (fax)

Attorneys for Plaintiffs

T:\CasesSF\Sony NY\BRF00029773.doc