UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x   **ELECTRONICALLY FILED**

:

:

:

In re SONY BMG CD Technologies Litigation      :   No. 05 CV 9575 (NRB)

:

:

:

---------------------------------------------------------------- x


**DEFENDANT SONY BMG MUSIC ENTERTAINMENT'S
MEMORANDUM IN OPPOSITION TO THE "EFF GROUP'S" MOTION FOR
THE AWARD OF ATTORNEYS' FEES**


Bruce P. Keller (BK-9300)
Jeffrey S. Jacobson (JJ-8872)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Counsel for Defendant Sony BMG
Music Entertainment*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 2

SONY BMG's Use of DRM Software and Its Response to the Controversy ...................... 2

Lawsuits Were Filed and Settlement Talks Began Immediately ........................................ 3

The Cases Were Effectively Settled Before the EFF Group Became Involved.................... 4

Even After December 6, the EFF Group's Role in the Settlement Was Minor ................... 5

ARGUMENT ................................................................................................................... 7

I.     The EFF Group Cannot Claim More Than A "*Quantum Meruit*" Fee Based On
       Its Minor, Latecomer Role In The Settlement. ....................................................... 7

II.    The *Goldberger* Factors Do Not Support A Large Fee Award To The EFF
       Group ................................................................................................................ 10

III.   The "Expert" Declaration Of Aram Sinnreich Does Not Justify A Large Fee
       Award To The EFF Group. .................................................................................. 13

IV.    The Class Action Fairness Act Of 2005 Does Not Permit The EFF Group To
       Claim A Substantial Fee In This Matter ............................................................... 16

CONCLUSION ............................................................................................................... 18

# TABLE OF AUTHORITIES

Page

## CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ........................................................................ 14

*Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
  433 F.3d 181 (2d Cir. 2005) ...................................................................... 8, 9

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .................................................................................... 14

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000) ...................................................................... 1, 11

*In re Auction Houses Antitrust Litig.*,
  No. 00-CV-0648, 2001 WL 210697 (Feb. 26, 2001 S.D.N.Y.) .................... 10

*In re Compact Disc Minimum Adver. Price Antitrust Litig.*,
  292 F. Supp. 2d 184 (D. Me. 2003) ............................................................ 17

*In re Excess Value Ins. Coverage Litig.*,
  2004 WL 1724980 (S.D.N.Y. July 30, 2004) .............................................. 17

*In re Holocaust Victim Assets Litig.*,
  424 F.3d 150 (2d Cir. 2005) ........................................................................ 7

*In re Medco Health Solutions, Inc., Pharm. Benefits Mgt. Litig.*,
  No. 03 MDL 1508 (CLB), 2004 WL 1243873 (S.D.N.Y. May 25, 2004)............. 7, 8, 9

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) .................................................................................... 13

*Navarro v. Fuji Heavy Inds., Ltd.*,
  117 F.3d 1027 (7th Cir. 1997) .................................................................... 14

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
  164 F.3d 736 (2d Cir. 1998) ...................................................................... 14

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
  93 Civ. 4001(NRB), 2004 WL 345551 (S.D.N.Y. Feb. 23, 2004) ............... 15

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ............................................................................................ 11

*Zaremba v. Gen. Motors Corp.*,
  360 F.3d 355 (2d Cir. 2004) ......................................................................................... 13

## STATUTES, RULES, & LEGISLATIVE MATERIALS

Class Action Fairness Act of 2005,
  28 U.S.C. §§ 1711-1715, 1453 ............................................................................ 1, 16, 17

Fed. R. Evid. 702 ............................................................................................................ 13

S. Rep. No. 109-14 (2005) ......................................................................................... 16, 17

## OTHER

Manual for Complex Litigation (Fourth) §§ 14.121, 21.71 (2004) ............................ 16, 17

## PRELIMINARY STATEMENT

Defendant SONY BMG Music Entertainment ("SONY BMG") opposes the motion by the Electronic Frontier Foundation ("EFF") and others representing individual plaintiffs Tom and Yvonne Ricciuti, Mary Schumacher, Robert Hull, Joseph Halpin, and Edwin Bonner (collectively, the "EFF Group"), for a nearly $2 million fee award in this matter for three reasons:

First, by the time the EFF Group had filed its complaint in this Court, SONY BMG and the plaintiffs in the four earlier-filed suits in this Court already had reached an agreement in principle on the material terms of a nationwide settlement.  At SONY BMG's invitation, the EFF Group, after filing its complaint, joined the discussion over final documentation of this Settlement Agreement.  The changes made after the EFF Group's arrival, however, were minor and not of any significant additional benefit to the class.

