UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x   **ELECTRONICALLY FILED**
: 
: 
: 
In re SONY BMG CD Technologies Litigation          :   No. 05 CV 9575 (NRB)
: 
: 
: 
-------------------------------------------------------------------- x

**DECLARATION OF JEFFREY S. JACOBSON, ESQ., IN OPPOSITION TO THE
"EFF GROUP'S" MOTION FOR THE AWARD OF ATTORNEYS' FEES**

Jeffrey S. Jacobson, Esq., hereby declares as follows:

1.      I am an attorney admitted to practice before this Court and a member of the

firm of Debevoise & Plimpton LLP ("Debevoise"), counsel to defendant SONY BMG Music

Entertainment ("SONY BMG") in this matter.  I submit this declaration, on behalf of SONY

BMG, in opposition to the request for fees and the reimbursement of expenses filed by the

Electronic Frontier Foundation ("EFF") and the law firms allied with EFF (hereafter, the

"EFF Group").  I have personal knowledge of the facts set forth below.

2.      The principal reason for SONY BMG's opposition to the EFF Group's request

for fees and reimbursement of expenses is that the EFF Group substantially overstates its

involvement in the settlement of this case.  SONY BMG had reached agreement with other

counsel on all material terms of the settlement before the EFF Group even filed suit in this

Court.  Although SONY BMG ultimately invited EFF and its co-counsel to comment on the

manner in which the final Settlement Agreement would be documented, the EFF Group's

rather minor contributions to the discussion neither materially changed the settlement nor

conferred significant benefits to the class.  Even were the Court to conclude that the EFF

Group alone was responsible for all the changes made to the Settlement Agreement once the EFF Group added its voice to the discussions, to date, the tangible benefit to Settlement Class Members from these changes has amounted to less than $10,000.  For these reasons, described in more detail below, the EFF Group's nearly $2 million fee application is wholly unjustified.

### *SONY BMG's Use of Digital Rights Management Software*

3.      SONY BMG is in the business of, among other things, releasing and marketing compact discs ("CDs") containing music recorded by numerous popular recording artists.  In recent years, CD sales have been negatively affected by rampant unauthorized copying and "sharing" of music.  Through readily-available CD-copying technology, now built into even inexpensive personal computers, CD purchasers can make an essentially unlimited number of physical copies of a CD, copy the music onto their computers, transfer it to an unlimited number of portable devices, and send, or make available, the music over the Internet.  In response to these developments, SONY BMG and some other recording companies have sought to use  digital rights management ("DRM") software on at least some of their CDs.  The purpose of DRM software, at least in SONY BMG's case, was to allow consumers of protected CDs to make reasonable *personal* use of the music on the CDs, but to block them from making more copies of the music than reasonably would be needed for personal use.

4.      Beginning in or about September 2003, one of SONY BMG's predecessor companies began including DRM software known as MediaMax Version 3.0 ("MM3") on some of its CD titles.  This software was developed by a third-party provider, SunnComm International Inc. ("SunnComm"), and licensed by BMG.  By July 2005, SunnComm had developed an updated version of MediaMax, version 5.0 ("MM5").  SONY BMG licensed MM5 from SunnComm and began including it on several CD titles. Beginning in February

2005, SONY BMG also began using other DRM software, "XCP," which it had licensed from a different vendor, First4Internet Ltd. ("F4I"), a United Kingdom corporation.

5.     As SONY BMG's documents (produced to plaintiffs in confirmatory discovery) show, it and its predecessor companies conducted extensive operability and compatibility testing of MM3, MM5 and XCP before placing that DRM software on any of their CDs.  The documents further reflect that, even though SONY BMG had sold millions of DRM-protected CDs from the beginning of this period through October 2005, it had not received any complaints from consumers that the security of any computer had been compromised by the XCP, MM5 or MM3 software.

### *November 2005:  Controversy Erupts on the Internet*

6.     In November 2005, however, SONY BMG found itself embroiled in a controversy over its use of DRM software.  On or about October 31, Mark Russinovich, a computer engineer who maintains an Internet web log, or "blog," posted an entry describing the XCP software as containing a "rootkit" — a word that, in computer parlance, connotes malicious intent.  Mr. Russinovich attached this posting as Exhibit B to his April 5 declaration in support of the settlement.

7.     Mr. Russinovich's "rootkit" charge was not correct.  Although F4I, in order to make it harder to circumvent XCP, apparently designed the software so that certain files would not be visible in an ordinary directory search, several experts now believe that the XCP software does not contain a "rootkit," as that term is commonly used.

8.     It subsequently emerged that Mr. Russinovich was working as an expert for plaintiffs' attorneys.  On November 1, the day after Mr. Russinovich's first blog posting, an attorney in California, Alan Himmelfarb, filed a class action suit against SONY BMG in

California state court, seeking certification of a class of California consumers of XCP-protected CDs.

