UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
In re SONY BMG CD TECHNOLOGIES      :   Civil Action No. 1:05-cv-09575-NRB
LITIGATION                          :
                                    :   <u>CLASS ACTION</u>
                                    :
                                    :   REPLY DECLARATION OF CINDY A.
This Document Relates To:           :   COHN IN SUPPORT OF RICCIUTI CLASS
                                    :   REPRESENTATIVES' MOTION FOR AN
    ALL ACTIONS.                    :   AWARD OF ATTORNEYS' FEES AND
---------------------------------------------------------x   REIMBURSEMENT OF EXPENSES

I, Cindy A. Cohn, declare as follows:

1.      I am an attorney at law, representing the Ricciuti Class Representatives in the above-referenced action and am Legal Director of the Electronic Frontier Foundation ("EFF").  I am licensed to practice in the State of California and appear *pro hac vice* in this action.  I have personal knowledge of the matters stated herein, and if called upon, I could and would competently testify thereto.  The Ricciuti Class Representatives include Tom and Yvonne Ricciuti, Mary Schumacher, Robert Hull, Joseph Halpin, and Edwin Bonner.

2.      Attached are true and correct copies of the following exhibits:

Exhibit A:   A letter dated December 5, 2005 from Jeffrey P. Cunard of Debevoise & Plimpton LLP to Robert S. Green, Esq., of Green Welling LLP and Cindy Cohn, Esq. of EFF;

Exhibit B:   An e-mail dated January 10, 2006 at 8:15:57 AM PST from Jeffrey S. Jacobson of Debevoise & Plimpton LLP to Elizabeth C. Pritzker, Aaron Sheanin, and Cindy Cohn regarding "FW: Sony BMG CD Settlement – Published Notice and Website Domain Name";

Exhibit C:   An e-mail dated January 18, 2006 at 10:44:07 AM PST from Jeffrey S. Jacobson of Debevoise & Plimpton LLP to Kurt Opsahl of EFF regarding "RE: full form notice";

Exhibit D:   An e-mail dated December 8, 2005 at 5:23:12 PM PST from Cindy Cohn of EFF to Bruce P. Keller and Jeffrey P. Cunard of Debevoise & Plimpton LLP and Thomas Hesse of Sony BMG regarding "Notice idea: Structured interviews";

Exhibit E:   An e-mail dated December 21, 2005 at 3:32:28 PM from Cindy Cohn of EFF to Elizabeth Pritzker and Scott A. Kamber regarding "[Sony DRM-priv] proposed banners" ;

Exhibit F:   An e-mail dated December 27, 2005 at 4:00:48 PM from Cindy Cohn of EFF to Jeffrey P. Cunard, Jeffrey S. Jacobson, and Bruce P. Keller of Debevoise & Plimpton LLP regarding "[Sony DRM-priv] Unfinished Settlement Matters";

Exhibit G:   An e-mail dated January 3, 2006 at 3:52:07 PM from Cindy Cohn of EFF to Jeffrey P. Cunard of Debevoise & Plimpton LLP regarding "[SonyDRM-priv] Happy New Year and resuming discussions";

Exhibit H:   An e-mail dated January 8, 2006 at 2:10:41 PM from Cindy Cohn of EFF to Jeffrey P. Cunard and Jeffrey S. Jacobson of Debevoise & Plimpton LLP regarding "[SonyDRM-priv] To do list from Friday meeting";

Exhibit I:   An e-mail dated February 1, 2006 at 5:45:36 PM from Jeffrey S. Jacobson of Debevoise & Plimpton LLP to Cindy Cohn and Kurt Opsahl of EFF regarding "Settlement website";

Exhibit J:   An e-mail dated February 2, 2006 at 4:10:30 PM PST from Jeffrey P. Cundard of Debevoise & Plimpton LLP to Cindy Cohn and Kurt Opsahl of EFF regarding "FW: banner notice";

Exhibit K:   An e-mail dated February 3, 2005 at 6:57:29 AM PST from Jeffrey S. Jacobson of Debevoise & Plimpton LLP to Cindy Cohn and Kurt Opsahl of EFF regarding "Anti-virus companies";

Exhibit L:   An e-mail dated February 7, 2006 at 4:19:37 PM PST from Jeffrey S. Jacobson of Debevoise & Plimpton LLP to Cindy Cohn of EFF regarding "RE: Settlement Administration Website"; and

Exhibit M:   An e-mail dated February 8, 2006 at 12:17:00 PM from Cindy Cohn of EFF to Jeffrey S. Jacobson, Jeffrey P. Cunard, Marissa M. Grimes, and Terrence Finneran of Debevoise & Plimpton LLP and Bruce Schneier regarding "[Sony DRM-priv] Settlement Administration Website".

