UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re SONY BMG CD TECHNOLOGIES LITIGATION | Civil Action No. 1:05-cv-09575-NRB |
| | <u>CLASS ACTION</u> |
| This Document Relates To: <br><br> ALL ACTIONS. | REPLY DECLARATION OF ARAM SINNREICH IN SUPPORT OF RICCIUTI CLASS REPRESENTATIVES' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES |

I, Aram Sinnreich, hereby declare as follows:

1.  I am writing this supplemental declaration in response to two recent court filings, Defendant Sony BMG Music Entertainment's Memorandum in Opposition to the "EFF Group's" Motion for the Award of Attorneys' Fees ("Sony BMG Opposition") and the Declaration of Jeffrey S. Jacobson, Esq., in Opposition to the "EFF Group's" Motion for the Award of Attorneys' Fees ("Jacobson Declaration").

2.  In each of these documents, both my expertise in the fields of music and technology and the soundness of the analytical methods I used in my written declaration (Declaration of Aram Sinnreich in Support of the Ricciuti Class Representatives' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Sinnreich Declaration") were challenged. In response, I will: (a) more fully set forth my expertise in the fields of music and technology; (b) explain why my analytical methodologies, used to form my opinions, are reliable; and (c) briefly address a weblog posting on my corporate site which Sony BMG Music Entertainment ("Sony BMG") misrepresented in an apparent effort to challenge the reliability of my opinions.

**I.   Evidence Demonstrating My Expertise in the Fields of Music and Technology**

3.  Both the Jacobson Declaration, and the Sony BMG Opposition challenge my expertise and my methodologies, but neither offers any support for these challenges, either in the form of a factually substantiated critique, or in the form of an alternative methodology or conclusion.

4.  Contrary to the unsubstantiated challenges posed in the Jacobson Declaration and the Sony BMG Opposition, I have a long history as an expert researcher in the fields of music and technology, and am well-known and well-regarded for my expertise within these fields. Even the defendants have previously acknowledged this; both Sony Music and BMG (the pre-joint venture constituents of what is now Sony BMG) were longstanding clients of Jupiter during my tenure there, paying significant amounts of money for access to my research and expertise.

5. I will cite four kinds of evidence to further demonstrate my expertise in the fields of music and technology: my prior experience as an expert witness, my professional research credentials and experience, my long history as a publicly recognized expert, and substantial public acknowledgement of my expertise in the form of accolades and awards.

6. The present suit is the third in which I have served as an expert witness. All three suits have centered around the fields of music, media and technology. I contributed a declaration and was deposed in support of the defense in *MGM vs. Grokster*, a suit which was eventually decided by the U.S. Supreme Court. In this case, my testimony largely centered on the potential legal uses of peer-to-peer file sharing technologies, and on the ways in which such technologies have benefited the music industry and musicians. I also contributed a declaration on behalf of the plaintiff in *RealNetworks vs. MLB*, in which I discussed the business implications of a potential contractual violation between the Internet technology company and the sports entertainment franchise. At present, I have been asked to contribute an affidavit to a fourth lawsuit, this one regarding the business and economic models behind digital music sales.

7. My professional history as a researcher and writer covering music and technology extends back nearly a decade, to the dawn of the commercial Internet. This period of time, dating back to my hiring as a Research Associate at Jupiter Communications in February, 1997, spans virtually the entire history of music on the Internet. By way of support for this claim, I offer the following: a Lexis-Nexis search of articles in "Major Papers" demonstrates that the term MP3 did not appear in print in any of these periodicals until May, 1997.

8. While I was at Jupiter, I produced syndicated research focusing on the fields of music, media, entertainment, and technology. From 1999 until my departure in 2002, I was the chief music analyst at the company, authoring or co-authoring the vast majority of Jupiter's publications

on the subject. In this capacity, I produced some of the first (if not *the* first) published corporate research on digital rights management (DRM) technology (1999), peer-to-peer file sharing (2000), digital music business models (2000), online music radio (2000), and CD copy-protection (2002). As should be evident without explanation, each of these aforementioned publications bears directly on the present suit.