Second, for that reason, the EFF Group's request for an award based on a multiplier of its entire lodestar, and its reliance on *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) to support that request, is entirely misplaced.  Multipliers are awarded only where counsel assumed substantial risk in filing a class action and then contributed significantly to the end result.  That does not describe the EFF Group in any respect.

Third, where a fee request purportedly is based on the value obtained for class members, as the EFF Group's application is in substantial part, the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711-1715, 1453 ("CAFA") requires that the actual redemption rate by class members, not the theoretical value if every class member were to file a claim, be considered.  By that measure, the EFF Group's asserted contribution to the settlement is, as of today's reckoning, worth less than $10,000.

## FACTUAL BACKGROUND

### *SONY BMG's Use of DRM Software and Its Response to the Controversy*

SONY BMG markets audio compact discs ("CDs").  Between August 2003 and November 2005, in response to rampant unauthorized copying and sharing of its artists' music, SONY BMG chose to use digital rights management ("DRM") software on certain CDs to protect the copyrighted contents of those CDs.  SONY BMG used three types of DRM software:  two versions of "MediaMax," a product of SunnComm International Inc., (a) MediaMax v.3 ("MM3"), which a SONY BMG predecessor company began using in August 2003, and (b) "MediaMax v.5" ("MM5"), which SONY BMG began using in June 2005; and "XCP," a product of First4Internet Ltd., which it began using in early 2005.  *See* Declaration of Jeffrey S. Jacobson dated May 1, 2006 ("Jacobson Decl.") ¶¶ 3-5.

For over two years, SONY BMG's use of this DRM software generated neither controversy nor security-related complaints.  Beginning in early November 2005, however, SONY BMG found itself embroiled in a public relations controversy focused on XCP.  On October 31, 2005, engineer Mark Russinovich posted an Internet web log (or "blog") entry describing the XCP software as containing a "rootkit" — a word that, in computer parlance, connotes malicious intent.  Then, on November 7, the computer security firm Computer Associates falsely charged SONY BMG with using XCP to spy on its customers' listening habits.  This false charge unfortunately was accepted as fact by major media sources, and it vaulted discussion of SONY BMG's DRM software onto the front pages of many newspapers.  *See* Jacobson Decl. ¶¶ 6-9.

SONY BMG responded immediately and appropriately.  Even though it had doubts about the alleged security vulnerability — and knew the spying charge to be completely unfounded — it ceased manufacturing CDs with XCP, discarded its warehouse stock of XCP

CDs, recalled unsold XCP CDs from wholesalers and retailers and announced a program whereby consumers who already had purchased XCP CDs could either return them to the place of purchase for refunds or store credit, or mail them to SONY BMG (at no cost) and receive a replacement CD without DRM software and free downloads of the music on those CDs.  SONY BMG also widely disseminated a software update that allowed users, at their option, either to completely uninstall XCP from their computers, or else to modify XCP to completely eliminate the alleged security vulnerability that Mr. Russinovich had publicized.  *See* Jacobson Decl. ¶ 10.  All of this was done within the first two weeks after the DRM controversy erupted.

### *Lawsuits Were Filed and Settlement Talks Began Immediately*

SONY BMG's response, although immediate, did not prevent lawsuits from being filed over XCP and, subsequently, MediaMax.  On November 14 — the day SONY BMG announced the recall and exchange program for XCP CDs — four different class action complaints were filed in this Court.  The suits asserted claims under state and federal law and sought certification of a nationwide class of purchasers of XCP CDs.  Several state attorneys general also advised SONY BMG directly, or put out statements saying, that they had begun investigations into SONY BMG's use of the XCP software.

Because SONY BMG, through the recall and exchange program, already had provided XCP CD purchasers with the largest item of relief requested in each of the complaints, it sought to resolve these lawsuits quickly.  SONY BMG's counsel contacted all the counsel involved in the suits and invited them to a meeting, which was held on November 21.  That meeting was attended by representatives of all four of the plaintiff groups and yielded a potential framework for settlement.  *See* Jacobson Decl. ¶¶ 12-15.