9.      On November 4, Mr. Russinovich published a new posting (Exhibit C to his declaration) in which he stated that, upon playing an XCP-protected CD, the Player "send[s] an ID to a [SONY BMG] website . . . to see if there are updates to for the album art and lyrics for the album it's displaying."  This statement, in itself, was relatively innocuous.  On November 7, however, the computer security firm Computer Associates charged SONY BMG with using this functionality to spy on its customers' listening habits.  This explosive charge — which was patently wrong, as the privacy audit SONY BMG conducted as part of this class action settlement has now conclusively proved — was accepted as fact, and it moved this issue from the blogs onto the front pages of national newspapers.  SONY BMG quickly found itself in a media firestorm over its use of the XCP software.

10.     Despite having doubts about the alleged security vulnerability, and despite knowing that the "spying" charge was completely false, SONY BMG responded to the controversy immediately and appropriately.  On Friday, November 11, it announced that it would no longer manufacture CDs with XCP.  On Monday, November 14, it announced a step that, to its knowledge, no previous software provider had taken as a result of a suspected security vulnerability:  It discarded its unsold stock of XCP CDs; recalled XCP CDs from retailers; authorized retailers to return, for full refunds, even CDs that had been opened; and announced a program whereby consumers could send in their XCP CDs, and receive replacement CDs without any DRM software, all at no cost to those consumers.  It also promulgated and widely disseminated a software update that allowed users, at their option,

either to completely uninstall XCP, or else to modify it to eliminate the alleged security vulnerability for computers onto which XCP was installed.

11.     The EFF Group, in its fee application, claims credit for SONY BMG's responses.   It is therefore important to stress that SONY BMG took all of these steps *voluntarily*, before EFF had even contacted the company.   SONY BMG's executives ordered the recall and exchange program because they believed that this was the best way to restore consumer confidence in the aftermath of the media onslaught.   The EFF Group had nothing whatsoever to do with these decisions.

### *Post-Recall Lawsuits Against SONY BMG*

12.     When the XCP recall and exchange program began to be reported in the press, several news stories quoted attorneys as saying that, notwithstanding that program, they intended to file lawsuits in the Southern District of New York seeking damages arising out of SONY BMG's use of XCP.   Late on November 14, I learned that four nearly identical complaints had been filed that day.   The first-filed case had been assigned to this Court and the other cases clearly were appropriate for consolidation with the first.

### *Settlement Discussions Begin Immediately*

13.     Given the steps that SONY BMG had undertaken voluntarily, it believed there was little to be gained through protracted litigation.   For that reason, on November 15, before SONY BMG had even been served with any of the complaints, I personally called all of the plaintiffs' counsel.   The thrust of my conversation with each attorney was that SONY BMG already had offered its customers the largest item of relief — a full recall and consumer exchange of XCP CDs — sought in each of the complaints.   All of the plaintiffs' counsel

were invited to a meeting at my firm on Monday, November 21 to discuss any other aspects of the cases that might contribute to their rapid resolution.

14.     The November 21 meeting was attended by a representative of every counsel who had filed a case in this Court, plus Mr. Himmelfarb (the lawyer who had sued in California).  Mr. Russinovich participated by telephone, and another of plaintiffs' experts, Matt Curtin, attended in person.  Dan Kaminsky, another computer engineer, attended at the invitation of the plaintiffs' counsel, but he said that he was acting independently of them.

15.     At the meeting, my partner Jeffrey Cunard and I briefed plaintiffs' counsel and their experts on the XCP recall and exchange program, the facts about XCP as we then understood them, and the falsity of the "spying" charge.  A very productive dialogue ensued. Although we did not agree on any particular settlement terms, we did discuss a general framework for settlement:  Modest incentives to encourage participation in the previously announced XCP recall and exchange program, a "privacy audit" — volunteered by SONY BMG — to demonstrate that it had not collected or used customers' personal data without their consent, a method for handling any security-related issues that might arise in the future with respect to MM3 or MM5, guidelines that SONY BMG would follow if it elected to use different DRM software in the near future, and a robust notice program.

16.     The next day (November 22), one of the plaintiffs' counsel, Scott Kamber, advised me that all of the counsel involved in the S.D.N.Y. cases had met and an "Executive Committee" had been formed which had agreed to designate Mr. Kamber's firm and the firm of Girard Gibbs and DeBartolomeo as "Lead Counsel."  Mr. Kamber said a stipulation to that effect was being prepared, along with a proposed order consolidating the various cases in this Court and appointing Lead Counsel.  That stipulation, with a proposed Case Management

Order ("CMO"), was electronically filed in this Court after the close of business on Wednesday, November 23 — the day before Thanksgiving.