3.   Mr. Jacobson's description of EFF's role in the process leading to the signing of the settlement documents is significantly inaccurate. I suspect that the inaccuracies are due, in part, to the fact that Mr. Jacobson was not one of the attorneys from Sony BMG Music Entertainment ("Sony BMG") who engaged in negotiations with EFF prior to mid-December, 2005. Instead, Mr. Jacobson's more senior partners Mr. Cunard and Mr. Keller, along with Sony BMG Vice-President Thomas Hesse at times, were the Sony BMG representatives directly involved in the negotiations with EFF. Mr. Jacobson was not on any of the many conference calls or included in any of the emails between EFF and Sony BMG prior to December 14, 2005. Accordingly, Mr. Jacobson's descriptions of the discussions at that time are not only inaccurate, they are almost entirely hearsay.

4.   Most obviously, Mr. Jacobson's characterizations of the discussions that I had with Mr. Cunard in November and early December, 2005 as not "extensive" are patently ridiculous. I and

- 2 -

my co-counsel spent many, many hours on the telephone and exchanging emails with Mr. Cunard during this period.  In each conversation we noted, and Mr. Cunard acknowledged, EFF's first threatened, then pending litigation.  Indeed, the entire context of the discussions at that time was about the steps that Sony BMG needed to take first, to avoid EFF filing suit and later, to avoid EFF moving for a temporary restraining order ("TRO").

5. After December 5, 2005, the discussions were almost entirely devoted to the steps Sony BMG needed to take in order to settle the litigation with EFF.

6. My communications records reflect that Mr. Cunard initiated over 34 communications with me during the 30-day period from November 14, 2005 to December 14, 2005. This figure does not include those I initiated with Mr. Cunard, often at his request, which would likely double the number of communications.  Specifically, my email and correspondence records indicate:

(a) 10 telephone calls with Mr. Cunard:  November 14, 16, and 30, December 1 (3 calls, one including Mr. Hesse), and December 4, 5, and 7 (2 calls);

(b) 2 letters from Mr. Cunard: November 17 (EFF replied on November 18), and December 5 (EFF replied on December 6);

(c) 20 emails from Mr. Cunard: November 17, 18 (2 messages), and 30 (2 messages), and December 1, 2, 3 (2 messages), 4 (6 messages), 5, 8 (2 messages), and 14; and

(d) 2 emails from Mr. Keller: December 12 and 13 when Mr. Cunard was in France.

7. In short, during this period I received communications from Mr. Cunard nearly every business day, with some days nearly entirely taken up with communications with him.  Mr.

- 3 -

Jacobson's suggestion that these discussions were merely for Sony BMG to inform EFF of decisions they had already made is farcical.

### Mr. Jacobson Misstates the MediaMax 5.0 ACL Problem

8.  Also likely because he had no involvement in the negotiations, Mr. Jacobson misstates many facts about the MediaMax 5.0 ACL security problem and EFF's role in finding it, bringing it to Sony BMG's attention quietly to avoid damage to class members, working with Sony BMG to develop a patch, then jointly releasing the patch with Sony BMG.

9.  In late November, 2005, EFF's consultants at iSEC Partners discovered a security problem in MediaMax 5.0 CDs called an ACL problem. This problem, also called a "privilege escalation vulnerability," allowed unauthorized users of a computer, either directly or through the internet, to gain complete control over the computer. While Mr. Jacobson notes that the problem is a common one, he neglects to point out that, while common, the problem is serious. Microsoft has a security management column about it entitled: "How to Shoot Yourself in the Foot with Security, Part 2: To ACL or Not to ACL." http://www.microsoft.com/technet/community/columns/secmgmt/sm1105.mspx (November 8, 2005).

10. Mr. Jacobson incorrectly states that the freedom-to-tinker.com website first "posted word" of the MediaMax 5.0 problem on November 30, 2005. *See* Declaration of Jeffrey S. Jacobson, Esq., in Opposition to the "EFF Group's" Motion for the Award of Attorneys' Fees, filed May 1, 2006 ("Jacobson Decl."), ¶27. This is untrue. There was no post about MediaMax on freedom-to-tinker.com on November 30, 2005. (although there was a post noting that Sony BMG had been alerted to the XCP rootkit problem in early October, 2005 and had ignored the alert).