9. In support of these and dozens of other research projects conducted at Jupiter, at USC, at Radar Research, and as an independent consultant, I have designed, fielded, analyzed and publicly discussed dozens of consumer surveys, reflecting the behaviors and attitudes of tens of thousands of consumers. Other research methodologies I have frequently employed include executive surveys, statistical modeling, network analysis, and face-to-face interviews. In addition to my research publications, I have also written journalistic articles about music and/or technology for publications including *The New York Times*, *Billboard*, *American Quarterly*, *Wired News,* and World Radio.

10. It is also worth reiterating that, during my tenure as Jupiter's chief music analyst, both Sony Music and BMG were long-standing clients (along with all the other major record labels), paying significant amounts of money for access to my expertise in the form of written research, public presentations, and face-to-face meetings.

11. I have also appeared as a visible and voluble expert on music and technology in public forums over the past decade, including the press and both academic and professional conferences. A Lexis-Nexis search for the terms "Aram Sinnreich" and "music" in news wires, major papers, and magazines retrieves over 300 articles in scores of publications. A *Google* search for the same two terms yields about 13,600 results, the majority of which appear to be news-related. I have appeared on television as an expert in these fields dozens of times, including appearances on

ABC, CBS, CNN, CNBC, MTV, and Fuji TV. Within the week prior to writing this, I have been interviewed about music and technology by both *Rolling Stone* magazine and CNBC.

12. I have appeared as a featured speaker at scores of music and technology-related conferences, including Plug.In (which I keynoted for three consecutive years), MIDEM, Music 2.0, Billboard Latin Music Summit, Billboard Dance Music Summit, NARM, the International Communication Association annual conference, and the National Communication Association conference. All told, the attendees of my public speaking engagements easily number in the tens of thousands, and include hundreds of highly-placed executives at nearly every major record label, music broadcaster, music retailer, and music technology company.

13. Finally, I have received public recognition and accolades for my expertise in the fields of music and technology. *InformationWeek* magazine voted me one of the top 15 "Innovators and Influencers" of 2001 for my research on music and technology, profiling me alongside the CEOs of Accenture and JetBlue. *Streaming Magazine* voted me one of the "50 Most Important People in Streaming" (referring to the online delivery of audio and video content). *Digital Music Weekly* referred to me as one of "15 Digital Music Industry Leaders." The chief executives at Jupiter Research awarded my music research as the best research published by the entire company in both 2000 and 2001. My academic paper on remix music technology and aesthetics was awarded the prestigious "Top Paper" award by the Critical and Cultural Studies Division of the National Communication Association in 2004. In testimonials on the Radar Research website, my research on music is highly praised by noted legal scholar Lawrence Lessig, and is called "always ahead of the curve" by the Vice President of Wireless Strategy and Operations at MTV Networks.

14. To summarize, I have a decade of professional expertise as a researcher in the fields of music and technology, as evidenced by my prior experience as an expert witness, my extensive

publications, my voluminous public record as an expert source for the press and presenter at conferences, and numerous public accolades and awards. Nearly all of this information is publicly available, and certainly available to Sony BMG (my former research clients).

## II.   Methodological Discussion

15.   The Jacobson Declaration claims that "Mr. Sinnreich himself has admitted that his opinions lack any real basis" and argues that a weblog post I authored "highlights the absence of any scientifically valid basis" for my opinions. Similarly, the Sony BMG Opposition argues that "as Mr. Sinnreich has himself admitted, his valuation methodology reflects subjective opinion" and that my valuation of the settlement terms "palpably contains nothing more than his own subjective belief and unsupported speculation." These are misrepresentations of my words, my intent, and my methods, which I will attempt to correct below.

16.   I was asked to evaluate the terms of the class action settlement. As I conveyed in my declaration, there is no definitive, scientific solution to many of the questions of valuation raised by the settlement. This is because conclusive data – and even a widely-agreed-upon methodology for producing such data – simply does not exist. This is what I meant in my declaration when I wrote that "[i]t is difficult to assign a fixed value to these attitudes among the consumer base – hence the need for a numerical proxy." This is also what I meant in my weblog post when I wrote that "I had to make arguments that were . . . impossible to firmly substantiate."