By November 23, the plaintiff group had organized into an "Executive Committee," appointed two of their number as Lead Counsel, and submitted a stipulation to the Court seeking ratification of the arrangement.  As described in detail in the Jacobson Declaration, SONY BMG immediately began negotiating with Lead Counsel.  On November 29, SONY BMG and Lead Counsel agreed to an outline that provided relief to all those who had purchased or used CDs containing not just XCP, but also MM5 (a minor issue respecting which had emerged over the Thanksgiving holiday) or MM3.  Details were fleshed out over the next several days and, on December 5, SONY BMG circulated a draft Settlement Agreement.  After relatively minor wording changes were made to that draft over the next two days, SONY BMG and Lead Counsel stated their mutual belief that the agreement was ready to be signed and presented to the Court for preliminary approval.  *See* Jacobson Decl. ¶¶ 16-20.

### *The Cases Were Effectively Settled Before the EFF Group Became Involved*

The EFF Group had nothing to do with SONY BMG's decision to initiate the XCP recall and exchange program, and it did not participate at all in the dialogue that led to the settlement framework to which SONY BMG and Lead Counsel agreed prior to December 5. SONY BMG had voluntarily removed XCP CDs from the market, and initiated the consumer exchange program, before the EFF Group even contacted SONY BMG.  The EFF Group had filed a lawsuit in California state court on November 21, seeking certification of a California-only class of purchasers of XCP and MediaMax CDs, but (1) the EFF Group had used that suit principally as a means to demand a recall of MediaMax CDs (it threatened to seek a TRO in the California case to force a recall, but it never did so, and ultimately withdrew its demand for a recall when the alleged problem with MM5 proved to be easily addressed); and (2) the

California case had been stayed pending coordination with several cases that had been previously filed in California state courts.  *See* Jacobson Decl. ¶¶ 21-28.

On December 5, after SONY BMG had issued the update to MM5 to address the alleged security vulnerability (and the EFF Group conceded that a recall of MediaMax CDs might not be required), the EFF Group filed an action in this Court (the *Ricciuti* case), and began to discuss potential settlement.  On December 6, the EFF Group responded to a settlement-related inquiry from SONY BMG with a letter explaining the elements it said it expected to see in a settlement.  Most of these elements, however, already had been incorporated into the draft settlement agreement SONY BMG had reached with Lead Counsel:  cash and free music incentives for participating in the XCP exchange program, a commitment not to manufacture additional CDs with XCP, MM5 or MM3, a process for addressing any future security issues arising from DRM software, a waiver of most of the controversial provisions of SONY BMG's "End User License Agreements" and a "privacy audit" to conclusively refute the false charge that SONY BMG had "spied" on its customers. *See* Jacobson Decl. ¶¶ 29-32.  Except as described below, the other elements in the EFF Group's December 6 letter (such as a proposal to establish a monetary claim process for consumers who purportedly suffered computer problems associated with XCP and MediaMax software) did not find their way into the final settlement agreement.

### *Even After December 6, the EFF Group's Role in the Settlement Was Minor*

SONY BMG responded to the EFF Group's December 6 letter by advising that it had reached a proposed settlement with the Lead Counsel for all the previously-filed plaintiffs. The EFF Group's effective response to that news — even before it had seen the draft Settlement Agreement — was to file a duplicative federal class action in the Northern District

of California and a concurrent petition with the Judicial Panel on Multidistrict Litigation seeking to transfer all related SONY BMG cases to that district.

That MDL filing failed to cause SONY BMG to reopen the matters that had already been agreed with Lead Counsel.  The EFF Group then requested and received the draft Settlement Agreement from Lead Counsel.  Because the EFF Group advised that it planned to suggest changes to the draft, SONY BMG invited both Lead Counsel and the EFF Group to a meeting on December 18, at which the EFF Group could share those comments.  *See* Jacobson Decl. ¶¶ 33-38.