17.    Although the CMO dealt only with the S.D.N.Y. cases, Mr. Himmelfarb — who was part of the group led by Lead Counsel — apparently understood and agreed that any federal settlement also would resolve his and the other cases filed in California state courts. Mr. Himmelfarb represented to me that, under usual California practices, later-filed California state court cases would be coordinated and that he, as the first-filed counsel, would have a significant amount of control over that coordinated litigation.  Because he was in favor of our reaching a nationwide settlement in the S.D.N.Y. cases that also would resolve the claims pled in the California cases, he said he would not oppose a stay of his and any coordinated California cases in order to allow the settlement process to occur in this Court.

### SONY BMG Responds to a New Allegation Respecting MediaMax

18.    Prior to the Thanksgiving holiday, the only issue that had arisen with respect to MM5 was an alleged problem with the uninstaller program that SunnComm had made available to delete MM5.  Although SunnComm advised us that it was not aware of any person having been affected by this theoretical problem, it agreed to modify the uninstaller and to cease distributing the existing uninstaller until the modification had been made.

19.    Over the Thanksgiving holiday, however, a professor of computer software, whose website is titled "Freedom to Tinker," reported that he had discovered a theoretical security vulnerability affecting MM5 itself.  SONY BMG's own experts advised the company that the "problem" this individual had identified actually was not uncommon with Windows-compatible software and that it could be addressed quickly and straightforwardly.  SONY BMG and its experts immediately began work on a fix, and the software upgrade to MM5,

with that fix, was released just a few days later.  Importantly, neither before or after SONY BMG released this update did a single consumer report having been affected by the issue that had been identified.  The theoretical problem never became real.

### *Post-Thanksgiving Settlement Discussions Bear Fruit Quickly*

**20.**       On Monday, November 28 — in anticipation of the Court approving the Case Management Order (which it did on December 1) — the putative Lead Counsel and I began to outline in general terms a proposed settlement.  On November 29, we agreed to an outline that provided relief to all those who had purchased or used CDs containing XCP, MM5 and MM3.  This outline included substantially all the elements of the Settlement Agreement the parties submitted to the Court the following month.  Then, over the next several days, we filled in the remaining details.  On Monday, December 5, I sent Lead Counsel a first draft of a Settlement Agreement that reflected the terms we had discussed.  We then negotiated relatively minor changes to this draft, and by the middle of that week I believed — and I expect Lead Counsel also believed — that the Settlement Agreement was ready to be signed.  Our mutual intent was to present the agreement to the Court the next week, and to seek preliminary approval for the settlement at the status conference the Court had scheduled for December 22.

### *EFF Had No Role in Settlement Discussions Prior to December 5, 2005*

21.       EFF has a long history of opposing the use of DRM software on CDs and DVDs.  During the first and second weeks of November, after the Russinovich postings and the Computer Associates accusation, EFF posted several comments about XCP on its own website.  In none of these postings did EFF purport to be acting as attorneys for particular clients.  On November 14, EFF posted to its website an "open letter to SONY BMG

executives."  This letter, too, was not posted in any sort of representative capacity.  It was in EFF's own name that it asked in this "open letter" for a recall of all XCP and MediaMax CDs.

22.     Also on November 14, EFF and the Green Welling firm sent a longer letter to SONY BMG executives.  Although EFF had not filed a lawsuit, it asserted in this letter that it represented a California consumer and similarly situated persons, and said it would seek a recall of all CDs containing XCP and MediaMax software.  By this time, however, SONY BMG already had recalled all XCP CDs and announced the consumer exchange program. (No software vulnerability had yet been identified with respect to MediaMax.)

23.     The EFF Group claims that, following the transmission of its November 14 letter, "the EFF group extensively negotiated the terms set forth in its demand letter with Sony BMG's counsel, including the XCP exchange program."  That is not true.

24.     Although the EFF Group's November 14 letter requested that SONY BMG undertake several additional steps, SONY BMG, through my partner Mr. Cunard, responded by informing EFF of the steps that SONY BMG had already taken and had voluntarily committed to undertake, and stating that SONY BMG had declined to recall any MediaMax CDs or otherwise to accommodate EFF's November 14 requests.

25.     Even the EFF Group's own time records fail to reflect any such "extensive negotiation" with SONY BMG about the XCP recall and exchange program.  As is reflected in those time records, their conversations with Mr. Cunard during the week of November 14 totaled less than two hours in duration.

26.     On November 21, after SONY BMG had rejected what it considered to be EFF's unwarranted appeal for a recall of MediaMax CDs, the EFF Group filed a purported

class action suit in state court in California, *Hull v. SONY BMG*.  Its focus remained on attempting to force a recall of MediaMax CDs.