11. As Mr. Halderman, the author of most of the MediaMax posts on freedom-to-tinker.com notes in the accompanying declaration, contrary to Mr. Jacobson's claims, Freedom-to-

Tinker did not discover or report the ACL problem in the MediaMax 5.0 CDs. The problem was discovered by EFF's consultants at iSEC Security.

12.     Moreover, the discussions in the immediate aftermath of the discovery of the flaw directly focused on EFF's planned TRO to seek both the halting of further distribution and the recall of the MediaMax 5.0 CDs. Mr. Cunard expressly sought to negotiate the steps that Sony BMG would have to take to avoid EFF seeking the TRO.

13.     In order to avoid EFF seeking a TRO, EFF insisted that Sony BMG move quickly to develop and deploy a patch for the flaw, in consultation with our consultants at iSEC Partners who discovered the flaw. Sony BMG agreed. EFF insisted that Sony BMG do a broad notice campaign for the security patch, including targeting purchasers through the CD bannering functionality and through artists websites (something we had called for on our website on November 28 http://www.eff.org/deeplinks/archives/004202.php). Sony BMG agreed. Ultimately, Sony BMG and EFF issued a joint press release about the ACL problem and the patch. Sony BMG also agreed to temporary moratorium on the production of MediaMax 5.0 CDs pending a complete security review, although they did agree to a recall. Because in our negotiations Sony BMG had agreed to most of our negotiation demands, we decided not to seek the TRO.

14.     Mr. Jacobson's implication that iSEC Partners somehow agreed with Sony BMG that the security problem wasn't serious is also misplaced. Again, this could be because Mr. Jacobson did not participate in the discussions. To the contrary, not only did iSEC believe that the MediaMax 5.0 flaw was a serious problem, Mr. Hesse, Mr. Keller, and Mr. Cunard both emphasized the same during a several hour long phone call with Sony BMG, their outside consultants, representatives from MediaMax, EFF, and iSEC Partners on December 1, 2005. I remember and my

contemporaneous notes reflect that during the call Mr. Cunard stated that "Sony BMG is taking this problem very seriously," and Mr. Hesse stated: "the security issue is there and we will fix it."

### EFF'S Role Continued After December 5, 2005

15. Mr. Jacobson also mischaracterizes EFF's role after December 6, 2005. As noted above, the daily communications with Mr. Cunard about the case continued throughout this period, including several letters where we presented our settlement demands. *See* Ex. A; Declaration of Reed R. Kathrein, Esq. in Support of the Ricciuti Class Representatives' Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Kathrein Decl."), Ex. 23.

16. On December 12, 2005, in response to a representation from class counsel Scott Kamber of Kamber & Associates, LLC that the case was "hours" away from settling, I called Mr. Keller (Mr. Cunard was in France) and he assured me that Mr. Kamber's claims were "untrue."

17. These discussions culminated with a plea from Mr. Cunard and Mr. Keller that I fly to New York to join in a meeting on December 18, 2005. My personal schedule made this trip extremely difficult, yet ultimately we yielded to strong, personal requests from both Mr. Cunard and Mr. Keller that my co-counsel and I attend the meeting.

18. Prior to agreeing to attend this meeting I informed Mr. Cunard and Mr. Keller that based upon my review of the draft settlement agreement (which we had to fight to get from Ms. Pritzker and only obtained after Sony BMG intervened), Sony BMG would have to agree to much more before EFF would sign on to the agreement. I highlighted the need for real relief for both MediaMax 5.0 and MediaMax 3.0 purchasers, not just continuing to offer the patches and uninstallers as the draft settlement provided. I also highlighted our demand that replacement music be offered to purchasers in MP3 or other non-DRM format, the outstanding EULA concerns that were not yet addressed and that the skeletal process for handling future security problems with Sony

BMG CDs in the draft agreement would need great strengthening. I also said that I wished to continue discussing a recall of MediaMax 5.0 CDs. I informed them that none of these issues had been addressed adequately in the settlement draft we had seen.

19. Mr. Cunard and Mr. Keller both assured me that while they were not willing to discuss a recall of MediaMax 5.0 CDs, Sony BMG was willing to take significant additional steps in response to all of our other issues. It was based upon those assurances that I agreed to come to New York to negotiate further.