17.   These avowals are hardly a confession of failure, incompetence, "subjective opinion" or "unsubstantiated speculation" on my part, but a reasonable description of the initial conditions under which I needed to make what my weblog post referred to as "well-reasoned and well-argued" judgments. My words were describing a process by which experts such as myself commence formulating opinions based on valid reasoning and reliable methodology. In this process, I relied on my extensive expertise in the fields of music and technology (documented at length above) to make

- 5 -

well-reasoned inferences, using the most reliable methodology I could apply given the imprecise nature of my subject. As I repeatedly observed (and substantiated) in my initial declaration, I made it a matter of practice to err on the side of using conservative assumptions whenever there was any significant range of possible evaluations.

18. In short, my discussion of quantitative imprecision was not a negative reflection on my methodology and the *outcome* of my analytical efforts, but rather an accurate description of the *starting conditions* upon which I had to base my analysis.

19. The Sony BMG Opposition takes issue with a few specific valuations from my declaration (although it fails to offer alternative methodologies or valuations). I will address these specific valuations below.

20. First, the Sony BMG Opposition challenges my assessment (in ¶12 of my declaration) that offering MP3 versions of songs claimants have purchased in a DRM-encrypted CD format has an estimated value of $1.80 per title. The memorandum claims that I "conceded that he picked this number arbitrarily and that the benefit actually may be worth no more than 'a fistful of pennies.'" I never conceded any such thing. The weblog post to which this passage refers describes my questions at the *outset* of researching my declaration, not my *conclusions* at the end of the project. This is evident in the way I phrased the weblog post as a question (conveniently distorted into the form of an affirmative statement in the Sony BMG Opposition): "replacing a DRM-encrypted CD with unencrypted MP3s has a positive value for any music consumer, but how much? One dollar? Two fifty? A fistful of pennies?" All research is based upon questions like these; in fact, the practice of research would be meaningless without such questions being asked at the outset.

21. As I described in my declaration, the $1.80 figure is based on two separate estimates. Essentially, it reflects [value added by absence of DRM] minus [value subtracted by quality loss].

The first term in this equation, my estimate of the value of a CD accounted for by its absence of encryption (20%, or $2.40 given a conservative $12.00 CD retail price), was arrived at by proxy. As I have repeatedly stated, there is no methodology by which such a figure may be definitively and unequivocally established, except perhaps by creating a large-scale controlled market environment, introducing two CDs identical but for the presence or absence of DRM, making this distinction and its ramifications perfectly transparent to all consumers, and observing the resulting price differences as retailers compensate for differentials in demand. Of course, such an experiment would cost hundreds of thousands if not millions of dollars to design, conduct and analyze. Hence, as I wrote in my declaration, "the need for a numerical proxy."

22. The proxy I chose in this case was the consumer behavior most closely reflecting the degree to which consumers place value on the freedom and flexibility afforded by an absence of DRM technology: namely, "ripping" CDs to their hard drives, in order to create play lists for future playback on computers, portable music devices, and home-burned compilation CDs. This is a conservative proxy; there are many other drawbacks to DRM (*e.g.*, security concerns, mechanical difficulties, time added to the music organization process, and the long-term viability of music libraries, contingent on the ongoing support of the DRM manufacturer), which are not adequately reflected in consumers' ripping behavior. This proxy was not at all arbitrary; it was based on my long expertise in creating, fielding, and analyzing consumer surveys regarding music and technology, and in inferring second-order information about consumers from the results.

23. The figure of 20% was based on my own experience fielding consumer surveys and on conversations with researchers who are presently involved in large-scale music consumer surveys. In 2000, based on research I conducted at Jupiter, the percentage of consumers who ripped their CDs was 17%. In 2001, it was 16%. In 2002, it was 17%. In each of these years, longer online

- 7 -

tenure and higher access speeds were correlated with a significantly larger percentage of consumers ripping their CDs. Given that, in the last four years, both the online tenure and the connection speed of the average American Internet user have increased, it is logical to assume that the percentage of users who have ripped their CDs has increased as well. Current Jupiter analysts have confirmed that my assumptions are correct, based on recent survey data.