Prior to that December 18 meeting, SONY BMG had agreed with Lead Counsel that class members who purchased any of the affected CDs — including MM5 and MM3 CDs — would be able to receive free MP3 downloads of the music they had bought (so that they could have the music on their computers without having to install the DRM software).  At the meeting, the EFF Group sought to obtain further benefits for MediaMax purchasers, including cash and additional free downloads.  SONY BMG refused the EFF Group's requests, but ultimately agreed, at the joint request of Lead Counsel and the EFF Group, to allow purchasers of MM5 CDs to claim one free album download from the list of albums that it had already agreed would be made available to purchasers of XCP CDs.  That was the only substantive change made to the Settlement Agreement in response to the EFF Group's requests; its other comments related to minor wording changes.  Jacobson Decl. ¶¶ 39-40.

At the conclusion of the December 18 meeting, the parties initialed the draft Settlement Agreement.  Minor changes were made to the draft agreement during the following, holiday-shortened week.  On December 28, all parties — including the EFF Group, on behalf of the individual plaintiffs it represents — signed the Settlement Agreement, and it was submitted to the Court.  *See* Jacobson Decl. ¶ 41.

The benefit of the free download for MM5 class members, for which the EFF Group claims credit, has so far proved not to be of much interest to the class.  As of April 28, only 1,344 of these benefits have been claimed.  *See* Jacobson Decl. ¶ 39.  By the EFF Group's estimate, therefore, this benefit has been worth less than $10,000 to the class.[1]

## **ARGUMENT**

The EFF Group's application for a nearly $2 million fee is undermined by (1) the narrow role it played and the limited value it added to the settlement; (2) the impropriety of awarding a lodestar multiplier to non-class counsel who filed claims well after the initial pleadings and played only a minimal role in settlement discussions; and (3) the limiting impact of CAFA on any possible award.  Taken together, these factors suggest that the EFF Group is entitled to no more than a nominal fee.

I.     THE EFF GROUP CANNOT CLAIM MORE THAN A "*QUANTUM MERUIT*" FEE BASED ON ITS MINOR, LATECOMER ROLE IN THE SETTLEMENT.

A fee request by a successful attorney for a plaintiff class is justified only if the attorney's efforts were "a substantial cause" of the settlement benefits obtained by class members.  *In re Holocaust Victim Assets Litig.*, 424 F.3d 150, 156-57 (2d Cir. 2005).  By contrast, if an attorney "neither created the class action settlement nor . . . induce[d] acceptance of it by the Defendants," but was simply part of "the finalization and fine tuning of the terms and provisions" substantially negotiated by others, that attorney's entitlement to a fee is sharply limited.  *In re Medco Health Solutions, Inc., Pharm. Benefits Mgt. Litig.*, No. 03 MDL 1508 (CLB), 2004 WL 1243873, at *13 (S.D.N.Y. May 25, 2004), *vacated on other*

---

[1]    The EFF Group appears to contend that the claims rate for this benefit would be higher if more MM5 CDs were equipped with a "banner" function.  In fact, banner-equipped CDs account for just 73 of the 1,344 MM5 download benefits claimed so far.  *See* Jacobson Decl. ¶ 54.

grounds sub nom. *Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181 (2d Cir. 2005).  The EFF Group played the latter role.  Accordingly, it is entitled, at best, to a *quantum meruit*-based fee based on the small value it obtained for the class.

The EFF Group's position is strikingly similar to that of the non-class counsel settlement participant in *Medco*, an ERISA class action.  In *Medco*, the attorneys who had been designated as class counsel negotiated a settlement in principle with the defendant. Linda Cahn, an attorney for one class member that was considering opting out of the class, then sought to participate in the negotiations.  "Because there was uncertainty as to whether [Ms. Cahn's client] would opt out of the Settlement . . . or remain within the Class and file objections to the Settlement," the court (Brieant, J.) directed that Ms. Cahn be allowed to participate in meetings, telephone conference calls, and appearances at Court with respect to finalizing the agreement in principle.  *Medco*, 2004 WL 1243873, at *13.

Before Ms. Cahn joined the dialogue, Medco had agreed to pay $42.5 million into a settlement fund.  Following approval of the settlement, Ms. Cahn filed an application seeking a fee of 10% of the $42.5 million, asserting that this fee was justified by the 2,182 hours she had spent working on the case.  The court found this request, by an attorney whose substantive role "was limited to fine tuning of provisions and documents after the Settlement had been agreed to in principle," to be "grossly excessive."  *Id.* at *12-13.