27.    On November 30, as the "Freedom to Tinker" website posted word of the theoretical security issue with MM5 described above, EFF sent a letter to Mr. Cunard informing him of that alleged issue and offering to provide SONY BMG with a detailed report on it.  In that letter, EFF stated that it planned to publicize the security risk, but said it would give SONY BMG time to rectify the problem before doing so.  In this letter, EFF also threatened to seek a temporary restraining order in the California courts to preclude the further sale and force a recall of MediaMax CDs, unless SONY BMG voluntarily initiated an "immediate recall" of the CDs.  Despite believing that EFF had no valid grounds for seeking a TRO, SONY BMG sought to avoid the costly and time-consuming battle always associated with such applications by involving EFF in the process of responding to the issue EFF had raised.  EFF and its security firm, iSEC Partners, were invited to discuss iSEC Partners' findings with SONY BMG and its own experts.  iSEC Partners' report was shared with SONY BMG and the experts, with counsel, talked by telephone about the problem and the software update to address it.

28.    iSEC Partners apparently came to share the opinion of SONY BMG's experts that the security issue with MM5 was of a type that was not uncommon and could be readily addressed through a software update.  SONY BMG's experts generated an update, and they and EFF's experts both tested it and found it to be effective.  SONY BMG and EFF issued a joint press release on December 6, attached as Kathrein Decl. Ex. 24, announcing the availability of the update.  EFF never sought a TRO.

### *EFF Had Only a Limited Role in Discussions After December 5*

29.     Prior to December 5, SONY BMG's dialogue with respect to a class action settlement was exclusively with Lead Counsel.  It had no such dialogue with the EFF Group. There were several reasons for this, chief among them being that the EFF Group had no real standing to join those discussions.  Its case pending in California state court, *Hull*, was not even the first-filed case in that court and had been stayed pending coordination with Mr. Himmelfarb's case.  The California cases also faced procedural hurdles not present in the New York cases, because SONY BMG's consumer contracts had a New York venue provision.  Even without these hurdles, the *Hull* case's single-state nature would not have made it an appropriate vehicle for a nationwide settlement — the only type of settlement in which SONY BMG was interested.

30.     On December 5, however, after the MediaMax update was completed and after the EFF Group's *Hull* action in California had been coordinated and stayed, the EFF Group filed an action in this Court, *Ricciuti v. SONY BMG*.  On that same day, Mr. Cunard informed EFF in writing of all the steps SONY BMG had voluntarily undertaken with respect to XCP and he stated, without discussing the details of the draft settlement agreement that had been negotiated with Lead Counsel, that SONY BMG was interested in settling the pending  cases. The letter also offered the possibility that, post-settlement, SONY BMG would separately engage with EFF, in its capacity as an advocacy organization with a longstanding interest in DRM (and not as attorneys for outside clients), on SONY BMG's future use of DRM.

31.     Mr. Cunard's December 5 letter was the first contact SONY BMG or my firm had with EFF or any member of the EFF Group concerning settlement of the class actions. The EFF Group's time records do not and could not reflect any prior discussions.  Thus, the

statements in the EFF Group's submission, to the effect that, prior to December 5, SONY BMG was negotiating a class action settlement with the EFF Group on some sort of parallel track, are simply not accurate.

32.     On December 6, the EFF Group sent Mr. Cunard a letter responding to his letter of December 5, and describing provisions it expected to see in any settlement agreement. SONY BMG already had committed to substantially all of the items the EFF Group listed in its letter, as part of the draft Settlement Agreement reached with Lead Counsel. The draft Settlement Agreement provided that:

- SONY BMG would provide incentives to induce participation in the XCP exchange program.

- SONY BMG would cease manufacturing CDs with MM5. (In the face of SONY BMG's resisting EFF's appeal for a recall of MediaMax CDs, EFF now conceded in this letter that it would settle for something less than a recall.)

- SONY BMG had agreed to a program whereby it would quickly, and in consultation with independent experts, respond to any future issues raised with respect to MediaMax;

- SONY BMG and Lead Counsel had planned a robust notice program with respect to the availability of the various settlement benefits, including direct emails, sponsored links on the Google and Yahoo! search engines and use of the "banner" function available on all XCP and some MediaMax CDs;

- SONY BMG had agreed to waive most of the provisions of its End User License Agreements that had become controversial; and

- SONY BMG had volunteered the privacy audit and committed to continue to respect to the privacy of its customers' personal information.

33.     Because the Settlement Agreement that we and Lead Counsel had drafted already included all the points in which EFF seemed to be interested, on December 7, with the assent of Lead Counsel, we invited the EFF Group to speak with Lead Counsel about commenting on — and, if they were so inclined, joining — that Settlement Agreement.