20. During the daylong negotiations in New York, EFF succeeded in getting Sony BMG to agree to major changes, plus a host of other minor ones throughout the agreement. Most important of these were:

(a) Sony BMG agreed to permanently cease production of MediaMax 5.0 CDs;

(b) All class members who purchased music with dangerous DRM (XCP, MediaMax 5.0), or with DRM that installed without notice (MediaMax 5.0 and MediaMax 3.0), received their music in a non-DRM format;

(c) All class members who purchased MediaMax 5.0 received an additional album downloaded for free;

(d) We developed a workable process for future security vulnerabilities and tightened definitions, deadlines, and requirements by Sony BMG;

(e) We negotiated significant additional disclaimers of terms in their End User License Agreements, again an issue first raised by EFF on November 9, 2005 and not included in the complaints filed by class counsel;

(f) Sony BMG agreed to put the results of the privacy audit on their website;[1]

(g) We negotiated prominent links to anti-spyware and anti-virus software vendors in Sony BMG's notices to the class; and

(h) We insisted on the removal of dangerous language concerning the "uncertifiability" of claims and negotiated the scope of the claims to be released to ensure more relief possible for individuals whose computers had been damaged.

### EFF'S Role in Website and Other Forms of Notice and Claims Process

21. Contrary to the belated claims of Ms. Pritzker and Mr. Jacobson, EFF had an active and welcomed role in assisting to develop the various forms of notice to be provided in the settlement and the format of the settlement website itself.  Between December 22, 2005 and February 28, 2006, Mr. Jacobson and Mr. Cunard sent me over 70 email messages, many of which were copied to Ms. Pritzker and over half of which concerned the various forms of notice to be provided.  Most of the rest concerned the final negotiations for the settlement documents and the attempt by Sony BMG and class counsel to amend the settlement agreement to decrease the benefit to the class without our consent.

22. Not only did Sony BMG request EFF's input about the various forms of notice, the vast majority of our suggestions were implemented into the settlement website and notices.

23. Most prominently, EFF strongly asserted that a primary goal of the notice process should be ensuring that as many people as possible addressed the security vulnerabilities created by the Sony BMG CDs through either patching or uninstalling the software.  This view was not reflected in the early drafts of the banners and other forms of notice prepared by Sony BMG and

---

[1] While Sony BMG's papers indicate that a privacy audit was done, the audit itself does not yet appear on their website in compliance with the settlement terms.

class counsel and the notices were all changed at EFF's insistence. Exs. B-C. It was only due to EFF's persistent and strong advocacy that the banners and settlement website featured the security interests of class members alongside the remedial benefits portion of the settlement.

24. EFF also worked to ensure that the notices and the settlement website were easy to use and superior to the standard class action settlement notices.

25. Sony BMG was receptive to most of our suggestions throughout the development process for the various forms of notice.

26. Importantly, at no time did counsel from Sony BMG or class counsel indicate that they did not want and expect EFF to provide comment and suggestions. To the contrary, EFF was actively engaged in negotiating improvements to the website and notice with Sony BMG. While not all of our suggestions were incorporated, many if not most of them were, including, most importantly:

(a) Equal prominence of security issues and settlement benefits in the website, banner ads and notice sent to class members, rather than having the notice feature only the settlement benefits;

(b) Easy-to-use structured interview format on the website; and

(c) Links to anti-virus and anti-spyware vendors.

27. Specifically, EFF's participation in the settlement notice issue included the following events set forth in the following paragraphs 28-42.

28. Starting on December 8, 2005, I wrote to Sony BMG, copying Ms. Pritzker and Mr. Kamber, suggesting that the settlement website be set up as a structured interview, rather than as a flat list of information. Ex. D.

29. On December 21, 2005, after a request from Ms. Pritzker for input, I sent an email to Ms. Pritzker and Mr. Kamber with comments on the banner notice Ms. Pritzker had shown me during the December 18, 2005 meeting. My message noted that these banners should be "security notices" and should emphasize the need for CD purchasers to patch their computers. Ex. E.

30. On December 27, 2005, I sent another email, this time to Sony's BMG counsel and copying class counsel, expressing concern about the notice to be given to the class and once again emphasizing the need to change Sony BMG's then-web pages so that they more clearly put class members on notice of the need to patch their systems. Ex. F. My email said in part:

> It is therefore imperative that those who have purchased the XCP CDs receive clear, unequivocal notice that they need to uninstall the XCP software from their machines before the viruses that have already been identified reach consumers and before any other security flaws in XCP are uncovered. It is also true for MediaMax 5.0, however, since the current banners do not give sufficient notice of the urgency of the need to patch or uninstall the software.