24.  The Sony BMG Opposition also falsely claims that "with no basis at all" I "'estimated'" (in quotes, to impute a lack of credibility) that consumers who rip their CDs only ascribe half of a CD's value to its digital uses, and that the remainder each ascribe one-eighth of the value to a CD's digital uses. In fact, the passage of my declaration this refers to is not an estimate at all. It is simply an attempt (characterized in my declaration by the words "if" and "we may . . . presume") to illustrate the intellectual process by which researchers such as myself create models, inferring one form of information from another.

25.  In other words, the opposing counsel have either misunderstood or mischaracterized my methodology. I arrived at my estimate of 20% by applying my expert judgment to the interpretation of survey data, not by estimating exactly what percentage of consumers ascribed exactly what percentage of value to what products. The latter exercise was merely a cross-check – a standard practice among model-builders – to see whether the model, as I constructed it, was reliable when applied to my understanding of actual music consumers based on repeated analysis of objective data. This is exactly the same standard of analysis that I – and other professional researchers with whom I have worked – commonly apply in all commercial projects. This includes the models of music industry economics I have included in nearly all of the music-related research I wrote for clients such as Sony Music and BMG.

26. As to the second term in my equation, in which I estimate that the delta between CD sound quality and MP3 sound quality accounts for approximately five percent of a CD's market value (or $0.60 cents, conservatively assuming a $12.00 retail price), it is also impossible to arrive at a definitive and unequivocal valuation in this case. As with the first term in the equation, I looked for survey data which would indicate the degree to which consumers put a premium on sound quality. According to recently published research by Jupiter, about one-third of survey respondents say that sound quality is important to them. According to another survey recently fielded by the Consumer Electronics Association (CEA), only about one-quarter of survey respondents said they could distinguish between the sound quality of a CD and an MP3.

27. These figures indicate that only a small minority of music listeners possess the capacity to make sound quality distinctions, or even care whether such distinctions exist. However, it would be unreasonable to assume that the relatively small delta in sound quality between CD and MP3 (the latter format is, after all, a "perceptual" compression algorithm, designed to remove only inaudible information) accounts for the entirety of this minority's valuation of CDs. Many sound-quality buffs, in fact, prefer vinyl, arguing that even CDs lack the necessary fidelity for an enjoyable listening experience. Thus, the percentage of a CD's total value that can be ascribed to the delta in quality between it and an MP3 must necessarily be a small minority of the total value even among the minority of consumers who prize sound quality. Knowing this, I chose to use a number that was small yet significant. Five percent (often held as the threshold of statistical significance) seemed the most appropriate estimate in this case. Once again, this figure was anything but arbitrary or subjective; I leveraged my extensive experience analyzing data about consumer attitudes and behaviors regarding music and technology in order to arrive at this estimate.

28.     Finally, the Sony BMG Opposition takes issue with my argument that 10% of the CDs covered by the class action had very likely become unplayable during the period between purchase and return.  Given my reasoning in the declaration, I fail to understand how representatives of Sony BMG could possibly argue with this estimate.  Sony BMG, like the other major labels, includes clauses assessing breakage fees of 10% to 15% in many of its recording contracts.  In essence, the Company routinely asserts in signed documents that up to 15% of CDs are *expected to* become broken in transit and storage, prior to purchase by consumers.  Given that the period following purchase is (a) longer and (b) more perilous to the CDs, which have been removed from their protective cases, than the period prior to purchase, I think that my estimate of 10% is quite conservative; far from the "wildly inflated valuations" I am accused of in the Jacobson Declaration.

29.     In short, each of the valuations I provided in my declaration (including, but not limited to, the ones addressed above) was rooted in my extensive expertise as a music and technology researcher, my long professional tenure observing and interpreting consumer behaviors and attitudes, and methodologies I have honed in the service of those roles over the past decade.

### III.    Discussion of My Weblog Posting

30.     Both the Jacobson Declaration, and the Sony BMG Opposition seize on a weblog post I published on April 24, 2006 as evidence that, in the words of the Jacobson Declaration, I have "Undermined" my "Own Opinion."  As I hope I have demonstrated above, nothing could be further from the truth.  However, I feel it is necessary to briefly address the weblog posting as a conclusion to this document.