The court decided that Ms. Cahn's fee, if any, would have to be in "the nature of *quantum meruit*," based on the actual benefits Ms. Cahn obtained for the class.  The court went on to substantially discount her lodestar (from 2,182 hours to 804), disallowing her claim for reimbursement for "writing opinion articles," "conferring with potential plaintiffs and State Attorneys General," researching other claims that she ultimately elected not to

bring, and "discussing opting out with persons wishing to do so."  In the court's view, none of these activities — for which the EFF Group also seeks recovery — "improve[d] the position of" settlement class members.  Multiplying Ms. Cahn's approved, settlement-related 804-hour lodestar by a rate of only $200 per hour, the court awarded Ms. Cahn a fee of approximately $160,000.  *Id.* at *12-15.[2]

In *Medco*, Ms. Cahn was at least credited by all sides with having "originated the theory of ERISA liability upon which the complaints in [*Medco*] was founded."  *Id.* at *12.  By contrast, the EFF Group originated nothing in this case — it filed a duplicative complaint after SONY BMG already had agreed to settle with earlier-filed plaintiffs.  The EFF Group's lodestar, like Ms. Cahn's, overwhelmingly reflects time spent on activities unrelated to the settlement, such as writing opinion articles, consulting with regulators, conferring with potential opt-outs and objectors and drafting papers in support of injunctive relief that, ultimately, it never sought.  *See* Jacobson Decl. ¶ 48.  Moreover, the benefits Ms. Cahn obtained for the class were, in the *Medco* court's view, significant.  Here, the only added benefit for which the EFF Group can conceivably claim partial credit is the free download that SONY BMG agreed to provide to purchasers of MM5 CDs.  To date, however, Settlement Class Members have sought this benefit with respect to only 1,344 MM5 CDs.  This small added value — estimated by EFF's own expert to be worth only $9,000 — cannot possibly justify a nearly $2 million fee request.

---

[2]   On appeal, the Second Circuit vacated the settlement and directed the district court to consider further whether the plaintiffs in the case had Article III standing.  Ms. Cahn separately appealed the district court's refusal to award her a percentage of the recovery, but because the Second Circuit vacated the settlement, it did not rule on her appeal.  *See Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 194-96, 203 (2d Cir. 2005).

Perhaps most importantly, the EFF Group's time entries, even when reviewed in the most generous light, reveal that very little time — 338 hours or less, out of the several thousand hours submitted — was devoted to negotiating the Settlement Agreement (including review of the draft agreement, attendance at the December 18 meeting, and later review and approval of the final draft). These hours mostly were logged by EFF itself, and must be further discounted because of the lack of appropriate detail in its time entries.[3] *See, e.g.*, *In re Auction Houses Antitrust Litig.*, No. 00-CV-0648, 2001 WL 210697, at *2 (Feb. 26, 2001 S.D.N.Y.) (discounting reported hours by twenty percent where "[t]here simply [was] no way to tell whether the time expended on matters such as unspecified factual investigation was justified"). Under no circumstances does this relatively small expenditure of time and the $9,000 benefit it has yielded for the class, yield a *quantum meruit* award of more than $100,000. In fact, even that is a stretch.

II.   THE *GOLDBERGER* FACTORS DO NOT SUPPORT A LARGE FEE AWARD TO THE EFF GROUP

There is a reason the EFF Group inaccurately claims to have engaged in "parallel" settlement negotiations with SONY BMG prior to December 5 and why it seeks primary credit for all of the benefits obtained for the class. It wants to portray itself as *de facto* "class

---

[3]   For example, the time records submitted by EFF's legal director, Cindy Cohn, reflect that on December 16, 2005, she spent 10 hours on "[s]trategy call with cocounsel. Prep for meeting with Sony. Consider potential security people and security response strategy." On December 19, 2005, Ms. Cohn's records reflect that she spent 14 hours on "[t]elephone call with Sony re: moving CMC. Call and email with cocounsel to report meeting and consider strategy. Gather fees. Call with Ms. Pritzker re: next steps. Discuss case with Mr. Baker." Cohn Decl. Ex. B. Ms. Cohn's practice of recording extremely long hours linked to a few vague activities makes it difficult to discern how much time she legitimately spent in pursuit of benefits for the class. Because of this difficulty, if the Court awards the EFF Group compensation based on EFF's hours, it should reduce those hours by a reasonable proportion.