34.     Rather than joining the process, however, on December 8, the EFF Group filed a second federal class action case, *Melcon v. SONY BMG*, in the U.S. District Court for the Northern District of California.  The EFF Group then immediately filed a motion before the Judicial Panel on Multidistrict Litigation (the "JPML") to transfer all pending related cases to San Francisco.  The EFF Group then asked SONY BMG to separately negotiate with it concerning a class action settlement, but SONY BMG refused to do so.  Only at that point did the EFF Group seek to participate in the existing discussions with Lead Counsel

35.     My understanding is that Lead Counsel provided the EFF Group with the draft Settlement Agreement mid-day on December 12.  Later on December 12, Cindy Cohn, EFF's legal director, sent us an electronic mail message in which she again asked to have separate discussions with us about settlement issues.  This email exchange, and the ensuing exchange quoted below, is attached hereto as Exhibit 1.  My partner, Bruce Keller, responded to Ms. Cohn that "[a]s you know, we are hoping to see you participate in the class action settlement process we've been pursuing with [Lead Counsel]."

36.     Replying to Mr. Keller later on December 12, Ms. Cohn asked us whether we would object to EFF's becoming co-Lead Counsel in the consolidated action in this Court. Rather than take a position on that matter, we left it for plaintiffs' counsel to work out among themselves, but noted:

> If, for whatever reason, it is not possible for you to reach an agreement with other class counsel, that will not stop Sony BMG from continuing to review its business practices regarding the issues it has recently faced.  It publicly has committed to do a top to bottom review of DRM and has so informed the various regulators with whom it has been in contact. How any decisions it makes in this regard get memorialized is a process issue that is far less important to Sony BMG than the result it ultimately wants to achieve. If it happens in the context of a class

settlement to which EFF is a party, fine. If EFF chooses to object to such a settlement because it is not a party (an odd objection, I would think) that is simply likely to drive the same result to be achieved as part of any formal resolution with regulatory bodies. . . .

We also would appreciate it if EFF would stop filing duplicative lawsuits in different jurisdictions. . . . To the extent you believe them necessary as part of your negotiation with other class counsel, Sony BMG simply notes that it also creates more work and cost for it and, for that reason, does not believe it conducive to our discussions.

In short, although we have lots to discuss, it seems that EFF now should decide whether it truly wishes to be part of a speedy global resolution or whether, for its own strategic reasons, it prefers to go it alone. Perhaps that can be one of the first things we discuss upon Jeff [Cunard]'s return. Best regards.

37.     We held a conference call with the full EFF Group on Thursday, December 15. During that call, we advised the EFF Group that we planned to finalize the Settlement Agreement with Lead Counsel at the earliest opportunity.  We suggested to the EFF Group that if it wished to comment on the Settlement Agreement and be part of the process, we would welcome its participation — but that it still needed to work out what its role in the case would be, either by reaching agreement with Lead Counsel, or by moving the Court to change the Lead Counsel structure.

38.     After consulting with Lead Counsel, we invited Lead Counsel and the EFF Group to a meeting in our offices on Sunday, December 18.  The expectation for the meeting was that the EFF Group would share any comments it had on the Settlement Agreement, SONY BMG and Lead Counsel either would or would not accept those comments, and the EFF Group then would decide whether it would endorse the final Settlement Agreement, let it go forward without the EFF Group's participation, or attempt to block it.

39.     Before that meeting, SONY BMG and Lead Counsel already had agreed that purchasers of all the affected CDs, including MM3 and MM5 CDs, would be able to receive free MP3 downloads to their computers of the music on those CDs.  The purpose of this benefit was to allow any consumer who wanted the music on his or her CD to be stored on a Windows-based personal computer to do so without having to actually copy the DRM software onto the computer.  At the December 18 meeting, the EFF Group pushed for additional cash or download benefits for MediaMax purchasers, but SONY BMG refused EFF's demands.  Ultimately, after further negotiations with EFF and Lead Counsel, SONY BMG agreed also to provide MM5 purchasers (who were being asked to download the software update to MM5) with one of the "incentive" free album downloads that were being provided to XCP purchasers.  This benefit has not, so far, proved to be of much interest to the class:  As of April 28, 2006, only 1,344 claims for this benefit have been received.

40.     The other comments EFF communicated at the December 18 meeting were a combination of wording changes and purported "clarifications" of matters, many of which we thought were already sufficiently clear.

41.     All parties initialed the agreement at the conclusion of the meeting on December 18.  On December 28, all parties signed it, and Lead Counsel submitted it to the Court.

### *EFF's Time Entries Betray a Strategy of "Creative Objecting"*

42.     On December 27 — the day before the EFF Group signed the Settlement Agreement — EFF Group member Lawrence Feldman's time records state that he "composed and forwarded email advising 'Creative Objecting' may improve settlement agreement."  His

time records from December 29 and January 4 — after the EFF Group had signed the Settlement Agreement — included more references to "Creative Objecting."