31. The December 27, 2005, email also renewed the suggestion of a structured interview format and confirmed telephone discussions where Sony BMG had agreed to widen the breadth of the email notice they were giving at our request. Ex. F.

32. On January 3, 2006, I sent an email to Sony BMG's counsel suggesting that we schedule our continued discussions concerning, in part, notice issues in the settlement. I invited Sony BMG counsel to San Francisco, California to continue discussions. Mr. Cunard responded and invited me to meet with him in New York, just prior to the preliminary hearing, "to talk about settlement notice issues." I agreed. Ex. G.

33. On January 6, 2006, at the request of Sony BMG counsel and with the knowledge of class counsel, my colleague Kurt Opsahl and I flew to New York to meet with Sony BMG's counsel to discuss the various forms of notice. Class counsel were invited, and while they declined to attend, they gave no indication that they were opposed to EFF giving input into the notice issues. At that

meeting Mr. Opsahl and I presented banner drafts that we had prepared to Sony BMG's counsel, in response to requests for input from both Sony BMG and class counsel. Our banners emphasized the security issues and Sony BMG's previous banners only mentioned the settlement benefits. During the meeting Sony BMG counsel and EFF ultimately tried to create banners that would reflect both concerns equally. Ex. H. I offered to try to create the banners and Sony BMG's counsel agreed. Ultimately, while Sony BMG did not use our models as a whole, they incorporated our idea (banners that rotated between a message about security and a message about settlement benefits) in the final banners. Ex. C.

34. During the meeting Mr. Opsahl and I also convinced Sony BMG to purchase additional *Google* adwords for the artists whose CDs were affected by the XCP and MediaMax problems for the period from February 15, 2006, through the Fairness Hearing. We also discussed many other issues arising from the settlement, ranging from the bit rate for the downloads of MP3 files from the website to the specific anti-virus and anti-spyware vendors that Sony would link to from its website, both elements of the settlement agreement inserted at EFF's insistence.

35. On January 10, 2006, Sony BMG counsel sent me, along with Ms. Pritzker and Mr. Sheanin from Girard, Gibbs & De Bartolomeo, LLP, the draft of the summary notice. Ex. B.

36. On January 18, 2006, at my request, Mr. Opsahl wrote to Mr. Jacobson and suggested changes to the notice "making the need for class members to update or uninstall the software more prominent." Mr. Jacobson responded that "we don't disagree with your suggestions" and "I'm pretty sure we should be able to address most of them." Ex. C.

37. On February 1, 2006, Mr. Jacobson wrote that he was delayed in giving us access to the "under-construction settlement website" but that it should come and that he thought we "will be

- 11 -

pleased with the structured interview format when you see it." Mr. Jacobson said this because, as noted above, the idea for the structured interview format came from EFF. Ex. I.

38.     On February 2, 2006, Mr. Cunard sent us Sony's revised banners in accordance with our suggestions on January 6, 2006.  Unlike the previous drafts of the banners done by Sony BMG and class counsel alone, these reflected both the class action settlement and the security concerns EFF had raised. Ex. J.  As Mr. Cunard explains:

> The "A" and "B" banners will rotate, so the effect will be that "Class Action Settlement" and "This CD Recalled" will alternate/flash on XCP CDs, and "Class Action Settlement" and "Important Software Update" will flash on MediaMax CDs.

This reflected the agreement reached between EFF and Sony BMG about giving security concerns and the settlement terms equal footing in the banner notice and incorporated EFF's specific suggestion that the banners rotate to accomplish this goal.

39.     On February 3, 2006, Mr. Jacobson wrote to me asking again for suggestions about anti-virus companies that they could link to from the Sony BMG settlement website. Ex. K. We provided them.

40.     On February 7, 2006, we provided feedback to Mr. Jacobson about the proposed settlement website and received Mr. Jacobson's response, in which he agreed to some ("[t]hat's a good idea") and disagreed with other ("I disagree with you on this") of our suggestions. Ex. L.

41.     On February 8, 2006, I sent comments to Sony BMG suggesting additional changes to the banner ads. Those suggestions were adopted by Sony BMG. Ex. M.

42.     These are just a subset of the correspondence between EFF and Sony BMG about the look and feel of the settlement website, banner notices and email notices.  In all, I received emails, letters, or was engaged in telephone calls with Sony BMG's counsel nearly every day from November 14, 2005 to February 10, 2006.  My email records reflect over 120 emails from Sony BMG's counsel during that time, which was less than 65 working days.  At no time did anyone from

Sony BMG's legal team, or class counsel who were included in many of these discussions, indicate that they did not believe that EFF had a vital role to play in the negotiation, settlement, and post-settlement work of this case.