31.     The Jacobson Declaration refers to the site of this publication as my "personal weblog." Similarly, the Sony BMG Opposition calls it my "personal blog." The weblog in question, which is titled "Radar Waves," is a professional publication, not a personal one.  The site is published by Radar Research, the firm in which I am currently a Managing Partner.

32. This site is used for a variety of functions, including marketing our company, sharing our expert analysis and recent research with our clients and the press, and providing the digital equivalent of a "soap box" from which we can quickly air opinions regarding breaking news. As such, the tone or voice of the writing on the weblog is very different from that in a court document. Primarily, it is far more informal, and not as precise in its choice of words.

33. My April 24, 2006 post, which briefly described my declaration and provided a link to a copy of it on another Web site, was written in the same informal voice I typically use for Radar Waves. The day after posting, I reviewed the site's traffic log and realized that someone had emailed the page to a large number of recipients. I immediately suspected that I had made an error in discussing the suit publicly, especially in such an informal and off-the-cuff narrative tone. I sought immediately to limit the potential damage from opportunistic attacks on my expertise and conviction (such as we have seen in the Jacobson Declaration and the Sony BMG Opposition), first by adding a disclaimer as an addendum, and then by shortening the blog post by removing all informal and opinionated language from it. Both revisions took place within 24 hours of the initial post, however not soon enough to avert exactly the kind of opportunistic attacks I had feared.

34. My expertise has been well established earlier in this document. As far as my conviction is concerned, I would observe that my decision to create a weblog post linking to the declaration was evidence of my confidence in the document, rather than any lack thereof. Further, my decision to continue linking to it, even in the face of such challenges to my professional reputation as posed by the Jacobson Declaration and the Sony BMG Opposition, indicates that I continue to stand firmly behind my conclusions.


I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct. Executed this 11TH day of May, 2006, at South Pasadena, CA.

_____
ARAM SINNREICH

T:\CasesSF\Sony NY\DEC00030854.doc

CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Reed R. Kathrein
REED R. KATHREIN

LERACH COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail: ReedK@lerachlaw.com

 Civil • Criminal • Query • Reports • Utilities • Logout 

# Mailing Information for a Case 1:05-cv-09575-NRB

# Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sanford P. Dumain**
  sdumain@milbergweiss.com

- **Jeffrey S. Jacobson**
  jsjacobs@debevoise.com mmgrimes@debevoise.com

- **Scott Adam Kamber**
  skamber@kolaw.com

- **Jonathan K. Levine**
  jkl@girardgibbs.com dcg@girardgibbs.com;ams@girardgibbs.com;ale@girardgibbs.com; cme@girardgibbs.com;zml@girardgibbs.com;ajd@girardgibbs.com

- **Ira M. Press**
  ipress@kmslaw.com

- **Shana Eve Scarlett**
  shanas@lerachlaw.com

- **Jason Louis Solotaroff**
  jsolotaroff@gslawny.com

- **Mark A. Strauss**
  mstrauss@kmslaw.com lmorris@kmslaw.com

# Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Cindy A. Cohn
```

Legal Director of the Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

**Lawrence E. Feldman**
Lawrence E. Feldman & Associates
432 Tulpehocken Avenue
Elkins Park, PA 19027

**Jeff D. Friedman**
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street
Suite 2600
San Francisco, CA 94111

**Daniel C. Girard**
Girard, Gibbs & De Bartolomeo, L.L.P.
601 California Street
Suite 1400
San Francisco, CA 94108

**Robert S. Green**
Green Welling LLP
595 Market Street
Suite 2750
San Francisco, CA 94105

**Reed R. Kathrein**
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street
Suite 2600
San Francisco, CA 94111

**Elizabeth Pritzker**
Girard, Gibbs & De Bartolomeo, L.L.P.
601 California Street
Suite 1400
San Francisco, CA 94108

**Peter G.A. Safirstein**
Milberg Weiss Bershad & Schulman LLP (NYC)
One Pennsylvania Plaza
New York, NY 10119

**Jenelle Welling**

Green Welling LLP
595 Market Street
Suite 2750
San Francisco, CA 94105