counsel," and to assert an entitlement to be paid not just for all time it claims to have expended in this matter, including time that had nothing to do with the ultimate settlement, but to a *multiple* of that "lodestar."  Neither the context nor the holding of the case they purport to rely upon — *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) — supports the EFF Group's request.[4]

Goldberger* was a securities case in which class counsel sought an award amounting to 25% of a $54 million settlement.  The District Court, however, awarded class counsel only its lodestar of $2.1 million, with no multiplier.  The Second Circuit upheld that decision. Although class counsel argued for a multiplier, assertedly on the basis of the risk it undertook in bringing the case, the Second Circuit believed that the case never had any real risk of *not* settling, and thus "fell in the low range of the risk continuum." 209 F.3d at 54.  The Court also expressed its "nagging suspicion that attorneys in these cases are routinely overcompensated for such things as contingency risk," and expressed a "preference for moderation" in awarding fees. *Id.* at 57.

The EFF Group's application is no exercise in moderation.  It is abundantly clear that, at all relevant times, the EFF Group faced even less risk in this matter than did the counsel in *Goldberger*.  By November 21, the day the EFF Group filed its California state court action, SONY BMG already had voluntarily recalled, and announced the consumer exchange program for, XCP CDs.  By December 5, the day the EFF Group filed a duplicate

---

[4]   The six factors the Second Circuit held in *Goldberger* to be relevant in determining a plaintiff's counsel's entitlement to a fee are (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Goldberger*, 209 F.3d at 50; *see Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (reaffirming *Goldberger* factors).

case in this Court, SONY BMG already had agreed to settle identical claims with the plaintiffs who preceded the EFF Group.  The EFF Group thus knew that its largely duplicative claims were all but certain to settle.  For these reasons, not only did the EFF Group assume no risk, but the litigation never threatened to be particularly complex.  The EFF Group's request thus fails the second and third *Goldberger* factors.

The EFF Group, moreover, was not class counsel and cannot request an award as such. The first and fifth *Goldberger* factors require weighing the EFF Group's requested fee against (1) the approximately 338 hours it spent on settlement-related activities, and (2) the mere $9,000 benefits that the EFF Group may claim to have achieved for the class.  Such an analysis precludes the EFF Group from even claiming full reimbursement for its 338 settlement-related hours, much less a multiplier of its *entire* lodestar.

The sixth *Goldberger* factor — public policy — also does not favor the EFF Group's application.  Where multiple plaintiffs have filed related class actions, public policy favors the plaintiffs organizing themselves in a manner designed both to minimize overlapping and duplicative work and to foster productive dialogue between the defendants and the organized plaintiff group.  The plaintiffs who filed their cases prior to the EFF Group organized themselves in that manner and sought Court approval for that structure by means of the CMO. The four firms in the EFF Group, by contrast, never took steps to ensure that they were not duplicating work of other counsel (or even each other), and they never asked the Court to appoint them as lead counsel or members of the executive committee approved in the CMO. The EFF Group should not, under these circumstances, receive a reward for this inefficiency in the form of a lodestar award, much less a multiplier of that lodestar.

Neither does public policy favor the attempt the EFF Group — and EFF in particular — has made at every turn in this short-lived case to wear multiple, conflicting hats.  The EFF

Group wants to claim full credit for the settlement (and to receive a fee as though it deserves full credit), but at the same time has publicly attacked the settlement as the inadequate product of a "reverse auction" in which its participation was limited.  Indeed, the EFF Group's time records suggest that when it signed the settlement, it did so with a plan to pursue "creative objecting" to gin up later opposition to it.  *See* Jacobson Decl. ¶ 42; Declaration of Lawrence E. Feldman, Ex. B, at 14-15.

III.   THE "EXPERT" DECLARATION OF ARAM SINNREICH DOES NOT JUSTIFY A LARGE FEE AWARD TO THE EFF GROUP.

The basis upon which the EFF Group attempts to justify a fee request far out of proportion to its efforts is the "expert" declaration of Aram Sinnreich.  This declaration, however, can and should be ignored because (1) Mr. Sinnreich has no demonstrable expertise in the matters on which he has opined; (2) as Mr. Sinnreich has himself admitted, his valuation methodology reflects subjective opinion, which means the EFF Group cannot rely upon it; and (3) the EFF Group had nothing to do with, and can validly claim no credit for, the vast majority of benefits that Mr. Sinnreich claims to have valued.