43.    Other of the EFF Group's time entries show that it is seeking to be paid for working on matters far afield of the Settlement Agreement, such as drafting opinion articles, consulting with state and federal regulators, and conferring with members of the class about potentially opting out of or objecting to the settlement.  Among the illustrative time entries are the following:

"draft blog post and newsletter; call for stories," Cindy Cohn, November 8, 2005;

"review blog post," Cindy Cohn, November 12, 2005;

"draft press releases and website," Cindy Cohn, November 20, 2005;

"revise p.r. and website; respond to media," Cindy Cohn, November 21, 2005;

"TT with TX AG's office.  TT co-counsel to report," Cindy Cohn, November 23, 2005;

"Call with TX AG's office," Cindy Cohn, December 22, 2005;

"Respond to press calls and emails . . . DR statement for website and for press," Cindy Cohn, December 29, 2005;

"Respond to press and public calls and emails," Cindy Cohn, December 30, 2005;

"Respond to press calls re: settlement," Cindy Cohn, January 3, 2006;

"Field media calls re security vulnerability," Corynne McSherry, December 6, 2005;

"Confer with Federal Trade Commission Representative re MediaMax issues and settlement," Corynne McSherry, December 21, 2005;

"Confer with Texas attorney general re: MediaMax issues and settlement," Corynne McSherry, December 22, 2005;

"Preparation for and Confer with Florida Attorney General's office re: case and settlement," Corynne McSherry, January 4, 2006;

"Speaking to press about suit and class injury," Jason Schultz, November 22, 2005;

"review emails and members' concerns regarding blog post," Allison Navone, October 31, 2005;

"continue responding to inquiries regarding EFF's action against Sony," Allison Navone, November 7, 2005;

"Respond to inquiries reqarding [sic] suit.  Direct press calls to appropriate staff members," Allison Navone, November 9, 2005;

"Continue responding to potential clients and general email/phone inquiries regarding the Sony rootkit," Allison Navone, November 10, 2005;

"Field requests from EFF members, potential clients, interested attorneys and media," Allison Navone, November 15, 2005;

"Respond to member and community inquiries regarding EFF's suit," Allison Navone, November 17, 2005;

"Respond to and thank EFF members who contacted CA Attorney General regarding Sony Rootkit," Allison Navone, December 7, 2005.

### *EFF's "Expert" Has Undermined His Own Opinion*

44.     To support its fee application, the EFF Group submitted the declaration of a purported "expert," Aram Sinnreich.  Mr. Sinnreich, whose resume shows no particular experience in the areas in which he has offered opinions, has assigned wildly inflated valuations to each aspect of this class action settlement.

45.     Mr. Sinnreich himself has admitted that his opinions lack any real basis.  In an April 24 posting to his personal weblog, aramsinnreich.typepad.com/radar_waves/2006/04/my_small_role_i.html, attached as Exhibit 2, Mr. Sinnreich wrote that:

> A month or so ago, I was contacted by attorneys at the Electronic Frontier Foundation (EFF), asking me to serve as an expert witness in the class action lawsuit over Sony/BMG's use of malware/spyware as a form of "copy protection" in millions of CD releases.
>
> My specific task was to evaluate the terms of the settlement, applying some meaningful dollar valuation to each term. This was very difficult; replacing a DRM-encrypted CD with

> unencrypted MP3s has a positive value for any music consumer, but how much? One dollar? Two fifty? A fistful of pennies? I had to make arguments that were, on the one hand, impossible to firmly substantiate, but, on the other hand, well-reasoned and well-argued enough to stand up in court. I think I did a pretty good job.
>
> You can check out my declaration here, if you're interested. It's preceded by exhibit A (my resume), so just skip through that part and start reading on page 6 of the PDF. Let me know what you think.

46.     The day after Mr. Sinnreich's initial web log posting, he noted in an "update"

that his posting had "gotten a lot of page views."  His update then said that:

> I want to make something clear that, in my typical self-effacing writing style, may not have been adequately represented in the post: namely, that I am extremely confident in the soundness of my arguments.  Some of them are factually rock-solid; when I say that it costs $1.11 to mail a CD, that is an unarguable truth. Others, in the absence of cut-and-dry data, are more nuanced arguments, and I spent a considerable amount of ink in the declaration explaining how I came to the decisions.  I would hate to think that an overly humble blog post could be misconstrued as ambivalence about the strength of my testimony or the depth of my expertise.  And, yes, I am still interested in any and all comments.

47.     Mr. Sinnreich's update further highlights the absence of any scientifically valid

basis for his opinions.

48.     Later on April 25, Mr. Sinnreich removed both the initial posting and the

"update" from his personal website.