43. Nor did class counsel or Sony BMG indicate that they believed that EFF's efforts were *pro bono*. To the contrary, in sharp contrast to their filings before this Court, I was repeatedly and personally assured by Mr. Cunard, Mr. Jacobson, and even Ms. Pritzker that EFF's participation in all phases of this litigation was vital and important and that EFF should be paid for the work it was doing. As late as February 2, 2006, Mr. Cunard specifically told me during a telephone call that Sony BMG would not object to EFF getting fairly paid for the all of the fees it had incurred working on the case.

44. I have reviewed the time spent by the entire EFF legal team on this case and of the 1,018.6 hours spent as of the time of filing of our motion, less than 20 of those hours can be attributed to press, including reviewing EFF's own press releases and materials and responding to media requests for comment about the case.

45. I have also reviewed the time spent by the entire EFF legal team on this case and less than 20 hours were spent in discussions with either State Attorney Generals or the Federal Trade Commission.

46. The assertion that EFF should be denied fees for its efforts to increase notice to the class because it "would have undertaken these activities irrespective of whether it participated in any litigation" are absurd. Class Counsel Corrected Opposition at 13. EFF receives many, many requests for assistance from people all across the Internet. As a small, nonprofit organization with an annual budget of less than $2 million, we must choose carefully where to place our scarce resources. EFF's decision to focus its resources on assisting the class in this case, as opposed to the hundreds of other

worthy causes, was based upon its role as counsel and its corresponding fiduciary duty to the class. EFF believes that its duty as class counsel included making all reasonable attempts to ensure that as many class members received notice as possible, and that this duty took on greater urgency once it became clear that several key sections of Sony BMG's promised notice to the class were chimerical.

47. Moreover, the vast majority of the work done by EFF to increase notice of the settlement is not reflected in the fee application. That work was done by EFF's webmaster and activist staff, which prepared the website, EFF's own banner ads, and other materials that EFF made available to promote the settlement. None of that time is reflected in this fee application.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct. Executed this 11 day of May, 2006, at San Francisco, California.

CINDY A. COHN, ESQ.

T:\CasesSF\Sony NY\dec00030896.doc

CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

    s/ Reed R. Kathrein
REED R. KATHREIN

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail: ReedK@lerachlaw.com

 Civil  •  Criminal  •  Query  •  Reports  •  Utilities  •  Logout 

# Mailing Information for a Case 1:05-cv-09575-NRB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sanford P. Dumain**
  sdumain@milbergweiss.com

- **Jeffrey S. Jacobson**
  jsjacobs@debevoise.com mmgrimes@debevoise.com

- **Scott Adam Kamber**
  skamber@kolaw.com

- **Jonathan K. Levine**
  jkl@girardgibbs.com dcg@girardgibbs.com;ams@girardgibbs.com;ale@girardgibbs.com; cme@girardgibbs.com;zml@girardgibbs.com;ajd@girardgibbs.com

- **Ira M. Press**
  ipress@kmslaw.com

- **Shana Eve Scarlett**
  shanas@lerachlaw.com

- **Jason Louis Solotaroff**
  jsolotaroff@gslawny.com

- **Mark A. Strauss**
  mstrauss@kmslaw.com lmorris@kmslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Cindy A. Cohn
```

Legal Director of the Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

**Lawrence E. Feldman**
Lawrence E. Feldman & Associates
432 Tulpehocken Avenue
Elkins Park, PA 19027

**Jeff D. Friedman**
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street
Suite 2600
San Francisco, CA 94111

**Daniel C. Girard**
Girard, Gibbs & De Bartolomeo, L.L.P.
601 California Street
Suite 1400
San Francisco, CA 94108

**Robert S. Green**
Green Welling LLP
595 Market Street
Suite 2750
San Francisco, CA 94105

**Reed R. Kathrein**
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street
Suite 2600
San Francisco, CA 94111

**Elizabeth Pritzker**
Girard, Gibbs & De Bartolomeo, L.L.P.
601 California Street
Suite 1400
San Francisco, CA 94108

**Peter G.A. Safirstein**
Milberg Weiss Bershad & Schulman LLP (NYC)
One Pennsylvania Plaza
New York, NY 10119

**Jenelle Welling**

Green Welling LLP
595 Market Street
Suite 2750
San Francisco, CA 94105