As a threshold matter, Mr. Sinnreich's qualifications to opine on the value of these settlement benefits are a mystery not solved by his declaration.  His declaration (at ¶ 1) states that he is "an expert in the areas of music and technology," but provides no details as to the basis of this purported expertise.  Mr. Sinnreich thus cannot be offered as an expert.  *See* Fed. R. Evid. 702 (requiring an expert to be "qualified . . . by knowledge, skill, experience, training, or education"); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156-57 (1999) (requiring "sufficient specialized knowledge"); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 359-60 (2d Cir. 2004) (affirming exclusion of purported expert testimony and noting that

purported expert lacked relevant qualifications); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (same).

The "valuation" Mr. Sinnreich offers, moreover, palpably contains nothing more than his own subjective belief and unsupported speculation. Hardly "the product of reliable principles and methods," as required by Federal Rule of Evidence 702, Mr. Sinnreich's declaration lacks grounding in scientific, technical, or other specialized "knowledge . . . connot[ing] more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). Because "it is critical that an expert's analysis be reliable at every step," *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266-67 (2d Cir. 2002), an expert must "show how his conclusion . . . is grounded in — follows from — an expert study of the problem." *Navarro v. Fuji Heavy Inds., Ltd.*, 117 F.3d 1027, 1032 (7th Cir. 1997). Mr. Sinnreich's declaration fails that test.

Indeed, Mr. Sinnreich himself has admitted that his conclusions are "impossible to firmly substantiate." Jacobson Decl. Ex. 2. For example, Mr. Sinnreich opined in his declaration that offering class members MP3 versions of songs they already have purchased has a stand-alone value of $1.80 per claimant. Sinnreich Decl. ¶ 12. On his personal blog, however, Mr. Sinnreich essentially conceded that he picked this number arbitrarily, and that the benefit actually may be worth no more than "a fistful of pennies." Jacobson Decl. Ex. 2. The next day, likely in response to the concern that this admission had been seen by the parties to this case, Mr. Sinnreich posted an "update" in which he said he was "extremely confident" about his analysis. "I would hate to think," he said, "that an overly humble blog post could be misconstrued as ambivalence about the strength of my testimony or the depth of my expertise." Jacobson Decl. ¶ 46. Then, later the same day, he removed his blog posting altogether. *Id.* ¶ 48.

Even without this truly remarkable sequence of postings, the subjective, and therefore unreliable, nature of Mr. Sinnreich's analysis is clear.  He began his "estimate" by admitting that "it is difficult to assign a fixed value to . . . attitudes among the consumer base" (¶ 6).  His response to that "difficulty" was to pull numbers seemingly out of thin air.  With no basis at all, he "estimated" that "the 20 percent of consumers who rip their CDs each ascribe only half the CD's value to its potential digital music uses" and that the remaining 80% of users "each ascribe only one-eighth of a CD's value to its potential digital music uses" (¶ 6); that 10% of CDs become unplayable within a short time after purchase (¶ 8); that "the differential between MP3 and CD sound quality accounts for roughly 5 percent of the retail value of a CD" (¶ 12), etc.  The problem with Mr. Sinnreich's opinion, therefore, is not a question of "confidence" or "ambivalence"; it is one of fundamental reliability.  Without a principled, supportable basis for his estimates, Mr. Sinnreich's opinions amount to no more than the type of "subjective belief or unsupported speculation" held inadmissible under *Daubert*.  *See, e.g.*, *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 93 Civ. 4001(NRB), 2004 WL 345551, at *7 (S.D.N.Y. Feb. 23, 2004) (Buchwald, J.) (striking opinions of purported music industry "expert" as too subjective to be considered).

Mr. Sinnreich's opinions with respect to benefits SONY BMG negotiated before the EFF Group became involved in settlement discussions are, moreover, irrelevant to the EFF Group's fee application.  With respect to the single benefit for which the EFF Group can claim even partial credit — the extra free download for MM5 class members — Mr. Sinnreich speculates (at ¶ 11) that the value is two-thirds of the average retail price of albums that he found to be available at online retailers, or $6.73.  This conclusion is no more grounded in objective facts than any other of his opinions.  Even were one to credit this wholly

unsubstantiated opinion, however, it would not support the EFF Group's fee application in this matter, because fewer than 1,400 of these benefits have been claimed.