### EFF's Complaints About Notice are Unfounded

49.     As part of its fee application (allegedly to support its claims that it has been

working in the best interests of class members, rather than its own interests), the EFF Group

accuses SONY BMG of misconduct with respect to the provision of notice to class members

— particularly those who purchased MM3 CDs.  I strongly disagree with the EFF Group's characterizations.

50.     Among the forms of notice SONY BMG agreed to provide was the following: "When a user inserts certain XCP CDs and MediaMax CDs into a computer with an active connection to the Internet, the computer queries SONY BMG's website and SunnComm's website (for XCP CDs and MediaMax CDs, respectively) for content, hereafter referred to as the 'Banner,' specific to the artist whose work appears on the XCP CD or MediaMax CD. SONY BMG will ensure that, on or before a date to be set forth in the Hearing Order, the Banner on MediaMax CDs and XCP CDs so equipped will, in addition to its regular artist-specific content, display a clear and conspicuous link to the Full Settlement Notice."

51.     EFF claims that it and SONY BMG "negotiated the[se] banner notices' look and feel" after the Settlement Agreement was signed  That is not so.  On January 6, EFF showed us proposed banners that it had designed, and proposed language for those banners. We rejected both the design and the language.  The banners SONY BMG ultimately used, which we negotiated with Lead Counsel, are very different from those EFF had proposed.

52.     EFF also claims that SONY BMG engaged in "deception" with respect to the number of MediaMax CDs that were banner-equipped.  (*All* XCP CDs are so equipped.)  At the time we negotiated the Settlement Agreement, SONY BMG was still researching which MediaMax CDs contained the banner function.  It was for that reason that the Settlement Agreement specifically said that this form of notice would be provided only on CDs that were "so equipped."  We did not obtain the results of that research until early February, and we immediately advised both Lead Counsel and EFF.

53.     Use of the banner to provide notice of the XCP recall, the availability of the MediaMax update and, ultimately, of the settlement itself, was SONY BMG's idea.  It was a cost-free way to target people who were, by definition, affected by the relevant issues.  Because only a small percentage of class members (those who insert the physical CDs into computers with active Internet connections) would see the banners.  It was not, however, the only, or even the most important, aspect of the notice program.  SONY BMG also  sent email messages directly to people who were on the "fan site" mailing lists of artists whose CDs were protected by XCP and MediaMax.  SONY BMG had *2.5 million* of these addresses — 300% more than we had initially believed (and told Lead Counsel and EFF to expect).  SONY BMG also published notice of the settlement in a range of widely-read newspapers and magazines.

54.     The smaller number of titles of MM5 CDs that were banner-equipped did not have a material effect on the quality or scope of notice to the class.   Indeed, of the approximately 1,344 claims for MediaMax benefits that the settlement administrator had received as of April 28, only *73* came from consumers who purchased banner-equipped MM5 CDs.   The other 1,271 claims came from persons who purchased non-banner CDs, all of whom presumably received one of the other forms of notice.

* * *

55.     To summarize, therefore, the EFF Group was not involved in any way in SONY BMG's voluntary decision to recall XCP CDs and to initiate a consumer exchange program.  SONY BMG had no dialogue at all regarding the terms of settlement with the EFF Group until December 5, 2005, by which point SONY BMG already had reached agreement in principle with Lead Counsel on all material terms of the eventual settlement.  The EFF

Group's  comments on the draft Settlement Agreement were minor, and the single class benefit for which the EFF Group can claim even partial credit has been claimed by fewer than 1,400 class members.  For all these reasons, SONY BMG opposes the EFF Group's motion to receive a substantial attorneys' fee and reimbursement of expenses.

56.     I have reviewed my declaration and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:          New York, New York
                May 1, 2006


                                    _____*s/ Jeffrey S. Jacobson*_____
                                    Jeffrey S. Jacobson

Exhibit 1

| From: | Keller, Bruce P. |
|---|---|
| Sent: | Tuesday, December 13, 2005 2:13 PM |
| To: | 'Cindy Cohn'; 'thomas.hesse@sonybmg.com'; Cunard, Jeffrey P.; Jacobson, Jeffrey S.; Feigelson, Jeremy |
| Cc: | 'Robert S.Green'; 'Kurt Opsahl' |
| Subject: | RE: Continuing our discussions |

Dear Cindy,

Thanks for your emails of yesterday. We'll talk tomorrow, when Jeffrey will be back in the office.

I want to reiterate a point made the other day. If, for whatever reason, it is not possible for you to reach an agreement with other class counsel, that will not stop Sony BMG from continuing to review its business practices regarding the issues it has recently faced.  It publicly has committed to do a top to bottom review of DRM and has so informed the various regulators with whom it has been in contact. How any decisions it makes in this regard get memorialized is a process issue that is far less important to Sony BMG than the result it ultimately wants to achieve. If it happens in the context of a class settlement to which EFF is a party, fine. If EFF chooses to object to such a settlement because it is not a party (an odd objection, I would think) that is simply likely to drive the same result to be achieved as part of any formal resolution with regulatory bodies. A court then can decide whether, notwithstanding such a result, the class is entitled to more.