IV.    THE CLASS ACTION FAIRNESS ACT OF 2005 DOES NOT PERMIT THE EFF GROUP TO CLAIM A SUBSTANTIAL FEE IN THIS MATTER

The EFF Group's attempt to justify a fee based on the asserted value of the settlement also is at odds with CAFA.  Under this new law, "[i]f a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed" — not the theoretical value of the settlement if *everyone* redeems.  28 U.S.C. § 1712(a).

CAFA's coupon settlement provisions mean that "if a settlement agreement promises the issuance of $5 million in coupons to the putative class members, but only 1/5 of potential class members actually redeem the coupons at issue, then the lawyer's contingency fee should be based on a recovery of $1 million — not a recovery of $5 million."  S. Rep. No. 109-14, at 30 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 30.  Such an approach ties "counsel's fate to that of their clients," thus ensuring that plaintiffs' counsel's compensation will be commensurate with the compensation actually received by class members.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121, at 190 n.502 (2004) (citation omitted).

Here, although one aspect of the settlement is a cash payment to XCP purchasers who participate in the exchange program, that benefit was not negotiated in any respect with the EFF Group.  The only benefit for which the EFF Group participated in the negotiations was the free single-album download being offered to MM5 class members.  That benefit inarguably is a "coupon" within the meaning of CAFA.  Even if the EFF Group were to be given sole credit for the coupons redeemable by MM5 class members for free album

downloads, those coupons leave the EFF Group arguing, in the face of CAFA, for a $2 million fee based on an actually-claimed value of less than $9,000.[5]

In addition, CAFA bars the EFF Group's attempt to claim fees based on the asserted value of injunctive relief.  A fee award tied to injunctive relief in a settlement must, under CAFA, be based only on the time the plaintiff's attorney actually spent obtaining such relief. *See* 28 U.S.C. § 1712(b), (c); S. Rep. No. 109-14, at 31, *as reprinted in* 2005 U.S.C.C.A.N. 3, 30.  The EFF Group airily asserts that the injunctive provisions set forth in Section IV of the Settlement Agreement have a value "in excess of $100 million."  Ricciuti Mem. at 35.  That grossly excessive valuation is, however, completely irrelevant to the calculation of appropriate attorney's fees under CAFA, which, as noted, looks to the actual time spent in obtaining those provisions.

Under this standard, the EFF Group is entitled to virtually nothing.  The injunctive provisions of the settlement were essentially entirely incorporated into the Settlement Agreement before the EFF Group joined the settlement discussions.  Accordingly, the EFF Group did not spend any significant time obtaining injunctive relief for the class.[6]

---

[5]    The Court also has discretion to delay awarding *any* fee to the EFF Group until the claims period closes on December 31, 2006.  *See In re Excess Value Ins. Coverage Litig.*, 2004 WL 1724980, at *16 (S.D.N.Y. July 30, 2004) ("the Settlement's actual value to the Class is unclear and cannot accurately be assessed until the rate at which Class Members redeem [the benefits] is known"); *In re Compact Disc Minimum Adver. Price Antitrust Litig.*, 292 F. Supp. 2d 184, 190 (D. Me. 2003) (deferring fee decision "until experience shows how many vouchers are exercised and thus how valuable the settlement really is").  *See also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.71, at 337 (2004) ("It is common to delay a final assessment of the fee award and to withhold all or a substantial part of the fee until the distribution process is complete.").

[6]    The time the EFF Group claims to have spent researching possible proceedings to enjoin sales of MediaMax CDs are non-compensable in the settlement context, because the EFF Group never sought this relief, much less obtained it.

CAFA, therefore, exactly like the *quantum meruit* method applied in *Medco*, precludes the EFF Group from claiming a fee in excess of the relatively small amount of time it actually worked on obtaining benefits in the Settlement Agreement that would not otherwise have been made available to the class.

## <u>CONCLUSION</u>

For the reasons specified above, SONY BMG respectfully requests that the Court award the EFF Group no fee at all or, in the alternative, award it a fee of no more than $100,000.

Dated: New York, New York
      May 1, 2006

Respectfully submitted,

\_\_*s/ Jeffrey S. Jacobson*_____
Bruce P. Keller (BK-9300)
Jeffrey S. Jacobson (JJ-8872)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Counsel for Defendant Sony BMG*
*Music Entertainment*