In that regard, we know from at least one jurisdiction that EFF has reached out to it to convey its point of view on these issues. That is your prerogative, but it is not conducive to our dialog with you.  We also would appreciate it if EFF would stop filing duplicative lawsuits in different jurisdictions.  (We just saw your latest filing in the Northern District of California.)  These filings serve little purpose in connection with your claims against Sony BMG--those have been pled several times over. To the extent you believe them necessary as part of your negotiation with other class counsel, Sony BMG simply notes that it also creates more work and cost for it and, for that reason, does not believe it conducive to our discussions.

In short, although we have lots to discuss, it seems that EFF now should decide whether it truly wishes to be part of a speedy global resolution or whether, for its own strategic reasons, it prefers to go it alone. Perhaps that can be one of the first things we discuss upon Jeff's return. Best regards.

-----Original Message-----
From: Cindy Cohn [mailto:cindy@eff.org]
Sent: Monday, December 12, 2005 5:23 PM
To: thomas.hesse@sonybmg.com; Keller, Bruce P.; Cunard, Jeffrey P.; Jacobson, Jeffrey S.
Cc: Robert S.Green; Kurt Opsahl
Subject: Continuing our discussions


Dear Jeff, Bruce, Thomas and Jeff,

We would like to continue our discussions with Sony BMG as soon as possible.
I know Jeff Cunard does not get back to the office until Wednesday, but we believe we should try to set something up before then, especially given the growing procedural complexities of the various litigations.

Will tomorrow (Tuesday) morning, 10am PST work for everyone?  I know from my discussions with Jeff Cunard before he left that you had additional

comments on our settlement discussion letter of December 6, 2005, responding to your settlement discussion letter of December 5.

We can use the EFF's conference call line, although if Jeff is in Europe, we will need someone to patch him in.

Cindy

```
************************************************************
Cindy Cohn                      ---- Cindy@eff.org
Legal Director                     ---- www.eff.org
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333 x108
(415) 436-9993 (fax)
```

Exhibit 2



**APRIL 2006**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     |     |     |     |     |     | 1   |
| 2   | 3   | 4   | 5   | 6   | 7   | 8   |
| 9   | 10  | 11  | 12  | 13  | 14  | 15  |
| 16  | 17  | 18  | 19  | 20  | 21  | 22  |
| 23  | 24  | 25  | 26  | 27  | 28  | 29  |
| 30  |     |     |     |     |     |     |

Add me to your TypePad People list

Subscribe to this blog's feed

**CATEGORIES**

Academic Hogwash

Books

DRM

Friends and Enemies

Gadgets

Games

Globalization

Google

IP/Copyright

Kids

« Nice branding campaign: da Vinci Code on Google | Main

## My small role in the Sony/BMG rootkit debacle: expert beancounting

A month or so ago, I was contacted by attorneys at the Electronic Frontier Foundation (EFF), asking me to serve as an expert witness in the class action lawsuit over Sony/BMG's use of malware/spyware as a form of "copy protection" in millions of CD releases.

My specific task was to evaluate the terms of the settlement, applying some meaningful dollar valuation to each term. This was very difficult; replacing a DRM-encrypted CD with unencrypted MP3s has a positive value for any music consumer, but how much? One dollar? Two fifty? A fistful of pennies? I had to make arguments that were, on the one hand, impossible to firmly substantiate but, on the other hand, well-reasoned and well-argued enough to stand up in court. I think I did a pretty good job.

You can check out my declaration here, if you're interested. It's preceded by exhibit A (my resume), so just skip through that part and start reading on page 6 of the PDF. Let me know what you think.

-----------------------------------------------------------

Posted by aram sinnreich on April 24, 2006 at 08:54 PM in **DRM**, **Music**, **New Research**, **Politricks** | **Permalink**

## TrackBack

TrackBack URL for this entry:
http://www.typepad.com/t/trackback/4737821

**MORE ABOUT US**

Radar Research

terra non firma

Aram Squalls

**RECENT POSTS**

My small role in the Sony/BMG rootkit debacle: expert beancounting

Nice branding campaign: da Vinci Code on Google

Porn Addendum: Burger King's Balls

Once again, porn leads the way

Selling Off Our History - To Showtime

Sexual Healing, 24 years later

Monday media: free IPTV, the adventures of Orkut in Brazil, and Google's ostensible metamorphosis into Big Brother

UMD R.I.P. -- Hurrah for Synergy!

Better late than never: In-Game advertising article is published

Welcome to Yosemite, Brought to You by Verizon

